# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | | |
|---|---|---|
| COLLEEN WITMER, Derivatively on Behalf of SCANA CORPORATION, | ) ) ) | CIVIL ACTION NO.:  3:17-3166-MBS |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KEVIN B. MARSH, GREGORY E. ALIFF, JAMES A. BENNETT, JOHN F.A.V. CECIL, SHARON A. DECKER, D. MAYBANK HAGOOD, LYNNE M. MILLER, JAMES W. ROQUEMORE, MACEO K. SLOAN, ALFREDO TRUJILLO, STEPHEN A. BYRNE, and JIMMY E. ADDISON, | ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |
| -and- | ) ) | |
| SCANA CORPORATION, a South Carolina corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

1.     This is a shareholder derivative action brought by Colleen Witmer ("Plaintiff") on

behalf of nominal defendant SCANA Corporation ("SCANA" or the "Company") against certain

of its current and former officers and directors for breaches of fiduciary duty and unjust enrichment

that damaged the Company's reputation and goodwill.  From at least 2016 through the present (the

"Relevant Period"), the Individual Defendants (as defined herein) have exposed the Company to

liability for violations of federal securities laws, and federal and state consumer protection laws,

subjecting SCANA to a securities fraud class action lawsuit in this Court and a government investigation concerning the Company's lending practices.

## SUMMARY OF THE ACTION

2.      SCANA is an energy-based holding company whose principal subsidiary, South Carolina Electric & Gas Company ("SCE&G"), is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.

3.      During the Relevant Period, Defendants artificially drove up the price of SCANA's stock by issuing false and misleading statements to investors, and omitting material information, concerning the progress, cost, and completion schedule of the multi-billion dollar nuclear construction project at V.C. Summer Nuclear Station (the "Nuclear Project") in Fairfield County, South Carolina. Defendants, including Kevin B. Marsh ("Marsh") and Stephen A. Byrne ("Byrne"), SCANA's Chief Executive Officer ("CEO"), repeatedly misled investors through various press events, press releases, investor conference calls, meetings with public officials, and filings with the SEC and other regulatory agencies, about the true status of the Nuclear Project. Indeed, rather than disclose to the market that the Nuclear Project was facing serious design, construction, and cost headwinds as described in a secret, 130-page report issued by Bechtel Corporation ("Bechtel") on February 5, 2016 (the "Bechtel Report"), Defendants doubled down on their strategy of deception and misdirection by issuing SCANA produced promotional videos, press releases, and other public statements that created a fundamentally false and misleading impression to investors that the project was running smoothly within a reasonable budget and on schedule.

4.      Yet, as only recently disclosed to investors, for much of the Nuclear Project's history, a formal construction schedule was never in place and costs were spiraling out of control. In addition to material misstatements and omissions about the status and progress of the Nuclear

Project, Defendants also issued false and misleading statements and omitted material information, concerning the financial health of its lead contractor for the project, Westinghouse Electric Company ("Westinghouse"). For example, long before Westinghouse sought bankruptcy protection on March 29, 2017, Defendants harbored grave concerns about Westinghouse's financial viability to continue the construction of the project. This too was never disclosed to investors and was otherwise masked by Defendants' deliberate misinformation campaign to create the false impression to investors and other stakeholders that the project had reached significant milestones and was moving forward as planned.

5.      Meanwhile, while the Individual Defendants either knew or were negligent in not knowing that the Nuclear Project was in jeopardy, the SCANA Board of Directors' (the "Board's") Compensation Committee approved large raises for both management (including Marsh and Byrne) and *each* of the current directors of SCANA.

6.      Accordingly, the Company has been harmed.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

8.      This Court has personal jurisdiction over each of the Defendants because each is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this district pursuant to 28 U.S.C.§ 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary

participation in the wrongful acts detailed herein, occurred in this district. Moreover, one or more of the Defendants either reside in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

10.    Plaintiff is a current shareholder of SCANA and has continuously held SCANA stock since July 2015. Plaintiff is a resident of Pennsylvania.

11.    Nominal defendant SCANA is a South Carolina corporation with principal executive offices located at 220 Operation Way, Cayce, South Carolina 29033-3701. SCANA is a citizen of South Carolina.

12.    Defendant Kevin Marsh ("Marsh") is the Chairman of SCANA's Board and it Chief Executive Officer ("CEO"). Upon information and belief Marsh is a citizen of South Carolina.

13.    Defendant Gregory E. Aliff ("Aliff") has served as a director of the Company since 2015. During the Relevant Period, Aliff served as the Chairman of the Company's Audit Committee and is a member of the Company's Executive and Nominating and Governance Committees. Upon information and belief Aliff is a citizen of Virginia.

14.    Defendant James A. Bennett ("Bennett") has served as a director of the Company since 1997. During the Relevant Period, Bennett served as the Chairman of the Company's Compensation Committee and is a member of the Company's Executive and Audit Committees. Upon information and belief Bennett is a citizen of South Carolina.

15.    Defendant John F.A.V. Cecil ("Cecil") has served as a director of the Company since 2013. During the Relevant Period, Cecil served on the Company's Audit and Compensation Committees. Upon information and belief Cecil is a citizen of North Carolina.

16.     Defendant Sharon A. Decker ("Decker") has served as a director of the Company since 2015. During the Relevant Period, Decker served on the Company's Compensation and Nuclear Oversight Committee.  Upon information and belief Decker is a citizen of North Carolina.

17.     Defendant D. Maybank Hagood ("Hagood") has served as a director of the Company since 1999. During the Relevant Period, Hagood serves as the Board's Lead Independent Director and serves on the Company's Executive, Nuclear Oversight, and Nominating and Governance Committees.  Upon information and belief Hagood is a citizen of South Carolina.

18.     Defendant Lynne M. Miller ("Miller") has served as a director of the Company since 1997. During the Relevant Period, Miller served on the Company's Audit and Nominating and Governance Committees.  Upon information and belief Miller is a citizen of Virginia.

19.     Defendant James W. Roquemore ("Roquemore") has served as a director of the Company since 2007.  During the Relevant Period, Roquemore served as the Chairman of the Company's Nuclear Oversight Committee and on the Company's Executive and Compensation Committees.  Upon information and belief Roquemore is a citizen of South Carolina.

20.     Defendant Maceo K. Sloan ("Sloan") has served as a director of the Company since 1997.  During the Relevant Period, Sloan served on the Company's Nuclear Oversight and Compensation Committees.  Upon information and belief Sloan is a citizen of North Carolina.

21.     Defendant Alfredo Trujillo ("Trujillo") has served as a director of the Company since 2013. During the Relevant Period, Trujillo served on the Company's Nuclear Oversight and Nominating and Governance Committee.  Upon information and belief Trujillo is a citizen of Georgia.

22.     Defendant Jimmy E. Addison ("Addison") currently serves as the Company's Chief Financial Officer ("CFO").  Upon information and belief Addison is a citizen of South Carolina.

23.    Defendant Byrne currently serves as the Chief Operating Officer of South Carolina Electric and Gas and Executive Vice President at SCANA.  Upon information and belief Byrne is a citizen of South Carolina.

24.    The defendants identified in ¶¶12-23 are collectively referred to herein as the "Individual Defendants."

25.    Defendants Marsh, Aliff, Bennett, Cecil, Hagood, Decker, Miller, Roquemore, Sloan and Trujillo are collectively referred to herein as the "Director Defendants."

26.    Defendants Aliff, Bennett, Cecil, and Miller are collectively referred to herein as the Audit Committee Defendants.

27.    Defendants Bennett, Cecil, Decker, Roquemore, and Sloan are collectively referred to herein as the Compensation Committee Defendants

28.    As directors and/or officers of SCANA, the Individual Defendants either knew, consciously disregarded, or were reckless and grossly negligent in not knowing or should have known the adverse, non-public information about SCANA's business, operations, prospects, internal controls, and financials, including the Company's failed prospect for the Nuclear Project, because of their access to internal corporate documents, conversations and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and committee meetings thereof, as well as reports and other information provided to them in connection therewith. The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon SCANA through, *inter alia*, the issuance of the improper statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and SCANA stockholders.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors, and/or fiduciaries of SCANA, and because of their ability to control the business and corporate affairs of SCANA, the Individual Defendants owed and owe SCANA and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SCANA in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of SCANA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     To discharge their duties, the officers and directors of SCANA were, and are, required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of SCANA were required to, among other things: (i) properly and accurately represent to investors and analysts the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health; (ii) ensure that the Company complied with its legal obligations and requirements, including complying with regulatory requirements and disseminating truthful and accurate statements to the investing public; (iii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality business performance, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (iv) remain informed as to how SCANA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and (v) ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

31.     Further, each officer and director of the Company owes to SCANA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had, and have, a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Breaches of Duties**

32.     The conduct of the Individual Defendants complained of herein involves knowing and culpable violations of their obligations as officers and directors of SCANA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.     The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing public and artificially inflating and maintaining the market price of SCANA's securities by making untrue statements and omissions about the Nuclear Project, and engaging in and concealing deceitful business and lending practices.

34.     The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, the Securities Class Action. As a result of this and other breaches of fiduciary duties, SCANA has expended, and will continue to expend, significant sums of money.

35.      Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of SCANA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to SCANA.

**The Compensation Committee**

36.      The charter of SCANA's Compensation Committee (the "Compensation Committee Charter") details that it is the Compensation Committee's purpose is "to assist the Board in the oversight of matters relating to compensation plans, compensation of SCANA's executives, SCANA's long-term strategic plans and performance in regard to management of human resources."

37.      Specifically, the Compensation Committee is charged with the following duties:

- Recommend to the Board salary and compensation levels, including fringe benefits, for all officers of SCANA and its subsidiaries;

- Review and make recommendations to the Board with respect to all SCANA executive compensation plans, including incentive compensation plans and equity based plans;

- Review SCANA's operating performance relative to the bonus and incentive programs;

- Review and approve corporate goals and objectives with respect to the compensation of the Chief Executive Officer, evaluate the Chief Executive Officer's performance in light of those goals and objectives and, either as a Committee or together with the other independent directors (as directed by the Board), determine and approve the Chief Executive Officer's compensation based on this evaluation

**The Audit Committee**

38.      The charter of SCANA's Audit Committee (the "Audit Committee Charter") states that the Audit Committee's purpose is to, among other things, "assist the Board in overseeing the integrity of SCANA's financial statements, ***SCANA's compliance with legal and regulatory requirements***..."

39. Specifically, the Audit Committee's include the following:

- Review with management and the external auditors the matters required by applicable professional and auditing standards relating to the conduct of the audit, including: (a) major issues regarding accounting principles and financial statement presentation, any significant changes in SCANA's selection or application of accounting principles, any major issues as to the adequacy of SCANA's internal controls and any special audit steps adopted in light of material control deficiencies; (b) issues relating to, and analyses prepared by management and/or the external auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including the development, selection and disclosures of critical accounting estimates and analyses of the use of alternative assumptions, estimates or Generally Accepted Accounting Principles ("GAAP") methods and their effects on the financial statements; (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements; and (d) the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information) and the financial information used as the basis for earnings guidance and briefings to analysts and rating agencies.

- Review with any disclosure committee of SCANA the effectiveness of SCANA's disclosure controls and procedures.

- Review and discuss with management and the external auditors the annual audited financial statements, including the disclosures to be made under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board the inclusion of the audited financial statements in the Form 10-K, if appropriate; and

- Discuss SCANA's major financial risk exposures and the steps management has taken to monitor and control such exposures.

## SUBSTANTIVE ALLEGATIONS

40. SCANA is an energy-based holding company whose principal subsidiary, SCE&G, is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.

41. On March 27, 2008, South Carolina Electric & Gas applied to the Nuclear Regulatory Commission ("NRC") for a Combined Construction and Operating License to build

two 1,100 MW AP1000 pressurized water reactors at the site Virgil C. Summer Nuclear Generating Station. The construction was approved by the NRC in March 2012.

42.    On January 19, 2016, SCANA issued a press release and video "Highlighting a Year of Progress for V.C. Summer Units 2 and 3." The press release touted the "achievement" of several "milestones" for "V.C. Summer," stating that "[t]he nuclear construction team concluded the year on a high note," and noted that "work continued steadily on the construction site . . . ."

43.    On February 5, 2016, Bechtel delivered the secretly commissioned Bechtel Report to SCANA and SCE&G. In the report, which was never made public until September 4, 2017, Bechtel informed SCANA and SCE&G that Westinghouse lacked a legitimate schedule to build the reactors:

> [T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC and major project management issues that must be resolved for project success:
>
> - While the Consortium's engineering, procurement, and construction plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.
>
> - The Consortium's project management approach does not provide appropriate visibility and accuracy to the Owners on project progress and performance.
>
> - There is a lack of a shared vision, goals, and accountability between the Owners and the Consortium.
>
> - The Consortium lacks the project management integration needed for a successful protect outcome.
>
> - The WEC-CB&I relationship is strained, caused to a large extent by commercial issues.
>
> - The overall morale on the project is low.
>
> - The Contract does not appear to be serving the Owners or the Consortium particularly well.
>
> - The issued design is often not constructible resulting in a significant number of changes. The construction planning and constructability review efforts are not far enough out in front of the construction effort to minimize impacts.

- There is significant engineering and licensing workload remaining (currently over 800 engineers) ITAAC closure will be a significant effort.

- Emergent issues potentially requiring NRC approval of LARs remain a significant project concern.

- There is a significant disconnect between construction need dates and procurement delivery dates.

- The amount of stored material onsite is significant, creating the need for an extended storage and maintenance program.

- Construction productivity is poor for various reasons including changes needed to the design sustained overtime, complicated work packages, aging workforce etc.

- The indirect to direct craft ratio is high.

- Field non-manual turnover is high.

- The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance.

- The schedule for the startup test program is in the early stages of development. The BIP turnover rate appears to be overly aggressive.  The Consortium's forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis.

44.     In March 2016, a month after receiving the Bechtel Report, ***Defendant Marsh stated in a letter to shareholders that "[SCANA] continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."***

45.     On April 28, 2016, SCANA held a conference call with analysts and investors to discuss the Company's first quarter 2016 earnings and operations. During the conference call, Defendant Byrne answered an analyst's questions regarding SCE&G's progress in constructing the V.C. Summer reactors. Byrne reassured the analyst that SCE&G's contractors were "doing a tremendous job" and that progress was "better than we expected."

[**Analyst**]: Okay. And then, I think you mentioned on the nuclear that the current critical path item is the shield building. And I know that in your report that you filed in February that was mentioned there as well. ***I was just wondering if you could update us on the status of that in terms of the components that are being fabricated, and so forth.***

[**Defendant Byrne**]: ***Yes. Dan, the shield building is going probably better than we had anticipated.*** Our concern for the shield building really came from the contractor, their concerns, and at the time, that was Chicago Bridge and Iron. Now, Fluor has taken over. But we still retained the CB&I Services crew that is doing that welding. So even though CB&I Power exited the Consortium, the CB&I Services folks who are doing the containment vessel welding and the shield building welding stay. ***They're doing a tremendous job.***

\*\*\*

***So overall, I'd say the shield building's going a little better than we expected***

46.    On May 1, 2016, Santee Cooper CEO Lonnie Carter sent a private letter to Jose Gutierrez, the interim President and CEO of Westinghouse: "Unfortunately, our experience with Westinghouse. . . has been set in a trend of continuous deceit and non-transparency.

47.    In June 2016, Defendant Marsh sent a private email to Mamoru Hatazawa, Executive Officer of Toshiba Corporation (the parent company of Westinghouse) as follows: "We have no doubt that we have been the victim of financial malfeasance by [Westinghouse] and Toshiba." In another email on June 8, 2016, March informed Mr. Hatazawa that "[w]e continue to be taken aback by what we see as Toshiba's lack of respect" and stating that Toshiba "is not acting honorably."

48.    On or around June 30, 2016, SCANA issued a "V.C. Summer Nuclear Station Units 2 & 3 Quarterly Report" to the South Carolina Office of Regulatory Staff ("ORS"). This report stated that "[w]hile certain aspects of the work present challenges to the completion schedule, overall progress continues…"

49.     On July 28, 2016, SCANA held a conference call with analysts and investors to discuss the Company's second quarter 2016 earnings and operations. During the conference call, Defendant Byrne answered an analyst's questions regarding the "timeline and schedule on the project and specifically on the milestones" and "ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project." Byrne reassured the analyst that the reactors' "guaranteed substantial completion dates remained" the same and that he did not "expect anything dramatic to come from" Westinghouse's recent change in subcontractors:

> [**Analyst**]: So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones, if you could provide a little bit more of an update there; and ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project.

> [**Defendant Byrne**]: Yes, Julien, this is Steve. ***The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3. We don't see anything to change those.*** Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and they will be giving that to Westinghouse. And remember that on the project now, we're dealing just with Westinghouse; Fluor is a subcontractor to Westinghouse. I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates. ***So I don't expect anything dramatic to come from that.***

50.     On October 7, 2016, SCE&G "[p]ublished" a video on YouTube of Defendant Marsh speaking to reporters on September 21, 2016, at the "V.C. Summer Media Day 2016." In the video, Defendant Marsh stated: ***"Well they say well if you could do it again, would you make the same decision? And absolutely I would make the same decision. I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future." Marsh further stated that "with projects of this nature, you're gonna have some***

*challenges... but we've been able to meet those challenges, make adjustments to the contract,*

*and continue progress on the project."* Marsh reiterated.

> *We're excited about where we are, we've had challenges, we've been able to work through those challenges,* because you're not gonna go through a project that's gonna be ten or twelve years without issues come up. I would offer if you've ever built a house, whether it took twelve months or eighteen months, you had a couple issues, you had a couple of change orders along the way, and the likelihood is that didn't reduce the cost of your house as you went through that process

51.    On October 27, 2016, SCANA held a conference call with analysts and investors to discuss the Company's third quarter 2016 earnings and operations. During the conference call, Defendant Byrne answered an analyst's questions regarding whether Westinghouse's subcontractor to build the nuclear reactors was "maybe having some troubles in terms of staffing up for the evening shift. . . ."  Byrne reassured the analyst that the reactors' "guaranteed substantial completion dates remained" the same and that he did not "expect anything dramatic to come from" Westinghouse's recent change in subcontractors. Byrne reassured the analyst that Westinghouse's subcontractor was "doing a good job"; that "we're very happy with what [the subcontractor] is doing for us"; and that the subcontractor has "been very successful recently":

> [**Analyst**]: Okay. And then I think in your last update report, there was also some discussion about Fluor maybe having some troubles in terms of staffing up for the evening shift or whatever. I wondered if you could update us on that.

> [**Defendant Byrne**]: Yes, Fluor, when they first came in, identified the need to increase staffing and wanted to staff a full back-shift or night-shift because we'd been operating with a skeleton crew night-shift or back-shift up to that point. Initially, they had some difficulty in hiring, but I'd say that they recently have rectified that. . . . *So they're doing a good job.* They're trying some innovative things, implementing multilingual workforces, those kinds of things. *So we're very happy with what Fluor is doing for us. So they've been very successful recently.*

52.    Also on October 27, 2016, SCANA issue a video on YouTube titled "SCE&G Welcomes News Media to Nuclear Construction Site" featuring "members of the V.C. Summer leadership team." In the video, Defendant Byrne spoke to reporters on September 21, 2016, at the

"V.C. Summer Media Day 2016." Byrne "gave the journalists an overview of the massive construction site before they boarded a bus to see it for themselves." Holding a microphone, Byrne stated: "The pace of this project is quickening. Though we have run into some issues and roadblocks in the past, most of those issues and roadblocks are behind us."

53.     On February 14, 2017, Toshiba announced that it would delay the release of its quarterly earnings report due to concerns around the company's accounting controls, specifically as they related to its U.S. nuclear subsidiary Westinghouse, which Toshiba estimated would require it to take a $6.3 billion write-down related to SCANA's nuclear project. Toshiba's chairman, Shigenori Shiga, announced his resignation to take responsibility for the massive write-down.

54.     Also on February 14, 2017, SCANA issued a quarterly report to the ORS that included "a revised completion schedule" for the two Nuclear Project reactors "of April 2020 and December 2020" – later than the previous completion dates of August 2019 and August 2020.

55.     Upon these and other revelations, SCANA's stock price fell approximately 6.25%, or $4.38 per share, from a closing price of $70.03 on February 13, 2017, to a closing price of $65.65 on February 17, 2017.

56.     Despite these announcements which revealed some – but not the full extent – of the troubles affecting SCANA, Westinghouse, Toshiba, and the Nuclear Project, Defendants continued to make false and misleading statements to the market.

57.     On February 16, 2017, SCANA held a conference call with analysts and investors to discuss the Company's first quarter 2017 earnings and operations. During the conference call, Defendant Marsh stated that "we still anticipate completing our two new nuclear units" and that "we are making substantial progress on these new plants":

We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, *we still anticipate completing our two new nuclear units*, which will enable us to provide our customers with safe, reliable energy for decades to come.... *As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again we will continue to monitor this situation closely and will alert you if we are made aware of any changes*

58.     During the same call, Defendant Byrne reassured analysts that SCANA would still reach its "2020 deadline" because "efficiency factors have increased significantly," things were "going much, much more smoothly," and that "we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us." Specifically, Byrne stated as follows.

> [**Defendant Byrne**]: . . . When you say the second unit, you talking about the second new unit or are you talking about Unit 2, which is the first new unit?
> [**Analyst**]: Sorry. Yes, the second new unit and the –
> [**Defendant Byrne**]: Second new unit.
> [**Analyst**]: -- 2020 deadline

> [**Defendant Byrne**]: Yes. *So what we've seen so far is that the efficiency factors have increased significantly. . . and it's going much, much more smoothly. So I have a reasonable confidence in the efficiency gains for the second new unit.*

* * *

> [**Analyst**]: And also, I think in an earlier question you were talking about the various critical paths, activities that you have coming up here over the first half of this year and going forward. How close are you guys to getting to the point where the construction project is, like now becomes a more traditional construction project in the nuclear in and of itself is no longer like the defining factor in terms of getting from here to there?

> [**Defendant Byrne**]: *Yes. I think we're actually pretty close to that. . . . I think we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us.*

59.     Between February 28 and March 2, 2017, SCANA attended the 2017 UBS & Morgan Stanley Utilities Conferences, at which the Company published a "2017 UBS & Morgan Stanley Utilities Conferences Presentation" for investors and industry analysts. This presentation

included the following slide, which graphically showed that SCANA's "Current Position" on the "Manufacturing Shield" for the V.C. Summers reactors was nearly complete:



60.    On March 29, 2017, Westinghouse filed to reorganize its business under the protection of Chapter 11 of the U.S. Bankruptcy Code.

61.    On April 12, 2017, Defendants March, Addison, and Byrne gave an "Ex Parte Briefing" to the Public Service Commission ("PSC") concerning Westinghouse's March 29 bankruptcy filing. During the briefing, Defendant Byrne stated that "[s]ince the bankruptcy, Westinghouse has been generally cooperative and responsive to our requests for information"; that "we expect this cooperation to continue"; and that "work continues on-site without substantial disruption."

62. During the briefing to the PSC, Defendants presented another slide to the PSC showing that the "Manufacturing Completion Schedule" for the V.C. Summer reactors was nearing completion:



63. On July 31, 2017, SCANA publicly announced that it would abandon construction of the nuclear project because of delays and cost overruns.

64. On August 2, 2017, *The Post and Courier* published an article titled "S.C. lawmakers want SCANA stockholders to eat costs of two failed nuclear reactors." The article stated:

> A bipartisan group of legislators met in the Statehouse on Wednesday to condemn utility regulators, the executives of SCANA and the board of the state-operated utility Santee Cooper, which partnered on the V.C. Summer expansion projects more than a decade ago.
>
> Many of the lawmakers went a step further, claiming they will investigate how to stop the executives and investors of SCANA — the parent company of [SCE&G] — from charging customers between $2 billion to nearly $5 billion in costs over

the next 60 years for the wasted concrete, steel and labor pumped into the unfinished reactors.

65.    On August 4, 2017, South Carolina Attorney General Alan Wilson announced that he was opening an investigation and state Senate leaders called for a special legislative session to investigate SCANA's abandonment of the Nuclear Project.

66.    In response to these announcements, SCANA's stock price fell approximately 5%, or $3.36 per share, to close at $63.79 per share on August 4, 2017, after several days of unusually heavy trading volume.

67.    On August 10, 2017, *The Post and Courier* published a "Top Story" article entitled "CEO: SCANA may not return to scuttled nuclear project — even if a new partner emerges." The article reported on Defendant Marsh's comments to state lawmakers that "he wasn't sure he would want to take the project back up after it fell years behind schedule and its costs soared billions of dollars over budget."

68.    On this news, SCANA's stock price fell approximately 2.1%, or $1.32 per share, to close at $60.69 per share on August 11, 2017.

69.    The same day, *Seeking Alpha* published an article commenting on Defendant Marsh's announcement. The article stated that "[a]bandonment of nuclear plant under construction is a dramatic and unexpected move that is meeting political uproar." The article further stated that "[SCANA] had made no indication that they were considering abandonment. Even the Regulators were taken by surprise. In fact, the Chairman of the Public Service Commission of South Carolina was quoted as asking senior management at an ex parte briefing "are the three of you aware that this Commission was blindsided yesterday by this news?"

70.     On August 31, 2017, *The Post and Courier* published an article titled "Secretive report on South Carolina nuclear reactor construction never given to state utility regulators." The article stated:

> SCANA Corp. may have misled state utility regulators about the existence of a secretive report that detailed construction failures at two troubled nuclear reactors at the V.C. Summer station in Fairfield County, months before the $9 billion energy project was abandoned.
>
> The director of the state Office of Regulatory Staff told *The Post and Courier* on Thursday that SCANA officials repeatedly told state agency employees they didn't have a copy of a report that was produced by Bechtel Corp., an engineering and project management company that observed the nuclear construction near Jenkinsville in past years.
>
> "They have continued to ask for it," said Dukes Scott, the regulatory staff director. "As we asked for it, they never said, 'Yes, here it is.'"
>
> Those state regulators were surprised last week when SCANA and Santee Cooper officials admitted under oath in a Senate hearing the document did exist, and they were again denied access to it by SCANA, who is now claiming it as legally privileged information.
>
> Eric Boomhower, a communications director for SCANA, said the reason the company is treating the document as privileged information is because the investor-owned utility and Santee Cooper hired Bechtel in anticipation of suing Westinghouse, the designer of the reactors and the primary contractor at V.C. Summer.
>
> "SCANA prefers to respect the legislative review process by not commenting on its actions in response to the report at this time," Boomhower added.
>
> Santee Cooper, which isn't overseen by state utility regulators, didn't respond to questions sent from the newspaper this week about the report.
>
> Lawmakers on two special legislative committees in the S.C. House and Senate have requested the document. It reportedly points out problems with the reactors' construction and offered recommendations of how to correct the nuclear build-out that was abandoned at the end of July.
>
> The exact findings of the report are not known but lawmakers hope the previously undisclosed document will shed some light into why electric customers are paying for two unfinished nuclear reactors that are only 30 percent complete and lacked a legitimate construction schedule.

Roughly 5,000 workers were fired at V.C. Summer when investor-owned SCANA and state-run Santee Cooper pulled the plug on the decade-long construction effort that was supposed to usher in a new age of nuclear power in the United States.

But to this point, nobody outside the two partnering utilities has seen the report. Gov. Henry McMaster, who oversees the 11-member board of Santee Cooper, knew nothing of it before last week. Later Thursday, McMaster sent a letter to Santee Cooper Chairman Leighton Lord asking for a copy of the report immediately.

Members of the state's regulatory staff heard about the report, compiled by Bechtel, the country's largest construction and civil engineering company, through conversations with workers at the V.C. Summer site in past years. But when the utility watchdog agency inquired about the document, Scott said his staff was told by SCANA officials that the utility didn't have a physical copy of any report.

SCANA employees informed state regulators that Bechtel had only orally communicated with them about the San Francisco-based company's work at V.C. Summer, Scott said.

Much is still unknown about Bechtel's work, including who paid for the report, what date Bechtel started its analysis, when it was completed, who it was delivered to and what problems it pointed out.

The report was initiated after Santee Cooper, the minority owner of the now-canceled reactors, pushed to have a third-party company analyze the construction effort, according to Lord.

By that point, the project had already seen one temporary construction schedule after another fail and the total cost for the two reactors increase dramatically.

Lord didn't go into detail about what findings or recommendations were contained in the report, but he told The Post and Courier it led Santee Cooper's board to issue a call for an independent construction monitor at the V.C. Summer site.

SCANA, which was primarily in charge of building and starting the reactors, rejected the call to hire a third-party construction monitor, according to Santee Cooper's chairman.

SCANA's failure to provide the state's utility regulators with the report has raised questions from state lawmakers leading the special committees.

"Some things just aren't quite adding up," said Rep. Russell Ott, a St. Matthews Democrat who co-chairs the House committee. "If a report surfaces, then we are going to have a situation where we will have to find out who is telling the truth."

SCANA and Santee Cooper have yet to hand over the report to senators and representatives investigating the nuclear plant debacle. But the committees have threatened to subpoena the document if the utilities don't comply. The Senate asked for the utilities to hand over the document by Sept. 7.

"We understand the Senate committee has indicated they plan to issue a subpoena for production of this document," the House committee wrote in their letter to the utilities. "We would hope to avoid that process but are willing and able to issue our own subpoena if forced to."

*The Post and Courier* has requested the report through the state's Freedom of Information Act.

McMaster, who has been pushing for a sale of Santee Cooper since the reactors were cancelled last month, said he's asked the state-run utility to produce whatever documents lawmakers need to investigate the reactors' failure.

"We've asked Santee Cooper to be forthcoming with information," McMaster said. "There are some things by law or agreement they can do, some things they can't, but our intention is to get every piece of information that would be of any interest at all to these people, these companies who are interested in purchasing some or all of Santee Cooper or entering into any other kind of agreement."

71.    On September 4, 2017 Governor McMaster publicly released the Bechtel Report over the objections of SCANA.

72.    On September 22, 2017, South Carolina Attorney General Alan Wilson requested that the State Law Enforcement Division ("SLED") launch a criminal investigation related to the Nuclear Project.

73.    On October 17, 2017 the Company announced that SCANA had been served with a document subpoena by the SEC. The October 17, 2017 press release stated:

Cayce, SC, October 17, 2017… SCANA Corporation (SCANA) (NYSE:SCG) announced today that SCANA and its subsidiaries (the "Company") have been served with a document subpoena issued by the staff of the Securities and Exchange Commission in connection with an investigation they are conducting relating to the new nuclear project at V. C. Summer Nuclear Station. The Company intends to fully cooperate with the investigation. No assurance can be given as to the timing or outcome of this matter.

74.    Despite the failure of the Nuclear Project, which continues to cost South Carolinians money and jobs, the Defendants were well compensated. According to the *Post and Courier*:

Since 2009, when work began on the V.C. Summer project, current and former outside directors have earned a combined $11 million in stock and cash for their

services, such as attending quarterly meetings and other required business gatherings, according to filings with the Securities and Exchange Commission.

Their latest raise took effect in mid-2016, after they bumped their annual retainer by $26,000, to $213,000, not including extra fees they can earn by attending special meetings and chairing committees.

At the same time, the board boosted the compensation for the five senior managers at SCANA, including base salaries and bonuses, by an average of 7 percent, to a total of $14 million last year. A board committee approved those increases in February 2016, the same month the so-called Bechtel report that SCANA had commissioned was completed.

75.    Specifically, Marsh and Byrne received additional compensation as part of the Company's Short-Term Incentive Program.  As the Company's 2017 Proxy stated, each of Marsh's and Byrne's "award was based on his oversight and support of new nuclear construction activities."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.    Plaintiff brings this action derivatively in the right and for the benefit of SCANA to redress injuries suffered, and to be suffered, by SCANA as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.

77.    SCANA is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

78.    Plaintiff will adequately and fairly represent the interests of SCANA in enforcing and prosecuting its rights.

79.    Plaintiff was a shareholder of SCANA at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is currently a SCANA shareholder.

80.    Plaintiff has not made any demand on the Board of SCANA to institute this action. SCANA is a publicly traded company with thousands of shareholders and millions of shares outstanding.

81.    The current Board of SCANA consists of the following ten (10) directors: Director Defendants Marsh, Aliff, Bennett, Cecil, Hagood, Decker, Miller, Roquemore, Sloan and Trujillo. There is reason to doubt that a majority of the Board could independently evaluate a pre-suit demand:

A.    There is reason to doubt that Marsh can independently evaluate a pre-suit demand because Marsh's principal professional occupation is his employment with SCANA. According to the Company's March 24, 2017 Proxy Statement filed with the SEC (the "2017 Proxy"), Marsh received over $6 million in total compensation in 2016. There is also reason to doubt that Marsh can independently evaluate a pre-suit demand because the Board has publicly stated Marsh is not independent. In the 2017 Proxy the Board has admitted that Marsh is not independent under the New York Stock Exchange Rules.  Further, Marsh faces a substantial likelihood of liability for issuing false and misleading statements regarding the progress of the Nuclear Project.

B.    The Audit Committee Defendants (Aliff, Bennett, Cecil, and Miller) face a substantial likelihood of liability for their failure to fulfill their duties as outlined in the Audit Committee Charter.  The Audit Committee Defendants were tasked with overseeing the Company's internal controls and assessing the Company's financial risk exposure.  The Audit Committee Defendants, through their knowing or negligent disregard of the conclusions reached in the Bechtel Report, permitted the Company to be materially exposed.

C.    The Compensation Committee Defendants (Bennett, Cecil, Decker, Roquemore, and Sloan) face a substantial likelihood of liability for their approval of additional compensation both to their fellow directors and the Short Term Incentive Program with respect to Marsh and Byrne which "was based on his oversight and support of new nuclear construction activities." The Compensation Committee Defendants either knew from the Bechtel Report reflected that there was no proper oversight of the Nuclear Project or was negligent in not performing the requisite due diligence before authorizing the additional compensation.

## COUNT I

### BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

82.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

83.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that SCANA disseminated accurate, truthful and complete information to its shareholders.

84.     The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing, or allowing, the Company to disseminate to SCANA shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein, including misstatements regarding the progress of the Nuclear Project. Causing and allowing these misstatements to occur could not have been a good faith exercise of prudent business judgment.

85.     The Individual Defendants caused and allowed SCANA to improperly withhold from the public the findings of the Bechtel Report though its findings had a material effect on the Company.

86.     As a direct and proximate result of Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

87.     Plaintiff, on behalf of SCANA, has no adequate remedy at law.

## COUNT II

## BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

88.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

89.     As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company maintained adequate internal controls and, when put on notice of problems with the Company's business practices and operations, including specific knowledge that SCANA engaged in unlawful corporate conduct, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

90.     The Individual Defendants willfully ignored the obvious and pervasive problems with the Nuclear Project and failed to make a good faith effort to correct the problems or their recurrence.

91.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

92.     Plaintiff, on behalf of SCANA, has no adequate remedy at law.

## COUNT III

**BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY**

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

95.     As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, SCANA has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

96.     As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

97.     Plaintiff, on behalf of SCANA, has no adequate remedy at law.

## COUNT IV

**UNJUST ENRICHMENT**

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense and to the detriment of SCANA. The Individual Defendants received

excessive compensation and bonuses due to the ongoing and pervasive violations of law at the Company.

100.     Plaintiff, as a shareholder and representative of SCANA, seeks restitution from these Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

B.     Directing SCANA to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to SCANA restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

**HOPKINS LAW FIRM, LLC**

*s/ William E. Hopkins, Jr.*
William E. Hopkins, Jr., Fed ID No. 06075
12019 Ocean Highway
Post Office Box 1885
Pawleys Island, South Carolina 29585
(843) 314-4202 – Telephone
(843) 314-9365 – Facsimile
bill@hopkinsfirm.com

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
First Floor
Berwyn, Pennsylvania 19312
(610) 225-2677 – Telephone
(610) 408-8062 – Facsimile

***Attorneys for Plaintiff***

November 21, 2017