# Exhibit 38

STATE OF SOUTH CAROLINA

COUNTY OF RICHLAND

IN THE COURT OF COMMON PLEAS
FOR THE FIFTH JUDICIAL CIRCUIT

| | |
|---|---|
| FIREMEN'S RETIREMENT SYSTEM OF ST. LOUIS, Derivatively on Behalf of SCANA CORPORATION and Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     v.<br><br>JIMMY E. ADDISON, D. MAYBANK HAGOOD, LYNNE M. MILLER, JAMES A. BENNETT, MACEO K. SLOAN, SHARON A. DECKER, JAMES W. ROQUEMORE, ALFREDO TRUJILLO, JOHN F.A.V. CECIL, GREGORY E. ALIFF, KEVIN B. MARSH, STEPHEN A. BYRNE, JAMES M. MICALI, HAROLD C. STOWE, DOMINION ENERGY, INC., and SEDONA CORP.,<br><br>          Defendants,<br><br>    -and-<br><br>SCANA CORPORATION, a South Carolina corporation,<br><br>          Nominal Defendant. | Case No.: 2017-CP-400-7547<br><br>AMENDED STOCKHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT<br><br><br><br><br><br><br><br><br><br><br><br>Date Action Filed: December 13, 2017<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by its attorneys, submits this Amended Stockholder Derivative and Class Action Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative and class action brought by plaintiff individually and on behalf of holders of the common stock of SCANA Corporation ("SCANA" or the "Company") and derivatively on behalf of SCANA against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment.   These wrongs resulted in billions of dollars in damages associated with the Company's abandonment of the construction of two nuclear reactors at SCANA's Virgil C. Summer Nuclear Generating Station ("V.C. Summer") in Fairfield County, South Carolina, as well as to SCANA's reputation, goodwill, and standing in the business community.   Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     SCANA is an energy-based holding company that engages in electric and natural gas utility operations throughout South Carolina, North Carolina, and Georgia.  SCANA operates through several wholly-owned subsidiaries, the largest and most significant being South Carolina Energy & Gas ("SCE&G").   SCE&G generates, transmits, distributes, and sells electricity to retail and wholesale customers.   According to the Company's most recent Annual Report on Form 10-K filed with the SEC, SCE&G's operating revenues constitute approximately 70% of SCANA's total operating revenues.

3.     SCE&G and South Carolina Public Service Authority ("Santee Cooper"), South Carolina's state-owned electric and water utility, announced a partnership in February 2006 to construct two nuclear reactors at SCANA's V.C. Summer facility in Fairfield County, South Carolina (hereinafter, the "Nuclear Project").   Under the agreement, SCANA owned a 55% stake in the Nuclear Project.

4.     The Nuclear Project was of paramount importance to the Company.  With its 55% stake, SCANA's share of the construction costs amounted to well over $5 billion and would be a massive undertaking.  Along with Santee Cooper, SCANA partnered with Westinghouse Electric Company LLC ("Westinghouse" or "WEC") as primary contractor, as well as Chicago Bridge & Iron Company N.V. ("CB&I"), in an agreement signed May 23, 2008.  SCANA then presented a cost and construction schedule for the Nuclear Project to the South Carolina Public Service Commission ("SCPSC") in a filing dated May 30, 2008.  The Nuclear Project broke ground on March 9, 2013, amid promises that the reactors would come online by 2018.

5.     The Nuclear Project, however, was mired with serious design, construction, and cost headwinds from the beginning.  The Individual Defendants (as defined herein) were far from prudent in their oversight of the planning and execution of the Nuclear Project, and actively concealed ongoing construction and management issues, in breach of their fiduciary duty.

6.     SCANA received repeated warnings that the Nuclear Project was plagued by design and management issues.  For example, the Company issued a grievance letter in May 2014 signed by defendant Kevin B. Marsh ("Marsh"), SCANA's former Chief Executive Officer ("CEO"), to Westinghouse and CB&I that pointed to their ongoing design and management issues causing significant delays and cost overruns with the construction of the reactors. Moreover, the nonpublic letter indicated that Westinghouse had an insufficient plan for the reactor design at the time that construction began, creating a ripple effect that prompted various changes and delays.

7.     Further implicating the Board's awareness, the Board approved an audit of the Nuclear Project in August 2015 from the Bechtel Corporation ("Bechtel"), a large construction and civil engineering firm.  Bechtel conducted a thorough assessment of the Nuclear Project,

including Westinghouse's design and management of its construction. As internal Santee Cooper documents would later reveal, SCANA and Santee Cooper received a draft of Bechtel's audit as early as November 2015 that demonstrated the Nuclear Project was failing. Bechtel assessed that the construction was behind by two to three years, jeopardizing SCANA's requirement to complete work by 2020 to remain eligible for $1.4 billion in federal tax credits. Bechtel further provided SCANA with several management integration issues between the Company and its partners due to a "lack of shared vision, goals, and accountability" and "strained" relationships.

8.      Even in the face of these revelations and setbacks, SCANA's fiduciaries created a false impression to investors and state regulators that the project was running smoothly within a reasonable budget and on schedule. As the goals and price continued to shift, the Individual Defendants continued to make false and misleading statements, and omitted material information, about the Nuclear Project's progress to fulfill short-term goals at the expense of long-term integrity. The Individual Defendants refused to make public Bechtel's initial draft audit and actively made efforts to redact or change the report through SCANA's outside counsel. In particular, SCANA's fiduciaries insisted that Bechtel delete criticisms of their oversight of the project and that the Company would not complete work prior to the 2020 deadline in an attempt to leave these critical details out of Bechtel's final report.

9.      On February 5, 2016, Bechtel finally issued a highly-critical 130-page report (the "Bechtel Audit") to SCANA, which the Company had whitewashed by suppressing the most critical findings of the draft Bechtel Audit. As the Nuclear Project was a core component of the Company's future energy output, its progress was or should have been closely monitored by the Individual Defendants. Through the Bechtel Audit, the Individual Defendants were on notice that, among other things, the Nuclear Project suffered from poorly engineered construction plans,

faulty designs, inadequate management of contractors, and worker turnover seriously impacting the Company's ability to complete the project on schedule. The Bechtel Audit also provided SCANA's Board of Directors (the "Board") with material issues regarding Westinghouse's lack of transparency to the Company's fiduciaries.

10.    Despite the shortcomings and risks associated with the Nuclear Project revealed to the Board in the Bechtel Audit, the Individual Defendants purposefully concealed the findings throughout 2016 and much of 2017. Instead, the Individual Defendants continued to issue promotional videos, press releases, and public filings and announcements that created a fundamentally false and misleading impression that the Nuclear Project was running smoothly and had met significant milestones. These statements also masked that the Individual Defendants had grave concerns about Westinghouse's financial condition and ability to continue constructing the Nuclear Project.

11.    On March 29, 2017, Westinghouse filed for bankruptcy protection, undermining the Company's previous public statements of its primary contractor's financial well-being. Despite this loss, the Company's fiduciaries repeatedly assured investors and the public that the Nuclear Project would be completed on schedule, claiming that the work on the project would continue "without substantial disruption." The Company further provided slides to the SCPSC that the Nuclear Project was nearing completion. The reality was that SCANA would not meet any of its deadlines.

12.    This truth emerged on July 31, 2017, when SCANA announced that it was abandoning construction of the Nuclear Project with only 40% of the goals complete. SCANA finally publicly acknowledged that the Nuclear Project was plagued with delays and cost overruns. Under South Carolina's Base Load Review Act (the "BLRA"), the Board voted to

withdraw SCANA's application with the SCPSC, and sought reimbursement for the Company's costs from its ratepayers through the BLRA as a result of their malfeasance totaling $4.9 billion.

13.     SCANA's abrupt abandonment of the Nuclear Project prompted South Carolina Attorney General Alan Wilson to conduct an investigation into SCANA's role in the Nuclear Project failure. Further, South Carolina Senate leaders called for a special legislative session to investigate SCANA's abandonment of the Nuclear Project. It was through these efforts that the existence of the Bechtel Audit was finally revealed.

14.     With the revelation that the Bechtel Audit existed, authorities increased their scrutiny of the Company's management of the Nuclear Project prior to its abandonment. After refusing several times to release the Bechtel Audit to the public, South Carolina's Governor, Henry McMaster, finally compelled SCANA to release it in September 2017. The South Carolina House Committee also held a hearing soon after where House members scrutinized SCANA officials for their poor decision-making and management of the Nuclear Project. In an article published by *The Post & Courier*, South Carolina State Representative Russell Ott asserted that the Individual Defendants' concealment of the Bechtel Audit was "a cover up" and "deception at its core." "The bottom line is they lied to everyone and they did it intentionally," Representative Ott stated.

15.     On September 21, 2017, the Company revealed that it had received a subpoena from the U.S. Attorney's Office for the District of South Carolina seeking documents related to SCANA's management of the Nuclear Project. By September 22, 2017, the State Law Enforcement Division ("SLED") had launched a criminal investigation upon request of Attorney General Wilson, focusing on SCANA's concealment of the Bechtel Audit. To make matters

worse, on October 17, 2017, the Company announced that it had received a subpoena from the SEC in connection with the Nuclear Project.

16.    Under the BLRA, the Company had the right to seek reimbursement from ratepayers for prudently incurred costs.  But with the increased scrutiny over the Company's concealment of the Bechtel Audit, SCANA withdrew its initial application for reimbursement. In an apparent admission of imprudent expenses incurred in the construction of the Nuclear Project, the Company proposed in a press release on November 16, 2017, to shift the multibillion-dollar bill to its stockholders.  Even with the latest proposal, SCANA will still recoup $29.5 million a month from ratepayers to cover the financing costs of the abandoned project over the next fifty years.

17.    In the wake of these revelations, SCANA's stock has plunged almost 40%, or $30.21 per share, erasing more than $4.3 billion in market capitalization from the time the Company received the Bechtel Audit until present.  Further, as a direct result of this unlawful course of conduct, the Company is now the subject of numerous state and federal consumer class action and federal securities class action lawsuits on behalf of investors who purchased SCANA's shares.  Also, the Company is subject to several ongoing criminal and civil investigations related to the Nuclear Project, including by the South Carolina Attorney General, South Carolina state Senate leaders, the U.S. Attorney's Office in South Carolina, the SEC, and SLED.

18.    While the Company has significantly suffered, the same cannot be said for its fiduciaries.  Defendants Marsh, the Company's then-CEO, and Stephen A. Byrne ("Byrne"), the then-Chief Operating Officer ("COO"), announced their retirements in the wake of the

abandonment of the Nuclear Project. Despite their participation in the wrongdoing, defendants Marsh and Byrne could receive tens of millions in total severance compensation.

19.     The Directors Defendants (as defined herein) recognized the liability they faced and the financial distress that they caused and therefore began a self-dealing and flawed process to attempt to rid themselves of this liability. On November 29, 2017, it was reported that SCANA hired an investment banker to look into a possible sale of the Company. Barely a month later, on January 3, 2018, SCANA announced that defendant Dominion Energy, Inc. ("Dominion") agreed to purchase the Company in a stock for stock deal (the "Proposed Acquisition"). Pursuant to the Proposed Acquisition, SCANA's stockholders would receive 0.6690 shares of Dominion stock for each share of SCANA stock (the "Proposed Consideration"). Based on the companies' stock prices before the announcement of the Proposed Acquisition, the Proposed Consideration is worth approximately $55.35 per share.[1]

20.     The Proposed Consideration undervalues the Company. Though defendants are able to claim the Proposed Consideration is at a premium to SCANA's current stock price; that is only because the Individual Defendants destroyed so much of the Company's value by their faithless and illegal acts. The Proposed Consideration actually represents a 12.4% *discount* to the Company's stock price before the July 31, 2017 announcement of the shuttering of the reactors at V.C. Summer. This significant discount demonstrates that the Proposed Consideration fails to take into account the valuable derivative claims currently being pursued

---

[1] This implied per share price is based on the Dominion's thirty day average before the announcement of the Proposed Acquisition. Based on Dominion's current stock price of approximately $77.19 per share, the Proposed Consideration is worth only $51.64 per share, further demonstrating the inadequately of the consideration. The Director Defendants could have protected stockholders from some of this downside by negotiating a collar, but in their rush to attempt to remove their liability failed to do so.

against the Individual Defendants. Excluding debt, Dominion is paying approximately $7.4 billion for the Company. If it paid the implied premium last summer before the Individual Defendants' destruction of SCANA's value, Dominion would have paid approximately $14 billion, almost twice the price.

21.    Further, even after the Individual Defendants' harmful actions, analysts still expected SCANA's stock price to recover and rise above the Proposed Consideration. In particular, Wells Fargo Securities set SCANA's price target at $65 per share and Mizuho Securities USA Inc. had a price target of $58.50. In addition, SCANA's stock price traded over the implied per share price of the Proposed Consideration as a recently as September 27, 2017.

22.    The Director Defendants are also attempting to tie the hands of stockholders (and the South Carolina government) and force them to approve the Proposed Acquisition. Under the terms of the Agreement and Plan of Merger dated January 2, 2018 (the "Merger Agreement"), the Director Defendants agreed to a termination fee of *$240 million*. This means that, under certain circumstances, if the Proposed Acquisition does not go through, SCANA will have to pay Dominion $240 million. Among the different triggers for this substantial termination fee is the disapproval of SCANA stockholders of the deal *or* Dominion's petition for approval to recoup some of the costs related to the abandonment of the Nuclear Project if not approved by the SCPSC (the "SCPSC Petition").

23.    As has unfortunately become the norm, while SCANA's stockholders are receiving unfair consideration, the same cannot be said for insiders. The Director Defendants currently own "phantom stock units," equity consideration that is meant to mirror the price of SCANA's stock, but can be exchanged for cash. The Director Defendants will receive deferred shares of Dominion stock for these phantom units, which will then convert automatically into

Dominion stock when they retire. Dominion will appoint one SCANA director to its board of directors (currently unnamed) and it appears that the other directors will retire upon completion of the merger, effectively turning these phantom units into Dominion stock in connection with the Proposed Acquisition.

24.    Further, executives, including defendants Jimmy E. Addison ("Addison"), Marsh, and Byrne will receive tens of millions of dollars in change of control benefits. Included in these benefits is the immediate vesting of the executives "performance shares," compensation that is tied to SCANA's stockholders' return. In light of the significant, but short term, degradation in SCANA's value due to the Individual Defendants' actions, executives would not have met these stockholder return goals and would not have received these benefits.

25.    In short, the Proposed Acquisition is designed to unlawfully divest SCANA's public stockholders of their holdings without providing them the maximized value they are entitled to and without adequate information to evaluate the transaction.

26.    As the Director Defendants have unlawfully placed their own interests ahead of SCANA's stockholders, the consummation of the Proposed Acquisition will result in irreparable harm absent judicial intervention.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over each defendant named herein. SCANA is a South Carolina corporation that conducts business in and maintains operations in this County, or is an individual who has sufficient minimum contacts with this County to render the exercise of jurisdiction by the South Carolina courts permissible under traditional notions of fair play and substantial justice.

28.    Venue is proper in this Court because defendants Marsh and James A. Bennett ("Bennett") reside in this County.  Additionally, a substantial portion of the transactions and wrongs complained of herein occurred in this County, including the defendants' primary participation in the breaches of fiduciary duty and other legal violations which harmed the Company.  Further, defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

## THE PARTIES

**Plaintiff**

29.    Plaintiff Firemen's Retirement System of St. Louis was a stockholder of SCANA at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current SCANA stockholder.

**Nominal Defendant**

30.    Nominal Defendant SCANA is a South Carolina corporation with principal executive offices located at 100 SCANA Parkway, Cayce, South Carolina.  SCANA is an energy-based holding company principally engaged, through subsidiaries, in regulated electric and natural gas utility operations and other nonregulated energy-related businesses in South Carolina, North Carolina and Georgia.  SCANA does not directly own or operate any significant physical properties, but it directly holds all of the capital stock of its subsidiaries.  SCANA's largest subsidiary, SCE&G, is a regulated public utility that provides electricity and natural gas services to residential, commercial and industrial customers in South Carolina.  As of December 31, 2016, SCE&G was engaged in the generation, transmission, distribution and sale of electricity to approximately 709,000 customers and the purchase, sale and transportation of natural gas to approximately 358,000 customers.  As of February 20, 2017, SCANA and its

subsidiaries had approximately 5,910 full-time, permanent employees. Upon completion of the Proposed Acquisition, SCANA will become a wholly-owned subsidiary of defendant Dominion.

**Defendants**

31.    Defendant Addison is SCANA's CEO and has been since January 2018 and President and COO, SCANA Energy Marketing, Inc. and has been since May 2014. Defendant Addison was also SCANA's Executive Vice President from January 2012 to January 2018; Chief Financial Officer from May 2006 to January 2018; Senior Vice President from May 2006 to January 2012; Vice President of Finance from August 2001 to May 2006; and held various positions with the Company or its subsidiaries beginning in 1991. Defendant Addison is named in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendant Addison knowingly, recklessly, or with gross negligence: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Addison the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $631,619 | $1,054,398 | $619,574 | $194,123 | $81,160 | $2,580,874 |

32.    Defendant D. Maybank Hagood ("Hagood") is SCANA's Non-Executive Chairman of the Board and has been since January 2018 and a director and has been since April 1999. Defendant Hagood was also Lead Director from April 2016 to January 2018. Defendant Hagood was also member of SCANA's Nuclear Oversight Committee in at least March 2017 and Chairman of the Audit Committee from at least March 2015 to at least March 2016. Defendant

Hagood knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Hagood the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $101,900 | $123,600 | $225,500 |

33. Defendant Lynne M. Miller ("Miller") is a SCANA director and has been since April 1997. Defendant Miller was also a member of SCANA's Audit Committee from at least March 2016 to at least March 2017 and Chairman and a member of the Nuclear Oversight Committee in at least March 2015. Defendant Miller knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Miller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $82,400 | $123,600 | $206,000 |

34. Defendant Bennett is a SCANA director and has been since April 1997. Defendant Bennet was also a member of SCANA's Audit Committee in at least March 2017 and a member of the Nuclear Oversight Committee from at least March 2015 to at least March 2016. Defendant Bennett knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear

Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Bennett the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Change in Pension Value and Nonqualified Deferred Compensation Earnings | Total |
|---|---|---|---|---|
| 2016 | $88,400 | $123,600 | $3,867 | $215,867 |

35.     Defendant Maceo K. Sloan ("Sloan") is a SCANA director and has been since April 1997. Defendant Sloan was also a member of SCANA's Nuclear Oversight Committee from at least March 2016 to at least March 2017 and a member of the Audit Committee in at least March 2015. Defendant Sloan knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Sloan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $86,400 | $123,600 | $210,000 |

36.     Defendant Sharon A. Decker ("Decker") is a SCANA director and has been since October 2015. Defendant Decker was also a SCANA director from December 2005 to April 2013. Defendant Decker was a member of SCANA's Nuclear Oversight Committee in at least March 2017. Defendant Decker knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the

Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Decker the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $82,400 | $123,600 | $206,000 |

37.    Defendant James W. Roquemore ("Roquemore") is a SCANA director and has been since and has been since December 2007. Defendant Roquemore was also Chairman of SCANA's Nuclear Oversight Committee from at least March 2016 to at least March 2017 and a member of that committee from at least March 2015 to at least March 2017. Defendant Roquemore knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Roquemore the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $92,400 | $123,600 | $216,000 |

38.    Defendant Alfredo Trujillo ("Trujillo") is a SCANA director and has been since October 2013. Defendant Trujillo was also a member of SCANA's Nuclear Oversight Committee from at least March 2015 to at least March 2017. Defendant Trujillo knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about

the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Trujillo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $82,400 | $123,600 | $206,000 |

39. Defendant John F.A.V. Cecil ("Cecil") is a SCANA director and has been since October 2013. Defendant Cecil was also a member of SCANA's Audit Committee from at least March 2015 to at least March 2017. Defendant Cecil knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Cecil the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $82,400 | $123,600 | $206,000 |

40. Defendant Gregory E. Aliff ("Aliff") is a SCANA director and has been since October 2015. Defendant Aliff was also Chairman of SCANA's Audit Committee in at least March 2017 and a member of that committee from January 2016 to at least March 2017. Defendant Aliff knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Aliff the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $89,900 | $123,600 | $213,500 |

41.     Defendant Marsh was SCANA's CEO from December 2011 to January 2018; Chairman of the Board from December 2011 to December 2017; and a director from January 2011 to December 2017. Defendant Marsh was also SCANA's President and COO from January 2011 to January 2018; Senior Vice President from May 1998 to January 2011; Chief Financial Officer from 1996 to April 2006; President, SCE&G from May 2006 to November 2011; COO, SCE&G from May 2006 to January 2011; and held various positions with the Company or its subsidiaries beginning in 1984. Defendant Marsh is named in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Marsh knowingly, recklessly, or with gross negligence: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Marsh the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2016 | $1,216,901 | $2,902,015 | $1,432,431 | $395,640 | $161,817 | $6,108,804 |

42.     Defendant Byrne was SCANA's Executive Vice President from 2009 to January 2018 and President, Generation & Transmission and COO, SCE&G from 2011 to January 2018. Defendant Byrne was also Executive Vice President, Generation, Nuclear and Fossil Hydro, SCE&G from 2009 to 2011; Senior Vice President, Generation, Nuclear and Fossil Hydro SCE&G from 2004 to 2009; and held various positions with the Company or its subsidiaries beginning 1995. Defendant Byrne is named in a related securities class action complaint that

alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Byrne knowingly, recklessly, or with gross negligence: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Byrne the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|------------------------|-------|
| 2016 | $631,619 | $1,054,398 | $619,574 | $199,358 | $77,192 | $2,582,141 |

43.    Defendant James M. Micali ("Micali") was a SCANA director from December 2007 to April 2017. Defendant Micali was also a member of SCANA's Audit Committee from at least March 2015 to at least March 2017. Defendant Micali knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. While in possession of material, nonpublic information concerning SCANA's true business health, defendant Micali sold 1,000 shares of his stock for $66,109 in proceeds. SCANA paid defendant Micali the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2016 | $91,400 | $123,600 | $215,000 |

44.    Defendant Harold C. Stowe ("Stowe") was SCANA's Lead Director from April 2013 to April 2016 and a director from April 1999 to April 2016. Defendant Stowe was also a member of SCANA's Audit Committee from at least March 2015 to at least March 2016.

Defendant Stowe knowingly or recklessly: (i) caused or allowed SCANA to disseminate improper statements concerning the progress, cost, and completion schedule of the Nuclear Project; (ii) concealed the Bechtel Audit revealing serious design, construction, and cost headwinds; and (iii) concealed concerns about the financial health of the Nuclear Project's primary contractor, Westinghouse. SCANA paid defendant Stowe the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $47,600 | $57,900 | $105,500 |

45.    Defendant Dominion is a Virginia corporation with principal executive offices locates at 120 Tredegar Street, Richmond, Virginia. Defendant Dominion is an energy utility company that delivers electricity and natural gas to nearly five million homes and businesses. Its operations include 25,600 megawatts of electric generating capacity, 66,300 miles of natural gas gathering, transmission, distribution, and storage pipelines, 64,200 miles of electric transmission and distribution lines, and an underground natural gas storage system with approximately one trillion cubic feet of storage capacity. As of December 31, 2016, Dominion has approximately 16,200 full-time employees, of which approximately 5,200 employees are subject to collective bargaining agreements.

46.    Defendant Sedona Corp. ("Merger Sub") is a South Carolina corporation and is a wholly-owned subsidiary of defendant Dominion. Upon completion of the Proposed Acquisition, defendant Merger Sub will merge with and into SCANA and cease its separate corporate existence.

47.    The defendants identified in ¶¶31, 41-42 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶32-41, 43-44 are referred to herein as the "Director

Defendants."  The defendants identified in ¶¶32-34, 39-40, 43-44 are referred to herein as the

"Audit Committee Defendants."  The defendants identified in ¶¶32-38 are referred to herein as

the "Nuclear Oversight Committee Defendants."  Collectively, the defendants identified in ¶¶31-

44 are referred to herein as the "Individual Defendants."

## **DUTIES OF THE INDIVIDUAL DEFENDANTS**

**Fiduciary Duties**

     48.    By reason of their positions as officers and directors of the Company, each of the

Individual Defendants owed and owe SCANA and its stockholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control

and manage SCANA in a fair, just, honest, and equitable manner.  The Individual Defendants

were and are required to act in furtherance of the best interests of SCANA and not in furtherance

of their personal interest or benefit.

     49.    To discharge their duties, the officers and directors of SCANA were required to

exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company.  By virtue of such duties, the officers and

directors of SCANA were required to, among other things:

     (a)    conduct the affairs of the Company in an efficient, business-like manner in

compliance with all applicable laws, rules, and regulations so as to make it possible to provide

the highest quality performance of its business, to avoid wasting the Company's assets, and to

maximize the value of the Company's stock;

     (b)    remain informed as to how SCANA conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, make

reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(c)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive or fraudulent conduct.

**SCANA's Code of Conduct and Ethics**

50.    The Company implemented a Code of Conduct and Ethics (the "Code of Conduct").   The Code of Conduct applies to all directors, officers, and employees of the Company.  Each person covered by the Code of Conduct must certify to his or her receipt and understanding of his or her obligations under the Code of Conduct.  As to lawful and ethical behavior, the Code of Conduct states:

### EXPECTATIONS OF PROFESSIONAL CONDUCT

It is our personal responsibility to uphold the Code of Conduct & Ethics each and every day.   Resources are available to help you understand the Company's expectations.   If you have a concern, talk about it with someone who is in a position to help you.   Report any conduct that is contrary to our SACRED Values.

Expectations of professional conduct apply to all employees, contractors, Board members or agents of SCANA. High standards of honesty, respect for the law and integrity are essential in carrying out SCANA's business.  They are also essential if we are to maintain the confidence of our customers and the communities we serve.

**As an employee, contractor, Board member or agent of SCANA, you must:**

• Abide by SCANA's Code of Conduct & Ethics;

• Behave honestly and avoid illegal, unethical or improper conduct;

• Be helpful, respectful and cooperative toward co-workers, customers, suppliers and the general public;

• Have a practical working knowledge of the policies, laws and regulations affecting your job responsibilities;

• Seek guidance from your supervisor, manager or a Company officer when in doubt about your responsibilities or the application of a policy;

• Report any actual or suspected violation of a law, rule or regulation through your management chain or other available reporting resources. If the concern is related to accounting, internal controls, auditing matters or financial reporting irregularities, contact the Corporate Compliance & Privacy Officer;

• Cooperate with any investigation of alleged wrongdoing;

• Be aware of the appearance of wrongdoing.

**Additionally, if you are a member of SCANA management, you must:**

• Be an ethical leader;

• Monitor and ensure your employees attend required compliance training, abide by the Code, and comply with laws, policies and regulations;

• Take appropriate actions to prevent conduct at work that creates an intimidating, hostile or offensive work environment, or makes employees uncomfortable;

• Promptly and properly address situations before they escalate;

• Ensure systems and procedures are in place to protect Company assets and legally achieve Company goals.

51.    The Code of Conduct requires accurate and truthful conduct when transacting with government entities, stating:

**GOVERNMENT TRANSACTIONS**

**POSITION STATEMENT**

SCANA is committed to compliance with all applicable federal, state or local laws and regulations when conducting its business.

**EXPECTATION**

SCANA is a family of companies that complies with all rules and regulations set by federal, state and local authorities where we do business. You are responsible for understanding the laws, rules and regulations that apply to your job. SCANA and its employees may be subject to substantial penalties and/or criminal punishment for non-compliance with regulations.

Laws and regulations applicable to transactions with government entities contain special rules that are stringent. Be accurate and truthful in the preparation, review

and submission of records, reports and other information. It is a crime to knowingly make a false statement or representation to a government official or agency. Any inquiries from government officials regarding SCANA's business activities should be reported to your management and/or SCANA's Legal Department immediately.

**Additional Duties of the Audit Committee Defendants**

52. In additional to the above duties, the Audit Committee Defendants, defendants Aliff, Bennett, Cecil, Hagood, Micali, Miller, and Stowe, owed specific duties to SCANA to assist the Board in overseeing the integrity of SCANA's financial statements. The Audit Committee Charter further provides that the Audit Committee must oversee the Company's compliance with legal and regulatory requirements. The Audit Committee is also charged with reviewing the "status of significant risk(s) for which oversight" and reviewing "at least annually SCANA's Corporate Risk Management program, its scope and effectiveness, and any other SCANA policies with respect to risk assessment and risk management." The Audit Committee must also discuss "SCANA's major financial risk exposures and the steps management has taken to monitor and control such exposures." The Audit Committee met quarterly throughout the relevant period. The Audit Committee Charter states:

**Duties and Responsibilities**

\* \* \*

- As appropriate or required, meet periodically and separately, with management, SCANA's General Counsel, the external auditors, Corporate Compliance and Audit Services, and the Risk Management Officer;

\* \* \*

- Review at least annually SCANA's Corporate Risk Management program, its scope and effectiveness, and any other SCANA policies with respect to risk assessment and risk management;

- Review the status of significant risk(s) for which oversight is assigned to the Committee by the Board of Directors;

- Discuss SCANA's major financial risk exposures and the steps management has taken to monitor and control such exposures;

* * *

- Review with any disclosure committee of SCANA the effectiveness of SCANA's disclosure controls and procedures;

* * *

- Review with the external auditors their opinion on management's assessment of the effectiveness of internal control over financial reporting;

- Review and discuss with management and the external auditors the annual audited financial statements, including the disclosures to be made under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board the inclusion of the audited financial statements in the Form 10-K, if appropriate;

- Review and discuss with management and the external auditors the quarterly financial statements, including disclosures to be made under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of each Form 10-Q, including the results of the external auditors' review of the quarterly financial statements;

* * *

- Review all reports required to be submitted by the external auditors to the Committee under Section 10A(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), which requires that the external auditors inform the Committee of illegal acts that have been detected or otherwise come to the attention of the external auditors in the course of the audit, and require senior management to take timely and appropriate remedial action with respect to such illegal acts;

* * *

- Review reports from Corporate Compliance and Internal Auditing regarding SCANA's conformity with applicable legal requirements and its Code(s) of Conduct;

- Review with the Board any issues that arise with respect to the quality or integrity of SCANA's financial statements, its compliance with legal, regulatory, or ethical requirements, the performance and independence of its external auditors or the performance of Audit Services;

* * *

- Establish procedures for the receipt, retention and treatment of complaints received by SCANA regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

\* \* \*

- Review and assess annually the adequacy of the Committee's Charter and recommend to the Board any improvements to the Charter that the Committee deems to be necessary or appropriate; and

- Conduct an annual performance evaluation to compare the performance of the Committee to the requirements of this Charter and any other duties or responsibilities delegated to the Committee by the Board, and report to the Board the results of the evaluation, which may take the form of an oral presentation by a member of the Committee to the Board.

**Additional Duties of the Nuclear Oversight Committee Defendants**

53.    The Nuclear Oversight Committee Defendants, defendants Bennett, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo, are charged with oversight of the Company's nuclear power operations.  Meeting quarterly, the Nuclear Oversight Committee must monitor, discuss, and evaluate SCANA's nuclear operations, "which include regulatory matters, operating results, training and other related topics."  According to the Company's 2017 Proxy Statement on Form 14A filed with the SEC, the Nuclear Oversight Committee Defendants periodically toured V.C. Summer and its training facilities.  "Additionally, the Committee routinely presents an independent report to the Board on the status of [SCANA's] operations."

**Control, Access, and Authority**

54.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of SCANA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

- 25 -

55.    Because of their advisory, executive, managerial, and directorial positions with SCANA, each of the Individual Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of SCANA, including information regarding the several factors negatively impacting the Company's performance.

56.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of SCANA, and was at all times acting within the course and scope of such agency.

**Breaches of Duties**

57.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of SCANA, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

58.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements to the public and SCANA's stockholders, improper practices that wasted the Company's assets, and caused SCANA to incur substantial damage.

59.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of SCANA, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent

the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, SCANA 'has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to SCANA's Nuclear Project that rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of SCANA, regarding the Individual Defendants' management of SCANA's operations and the Nuclear Project's estimated cost and timeline; and (iii) enhance the Individual Defendants' executive and directorial positions at SCANA and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

62.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

63.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

64.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### THE NUCLEAR PROJECT IS MIRED IN DESIGN FLAWS, CONSTRUCTION DELAYS, AND COST OVERRUNS

**Background of the Nuclear Project**

66.    SCANA is a South Carolina corporation created as a holding company. It holds directly all of the capital stock of its subsidiaries. Primary among its subsidiaries is SCE&G, which engages in the "generation, transmission, distribution and sale of electricity to approximately 709,000 customers and the purchase, sale and transportation of natural gas to approximately 358,000 customers (each as of December 31, 2016)" according to the Company's

most recent Annual Report on Form 10-K for the fiscal year ended December 31, 2016, filed with the SEC on February 24, 2017 (the "2016 Form 10-K"). "SCE&G's electric service territory extends into 24 counties covering nearly 16,000 square miles in the central, southern and southwestern portions of South Carolina."

67.     Beginning in at least 2006, SCANA began significant lobbying efforts with the South Carolina Legislature to pass the BLRA.  On information and belief, this lobbying effort cost the Company millions of dollars, and focused on persuading legislators that South Carolina ratepayers should foot the bill for any cost overruns for the Nuclear Project.  The South Carolina Legislature adopted the BLRA on May 3, 2007.  The BLRA provided a blank check to SCANA, allowing the Company to raise electric rates in South Carolina to fund the construction of the Nuclear Project if it went over budget or fell behind schedule.

68.     An article dated September 2, 2017, published by *The Post and Courier*, noted that "[a]ll but one of the 32 lawmakers investigating the demise of the V.C. Summer nuclear project have taken campaign contributions from the utility [SCANA] responsible for building it, highlighting the extent of the power industry's efforts in Columbia."  The article linked the lobbying efforts to the fast tracking of the BLRA in 2007 "a law that broke tradition and allowed private utilities — SCE&G in this instance — to bill customers for power plants before they're completed."

69.     The BLRA is not completely without oversight.  While the BLRA establishes SCANA's right to recover prudently incurred development costs in the event of abandonment, the SCPSC determines whether a utility has accrued those costs prudently at the time of abandonment.

70. By 2008, SCANA's subsidiary, SCE&G began the process of obtaining construction and operating licensing for two 1,117 megawatt nuclear electric-generating units at V.C. Summer in Fairfield County, South Carolina, with the SCPSC and the U.S. Nuclear Regulatory Commission. SCE&G partnered with Santee Cooper, a state-owned utility in South Carolina, in a joint venture for the planning and construction of the Nuclear Project. SCANA, through SCE&G, was 55% responsible for the joint venture. SCE&G and Santee Cooper commissioned Westinghouse, a subsidiary of Toshiba Corporation ("Toshiba"), to be primary designer and contractor, and CB&I (collectively, the "Consortium") for the building of the two nuclear plants under an engineering, procurement, and construction ("EPC") contract.

71. SCANA, through SCE&G, filed a combined application on May 30, 2008, for a Certificate of Environmental Compatibility, Public Convenience and Necessity, and for a Base Load Review Order, with the SCPSC and the South Carolina Office of Regulatory Staff ("ORS") under the BLRA. According to a press release issued by the Company that same day, SCANA's share of the cost of construction would amount to $5.4 billion. SCANA stated that Unit 2 would come online in 2016, and Unit 3 in 2019. The Nuclear Project finally broke ground in March 2013, but was still plagued by construction delays and cost increases.

72. In 2016, V.C. Summer's preexisting Unit 1 provided approximately 5.8 million megawatt hours, representing 25% of SCANA's total energy generation through SCE&G. With the construction and supposed completion of Units 2 and 3, the Company boasted that its energy generating capacity and the percentage of total generating capacity represented by nuclear sources would greatly increase. SCANA stated in its 2016 Form 10-K that SCANA would be retiring many coal-fired plants, and adding renewable, nuclear energy to replace this segment. By 2021, the Company projected that approximately 56.7% of its generated energy would come

from nuclear power, emphasizing the importance that the Nuclear Project held as part of the Company's overall strategy.

**The Nuclear Project Is Delayed Due to Known Construction, Cost, and Management Issues**

73.    On March 2, 2009, the SCPSC approved the EPC contract and construction schedules provided by SCANA.  The construction of the Nuclear Project, however, was fraught with known construction delays, cost increases, and issues with Westinghouse's management from the beginning.  On several occasions, SCANA sought approval from the SCPSC for cost increases totaling approximately $2 billion in additional construction costs, as well as scheduling delays of up to three years.

74.    The first cost increase came in November 2010.  At this time, SCANA submitted a petition to the SCPSC to increase its capital cost forecast for the Nuclear Project by $174 million, which SCPSC approved.

75.    The Company requested and received another capital cost forecast increase from the SCPSC of $283 million in May 2012.  The request also included a delay of the construction schedule for Unit 2 until March 15, 2017, and an acceleration of the construction of Unit 3 to May 15, 2018.

76.    Company fiduciaries were aware of Westinghouse and CB&I poor management of the Nuclear Project as early as at least 2014.  An internal letter from defendant Marsh dated May 6, 2014, to executives at Westinghouse and CB&I, aired SCANA's grievances regarding Westinghouse's ongoing failures under the EPC contract (the "May 2014 Grievance Letter").  Among these issues not shared with the public, SCANA noted that design issues contributed to ongoing project delays which had "tested [SCANA's] resolve."  Defendant Marsh also pointed to high executive turnover since the project began in May 2008, as well as major litigation that

Westinghouse had become embroiled in due to EPC agreements with two other utilities which had overextended the contractor. He further noted that there was an "evident deterioration" of the relationship between senior management within the Consortium, and that management was "less focused and seem[ed] intent on taking advantage of [SCANA's] cooperative nature."

77.    The May 2014 Grievance Letter also pointed to design issues that the Company asserted "contributed to the project delay." Specifically, defendant Marsh identified the delayed completion of Issued For Construction ("IFC") drawings. According to the May 2014 Grievance Letter, the Company was advised that the Consortium had design delays in May 2012, when Westinghouse informed the Company that it would not meet the October 11, 2012 schedule for many of the IFC packages. While Westinghouse then initially reported 94% completion of the IFC documents in December 2013, Westinghouse backtracked on March 31, 2014, when the contractor reported that the IFC documents were only 88% complete. Westinghouse's many design changes adversely impacted the structural and civil work on the Nuclear Project, as well as multiple license amendment requests.

78.    Despite Westinghouse's shortcomings and the attendant risk, SCANA continued its relationship with the contractor in the face of continued delays and cost overruns. Reports in the media pointed to flaws in the design that created delays downstream. An article published by *The Associated Press* in July 2014 entitled "Promises of Easier Nuclear Construction Fall Short" stated that analysts found the designs "were hard or impossible to make." The article's author consulted engineers to assess the Nuclear Project's progress and found that "[u]tility companies [including SCANA] got early warnings but proved unable to avoid the problems."

79.    The rising costs and increasing delays affected SCANA's ability to capitalize on its return on capital. In June 2015, the ORS and South Carolina's Energy Users Committee

agreed to no longer challenge SCANA's changes to its construction and capital cost forecasts in exchanged for a return on capital rate reduction from 11% to 10.5%, affecting the Company's future operating revenues.

80.    In September 2015, SCANA sought and received from the SCPSC an increase in its capital cost forecast of $698 million.  This submission was accompanied by a construction scheduling delay until January 19, 2019 for Unit 2 and June 16, 2020 for Unit 3.

81.    In October 2015, Fluor Corporation ("Fluor"), a global engineering and construction firm, replaced CB&I as a subcontractor.  On October 27, 2015, SCE&G, Santee Cooper, and the Consortium amended the EPC contract, effective in December 2015.  As part of the agreement, Westinghouse engaged Fluor as its subcontracted construction manager.

82.    Again in May 2016, the Company requested and received permission to enter a fixed price contract with Westinghouse that included an additional $832 million in its capital cost forecast.  SCANA also sought to extend the completion date of the Nuclear Project once again, with Unit 2 to be completed August 3, 2019, and Unit 3 to August 31, 2020.

83.    Internal Santee Cooper documents obtained by *The State* demonstrated that SCANA officials, including defendant Marsh, knew that SCANA needed to overhaul the management of the Nuclear Project.  The article dated September 7, 2017, entitled "SCE&G Failed to Heed Santee Cooper Warnings at Bungled Nuke Project, Records Show," pointed to a June 18, 2016 email from non-defendant Santee Cooper executive Lonnie Carter to defendant Marsh.  Based on studies conducted in 2015, non-defendant Carter conveyed to defendant Marsh the need for "onboard experts to help work on key issues and improve management of the project."  By November 2016, non-defendant Carter emailed to defendant Marsh that "SCANA's project management team … does not have the comprehensive skills and depth of experience

necessary in engineering, scheduling, project controls and construction to manage a large new build project with complexities." Non-defendant Carter further reiterated the need to hire an outside manager and asked defendant Marsh "why this has not yet been done."

84.    The Board was also aware that Westinghouse's management of the Nuclear Project was in danger due to the contractor's impending bankruptcy. Internal documents uncovered by *The State* cited in its September 7, 2017 article revealed that on March 21, 2016, the Company's Board met with Santee Cooper's Board to discuss how the possibility of Westinghouse's bankruptcy risked the completion of the Nuclear Project. The article noted that Santee Cooper pushed at this time to retain an outside bankruptcy lawyer due to concerns about the financial health of Westinghouse and its parent, Toshiba. This was a full year before Westinghouse officially declared bankruptcy, yet the Board took no action.

85.    An article in *The Post and Courier* addressed the May 2016 cost overruns and construction delays associated with the Nuclear Project. The article focused on ratepayers' concerns that they would be strapped with the costs of these overruns. The article stated:

> Did you know that South Carolina law allows utility companies to charge consumers more for cost overruns on big projects like building a nuclear power plant?
>
> It sounds shocking, but the Office of Regulatory Staff (ORS) just published a report showing that SCE&G V.C. Summer project has cost $1.5 billion more than originally estimated.
>
> And guess who is footing the bill? South Carolina consumers, many of whom live on modest incomes and cannot afford these additional costs.
>
> AARP South Carolina continues to raise concerns about the cost overruns that have resulted during the current SCE&G capital improvement projects. The most serious questions we raised about the state regulations that allow SCE&G to charge consumers for cost overruns remain unanswered.

* * *

- 34 -

Consumers should not be forced to continue paying good money after bad, if in fact there is a better alternative. Is there an opportunity for an analysis to determine alternatives?

Why should utilities like SCE&G even try and control costs on power plant projects, since the financial risk is borne by consumers and not the company?

In addition, why is there no provision to allow for refunds or rebates to consumers if a project goes bad?

With every passing year, as the V.C. Summer project grows more expensive, these questions become more urgent. Consumers should not be forced to continue paying their hard-earned money with no end in sight.

AARP urges the ORS to remember the best interests of everyday South Carolinians, maintain close oversight of this project, and address our areas of concern in a timely manner.

86.    The worsening financial condition of Westinghouse and its impact on the Nuclear Project caught the attention of industry analysts. In June 2016, Morgan Stanley downgraded the Company's stock rating from "equal weight" to "underweight," an indication that SCANA was expected to underperform other companies within the industry. The rating change was tied to concerns that if Toshiba's and Westinghouse's financial condition continued to worsen, Westinghouse would not be able to honor the terms of the EPC with SCANA and default on its obligations to complete the Nuclear Project.

87.    By February 2017, Westinghouse's potential financial collapse that SCANA left unaddressed became a practical inevitability. On February 14, 2017, Toshiba, parent of Westinghouse, announced a delay in the release of its quarterly earnings report due to its concerns over its accounting controls over Westinghouse. In particular, Toshiba estimated that it would need to write down $6.3 billion related to the Nuclear Project. Toshiba's Chairman at the time, Shigenori Shiga, resigned in the wake of this massive write-down.

88.     That same day, February 14, 2017, SCANA issued a revised completion schedule for the Nuclear Project yet again.  This shift was substantial: Unit 2 would now not be completed until April 2020, and Unit 3 not until December 2020.

**The Bechtel Audit Further Alerts the Individual Defendants to Ongoing Construction, Cost, and Management Issues with the Nuclear Project**

89.     In the midst of mounting delays and cost overruns, Santee Cooper's management began to urge SCANA to hire Bechtel to perform a comprehensive assessment of the Nuclear Project to mitigate these issues.   In April 2015, SCANA and Santee Cooper met with the engineering firm Bechtel to evaluate the engineering firm's proposal for its Audit.  Defendant Marsh agreed to seek the Board's approval of Bechtel as auditor.  By August 6, 2015, SCANA and Bechtel had signed an agreement for Bechtel to perform its audit by the end of 2015 at a cost of $1 million, an agreement approved by the Board.

90.     Through the assessment provided by Bechtel in its draft Audit, SCANA and the Board were on notice that the Nuclear Project schedule was at significant risk of non-completion. Bechtel completed the first draft of its initial findings as early as October 22, 2015.  Bechtel then delivered the draft Audit report to SCANA on November 9, 2015.  The draft Audit stated that "the current schedule is at risk," listing several significant issues pushing the completion dates for Units 2 and 3 well past the 2020 date.  According to the draft Audit, "to-go scope, quantities, installation rates, productivity, and staffing levels all point to project completion later than the current forecast," pushing the completion date of both Units to June 2023.   This critical reassessment jeopardized SCANA's ability to receive the $1.4 billion in federal tax credits needed to finance the project.

91.     In addition to an overall assessment that the Nuclear Project would not be completed by the dates SCANA provided to the regulators and the public, Bechtel's draft Audit contained a comprehensive list of shortcomings and risks plaguing the operation.   Bechtel pointed to a lack of project management, plans and schedules that did not reflect reality, and strained relations between the parties within the Consortium, among other things.   The draft Bechtel Audit stated:

- The to-go scope quantities, installation rates, productivity, and staffing levels all point to project completion later than the current forecast.

- While the Consortium's engineering, procurement, and construction (EPC) plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.

- The Consortium lacks the project management integration needed for a successful project.

- There is a lack of shared vision, goals, and accountability between the Owners and the Consortium.

- The Contract does not appear to be serving the Owners or the Consortium particularly well.

- The detailed engineering design is not yet completed which will subsequently affect the performance of procurement and construction.

- The issued design is often not constructible resulting in a significant number of changes and causing delays.

- The oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation.

- The relationship between the Consortium partners (Westinghouse Electric Company (WEC) and Chicago Bridge & Iron (CB&I)) is strained, caused to a large extent by commercial issues.

92.     The problems that Bechtel noted required action by SCANA's management and Board.   Instead of addressing these problems, the Individual Defendants actively sought to suppress the more critical findings prior to the final Audit's release in February 2016.   Having

obtained a copy of the draft Audit in November 2017, *The Post & Courier* revealed in an article entitled "Insight that Would've Alerted Problems with Nuclear Project Scrubbed from Audit Two Years Ago" that SCANA's fiduciaries sought to delete Bechtel's more critical analysis. According to the article, SCANA hired non-defendant attorney George Wenick "to battle with Bechtel over what would be included in the final document."   According to internal Santee Cooper documents, SCANA wanted Bechtel to remove criticisms of the Company's lack of oversight of the project and the push back of the 2020 deadline.

93.    As detailed herein, SCANA continued to assure regulators, ratepayers, and the investing public that there was significant progress being made on the Nuclear Project and that the Units would be completed by the 2020 deadline.  But as the chief counsel of the ORS non-defendant Jeff Nelson would later state upon revelations that SCANA was abandoning the project, "[t]here was information that was withheld from us and the Public Service Commission" as far back as 2015.

94.    Specifically, more than 30 pages disappeared from the final Bechtel Audit, delivered by Bechtel to SCANA on February 5, 2016.  Still scathing in its assessment, the final Bechtel Audit focused on ongoing issues with SCANA's primary contractor, Westinghouse. According to Bechtel's auditors, Westinghouse did not have a reasonable construction schedule, used a reactor design that was not constructible, and employed subcontractors who did not have commercial motivation to complete the Nuclear Project, among other things.  The Bechtel Audit stated:

> [T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC and major project management issues that must be resolved for project success:
>
> - …[T]he plans and schedules are not reflective of actual project circumstances

- The Consortium's project management approach does not provide appropriate visibility and accuracy to the Owners on project progress and performance

- The Consortium's forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis

- There is a lack of a shared vision, goals, and accountability between Owners and the Consortium

- The Consortium lacks the project management integration needed for a successful project outcome

- The WEC-CB&I relationship is strained, caused to a large extent by commercial issues

- The overall morale on the project is low

- The Contract does not appear to be serving the Owners or the Consortium particularly well

- The issued design is often not constructible resulting in a significant number of changes. The construction planning and constructability review efforts are not far enough out in front of the construction effort to minimize the impacts

- There is significant engineering and licensing workload remaining (currently over 800 engineers) [Inspections, Tests, Analyses, and Acceptance Criteria] closure will be a significant effort

- Emergent issues potentially requiring [Nuclear Regulatory Commission] approval of [License Amendment Requests] remain a significant project concern

- There is a significant disconnect between construction need dates and procurement delivery dates

- The amount of stored material onsite is significant, creating the need for an extended storage and maintenance program

- Construction productivity is poor for various reasons including changes needed to the design, sustained overtime, complicated work packages, aging workforce, etc.

- The indirect to direct craft ratio is high

- Field non-manual turnover is high

- The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance

- The schedule for the startup test program is in the early stages of development.  The [Boundary Identification Package] turnover rate appears to be overly aggressive

95.  On or about mid-February 2016, an internal Santee Cooper memorandum indicated that SCANA officials expressed concern about whether the release of the Bechtel Audit would subject the Company's officers and directors to a stockholder suit.  The Columbia, South Carolina, news site *TheState.com* later obtained the memo entitled "Bechtel Report Action Plan," and published its contents in an article entitled "Confidential Memo Shows SCANA, Santee Cooper Long Worried Over Nuclear Woes."  The article reported that "[s]ome 20 months before a report critical of the failing V.C. Summer nuclear project became public, SCE&G was worried how much – if anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper."  The article notes that SCE&G officials were "specifically aware of problems raised in [the] report," noting that failure to act could result in officer and director liability.  The memo also states that SCANA "wanted to know what kind of disclosures they should make to prospective buyers of their corporate debt, given they … knew the nuclear project had serious troubles."  Moreover, the memo also revealed that SCANA officials were aware the ORS "was trying to find out about the Bechtel report," but the information in the Audit remained concealed from ORS authorities, with SCANA denying its existence.  South Carolina Representative James E. Smith, Jr. was quoted in the article stating that the Santee Cooper memo showed that SCANA "could no longer have plausible deniability, to say they didn't know what was going on."

96.  The Individual Defendants knew or were reckless in not knowing about the problems associated with the Nuclear Project that the Bechtel Audit brought to light.  The

Nuclear Project, which included the expansion of a preexisting nuclear plant at the Company's V.C. Summer facility, was a key aspect of SCANA's plan to expand its nuclear energy generating capabilities. Therefore, the Nuclear Project was a core component of the Company's future energy output, and its progress was or should have been closely monitored by the Individual Defendants.

97.    As explained in the Company's 2017 Proxy Statement on Form DEF 14A, filed with the SEC on March 24, 2017, "risk oversight is ... thoroughly interwoven into the direction of the Board." The Nuclear Project, and the billions of dollars the Company poured into it, was a significant risk to SCANA. Further, because primary contractor Westinghouse's operational performance and financial stability were tied to when Units 2 and 3 would become operational, the schedule for completing the Nuclear Project and matters affecting that schedule, including those surrounding Westinghouse, were likewise significant risks to the Company requiring the Board's diligent oversight.

98.    To assist in the Board's duty of risk oversight, the Board established an executive senior officer-level Risk Management Committee reporting directly to the Audit Committee. The Risk Management Committee regularly conducts scheduled meetings wherein the Committee receives presentations from management representatives pertaining to risks of a particular operation, including the Nuclear Project. Among the topics of risk presented to the Audit Committee through the Risk Management Committee was likely the critical analysis provided in the Bechtel Audit regarding the status of the Nuclear Project. It is the duty of the Audit Committee to "[r]eview the status of significant risk(s) for which oversight is assigned to the Committee by the Board," "[d]iscuss SCANA's major financial risk exposures and the steps

management has taken to monitor and control such exposures," and report these risks to the Board.

99.     Moreover, the Nuclear Oversight Committee was charged with monitoring, discussing, and evaluating SCANA's nuclear operations, "which include regulatory matters, operating results, training and other related topics." The Nuclear Project and the status of its construction and attendant cost was at the forefront of the Company's nuclear operations, with over 56% of all the Company's generated energy provided coming from the Units at V.C. Summer by 2021. The Nuclear Oversight Committee had a duty to oversee and monitor any status of the Nuclear Project, including those revealed in the Bechtel Audit.

100.     The matters discussed in the Bechtel Audit were all red flags that the schedule for building the Nuclear Project was impossible to meet in the timeframe reported to the public and state regulators, that the projected costs associated with the Nuclear Project were unrealistic, and that SCANA was not complying with applicable laws in the design and construction of the Nuclear Project. These warnings went to the highest level of management, including the Company's CEO, defendant Marsh. The members of the Board either knew about these red flags and failed to act or consciously failed to take appropriate steps to learn about them. Under either scenario, the members of the Board breached their fiduciary duty of loyalty to the Company.

**IMPROPER STATEMENTS**

**Individual Defendants' Improper Statements Prior to the Bechtel Audit**

101.     Before the issuance of the Bechtel Audit, the Individual Defendants made repeated improper statements about the cost, progress, and completion schedule of the Nuclear Project at V.C. Summer. The Individual Defendants had no reasonable basis to make the positive claims in the SCANA's public filings and announcements in the face of construction

delays and cost overruns.  In truth, the Board and officers of SCANA failed in their duty to oversee the operation of the Nuclear Project.  In particular, the Individual Defendants were in breach of their fiduciary duty by concealing flaws related to project mismanagement and a lack of a constructible design that would ultimately doom the Nuclear Project.  For example, the Company fiduciaries, including defendant Marsh, were aware of ongoing design and management issues with Westinghouse and CB&I causing significant delays and cost overruns with the construction of the reactors, as evidenced by the May 2014 Grievance Letter.

102.    On February 19, 2015, the Individual Defendants caused or allowed the Company to issue a press release announcing the financial results for the fourth fiscal quarter and the full fiscal year 2014.  The press release touted "major accomplishments" for the Nuclear Project, "such as the placement of the Unit 2 module CA20, the first ring of the Unit 2 containment vessel, the Unit 2 module CA05, and the containment vessel bottom head for Unit 3."  The press release also boasted that customers would realize $1.2 billion in interest savings in rates for planned issuances.  The press release stated:

**New Nuclear**

Progress continues on V.C. Summer Units 2 and 3. 2014 marked some major accomplishments for the project such as the placement of the Unit 2 module CA20, the first ring of the Unit 2 containment vessel, the Unit 2 module CA05, and the containment vessel bottom head for Unit 3. Escalation continues to run below original expectations and due to the historically low interest rate environment over the last several years, customers will realize approximately $700 million in interest savings over the life of the debt issued to support the financing as the weighted average rate has been 4.99%, compared to the original estimate of 6.43%.  Additionally, SCE&G has locked in rates for planned issuances over the next two years which will likely generate an additional $525 million in savings over the life of those issuances.  In total, this equates to approximately $1.2 billion in interest savings that will be realized by our customers.

103.    On February 27, 2015, the Company filed its Annual Report on Form 10-K for the fiscal year ending December 31, 2014 (the "2014 Form 10-K") with the SEC, providing the

Company's financial results and position. The 2014 Form 10-K was signed by defendants Marsh, Addison, Bennett, Cecil, Hagood, Micali, Miller, Roquemore, Sloan, Stowe, and Trujillo. These defendants omitted or failed to disclose that the Nuclear Project was mired in design flaws, construction delays, and cost overruns.

104.    The 2014 Form 10-K contained certifications by defendants Marsh and Addison pursuant to sections 302 and 906 of Sarbanes-Oxley Act of 2002 ("SOX") that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

105.    In a March 12, 2015 press release, defendant Marsh claimed that "[s]ubstantial progress has been made towards the completion of the units," despite an increase in the capital cost in the Nuclear Project. Further touting the progress, he stated: "eighty five percent of the major equipment for Unit 2 has been received on site, the containment vessel bottom heads of both units have been set, and all three of the steel rings that comprise the vertical walls of the Unit 2 containment vessel have been completed or are near completion. Also, the first ring for Unit 2 has been set in place and a total of twenty three million man-hours have been worked with an excellent safety record."

106.    On January 19, 2016, the Individual Defendants caused or allowed the Company to release a video entitled "Highlighting a Year of Progress for V.C. Summer Units 2 and 3" discussing the progress of the Nuclear Project. In the video, the Company claimed that the Nuclear Project was moving along successfully and the "construction team concluded the year on a high note."

107.    On the same day, January 19, 2016, SCANA issued a press release.  In the press release, the Company touted the "achievement" of several "milestones" for the Nuclear Project. The Company further claimed that "mechanical modules were also taking shape" while "work continued steadily on the construction site."

**Individual Defendants' Continued Improper Statements and Concealment After the Bechtel Audit**

108.    Despite receiving the Bechtel Audit, the Individual Defendants continued to make improper statements about the cost, progress, and completion schedule of the Nuclear Project. Moreover, the Individual Defendants actively concealed the contents of the Bechtel Audit from state regulatory authorities, ratepayers, and the investing public until compelled to release it by South Carolina Governor Henry McMaster in September 2017.

109.    On February 26, 2016, the Company filed its Annual Report on Form 10-K for the fiscal year ending December 31, 2015 (the "2015 Form 10-K") with the SEC, providing the Company's financial results and position.  The 2015 Form 10-K was signed by defendants Marsh, Addison, Aliff, Bennett, Cecil, Decker, Hagood, Micali, Miller, Roquemore, Sloan, Stowe, and Trujillo.  These defendants omitted or failed to disclose the results of the Bechtel Audit, that the Nuclear Project was mired in design flaws and cost overruns, and that there was serious concern about the financial health of the Nuclear Project's primary contractor, Westinghouse.  Instead, the 2015 Form 10-K stated that the new reactors were "used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates."  The 2015 Form 10-K also reported that the total estimated project cost ranged from $7.1 billion to $7.6 billion, that Unit 2 would be completed by August 2019, and Unit 3 by August 2020, despite having no basis for this claim given the Bechtel Audit's findings.