UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| COLLEEN WITMER and RICHARD WICKSTROM, Derivatively on behalf of SCANA CORPORATION, | ) ) ) | CIVIL ACTION NO.: 3:17-CV-3166-MBS |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| KEVIN B. MARSH, GREGORY E. ALIFF, JAMES A. BENNETT, JOHN F.A.V. CECIL, SHARON A. DECKER, D. MAYBANK HAGOOD, LYNNE M. MILLER, JAMES W. ROQUEMORE, MACEO K. SLOAN, ALFREDO TRUJILLO, STEPHEN A. BYRNE, and JIMMY E. ADDISON, | ) ) ) ) ) ) ) ) ) ) | **VERIFIED CONSOLIDATED AND AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |
| | ) | |
| Defendants. | ) ) ) | |
| -and- | ) ) | |
| SCANA CORPORATION, a South Carolina corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |
| _____ | ) | |

Plaintiffs Colleen Witmer and Richard Wickstrom ("Plaintiffs"), by and through their undersigned attorneys, hereby submit this Verified Consolidated and Amended Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant SCANA Corporation ("SCANA" or the "Company") against current and former officers and directors of SCANA, seeking to remedy their breaches of fiduciary duties and other serious misconduct that has damaged the Company. Plaintiffs allege the following upon their knowledge with respect to

themselves, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of SCANA's public documents and press releases, SCANA's public filings with the United States Securities and Exchange Commission ("SEC"), wire and media reports published regarding SCANA, securities analysts' reports and advisories about the Company, transcripts of SCANA investor conference calls,  reports by global engineering, construction, and project management firm Bechtel Corporation ("Bechtel"), and transcripts of hearings before various legislative committees.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a derivative action on behalf of SCANA seeking to redress harm to the Company stemming from Defendants' egregious breaches of fiduciary duties, committed from at least August 1, 2015 through the present (the "Relevant Period"), relating to SCANA's construction and ultimate abandonment of two nuclear reactors at the V.C. Summer Nuclear Generating Station near Jenkinsville, South Carolina (the "Nuclear Project").  SCANA and its partner spent approximately $9 billion on the failed Nuclear Project.  As a result of Defendants' breaches, SCANA has lost billions of dollars in write-downs and unrecoverable costs, lost billions in market capitalization, and is exposed to billions of dollars in further losses, as well as tremendous civil and criminal liabilities.

2.    SCANA is an energy-based holding company whose principal subsidiary, South Carolina Electric & Gas Company ("SCE&G"), is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.  SCE&G and the South Carolina Public Service Authority, a state-owned utility that is also known as Santee

Cooper, jointly own the V.C. Summer plant in Fairfield County, South Carolina.  SCE&G is the plant operator of V.C. Summer.

3.      In 2007, SCANA successfully lobbied the South Carolina legislature to pass new legislation that would allow it to construct two new nuclear reactors at V.C. Summer.  Also in 2007, South Carolina passed a law called the Base Load Review Act ("BLRA"), which allows utilities to pass power plant capital financing onto customers.  SCANA used the BLRA to increase rates for SCE&G customers in order to pay for the failed Nuclear Project.

4.      SCANA initially projected that the first reactor would be on-line and generating power as early as 2016, and the second by 2019.  The total projected cost at the time was $9.8 billion and was referred to as one of the most ambitious construction efforts in South Carolina history.  After going through multi-year federal and state approval processes, SCANA, along with Santee Cooper, began construction on the Nuclear Project in March 2013.  SCANA's lead contractor for the Nuclear Project was Westinghouse Electric Company ("Westinghouse").

5.      The Nuclear Project immediately began to experience significant delays and runaway costs.  SCANA received extensive warnings about these problems early in the Nuclear Project's construction but did little to remedy the situation.  Indeed, SCANA continued to petition the South Carolina Public Service Commission ("PSC") for further rate increases and schedule extensions.  As issues worsened, SCANA's partner on the Nuclear Project, Santee Cooper, pressured SCANA to hire construction firm Bechtel to perform an in-depth analysis of the viability of the Nuclear Project.  SCANA did not want to hire Bechtel – Santee Cooper insisted.  In August

2015, the full SCANA Board approved a proposal to retain Bechtel to assess the Nuclear Project, with findings to be presented later that year.[1]

6.    Bechtel presented its initial findings to SCANA in October 2015 and issued its first report (the "Original Bechtel Report") on November 9, 2015.  The Original Bechtel Report made clear that it would be virtually impossible for SCANA to complete work on the Nuclear Project by the end of 2020 – a crucial deadline for SCANA to be eligible for $1.4 billion in federal tax credits.  The Original Bechtel Report stated that the construction was a minimum of two to three years behind its publicly-projected schedule and would not be completed before mid-2022. The Original Bechtel Report also identified a laundry list of problems with the Nuclear Project, including that relevant construction and installation rates "all point to project completion later than the current forecast"; that "plans and schedules are not reflective of actual project circumstances"; that the Company lacked "project management integration needed for a successful project"; and that there was a "lack of shared vision, goals, and accountability" between SCANA and its partners, including "strained" relationships between certain of the entities.

7.    The Original Bechtel Report states that Bechtel representatives "met with SCE&G CEO [Defendant Marsh]" during the week of October 12-16, 2015.  Thus, Defendant Kevin B. Marsh ("Marsh") was well aware of the critical problems with the Nuclear Project by that time.

8.    SCANA worked furiously with Bechtel to sanitize the Original Bechtel Report and downplay the statements contained therein about grave problems plaguing the Nuclear Project.  To that end, at the Defendants' urging, on February 5, 2016, Bechtel issued an updated version of the

---

[1] The "Board" means Defendants Kevin B. Marsh, Gregory E. Aliff, Sharon A. Decker, Lynne M. Miller, Alfredo Trujillo, James A. Bennett, D. Maybank Hagood, James W. Roquemore, John F.A.V. Cecil, and Maceo K. Sloan.

Original Bechtel Report (the "Updated Bechtel Report").[2]    The Updated Bechtel Report still contained many of the Original Bechtel Report's adverse findings about the Nuclear Project's feasibility, but it no longer expressly stated that completion by 2020 was impossible.

9.    A September 27, 2017 report in *The* State by Cindi Ross Scoppe entitled "How much worse was the original Bechtel nuclear report?" discusses the dynamic surrounding the dueling Bechtel Reports.  The article stated:

> A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry: "Bechtel Assessment Report…Weeks go by with…wrangling over [SCANA's attorney's] rejection of initial report, redactions, timeline removal, critique of project management."

10.    The Bechtel Reports put every member of SCANA's Board of Directors (the "Board") on notice that there were insurmountable problems with the Nuclear Project, including an unrealistic and unachievable schedule; unlikely completion of engineering and licensing workload; and poor productivity.  The Board knew that these, and other, problems fundamentally threatened the Nuclear Project.

11.    In or around February 2016, Santee Cooper authored a memorandum (the "Santee Cooper Memo"), which reveals that SCE&G was worried over whether releasing the Updated Bechtel Report would expose SCE&G directors and officers to liability in a "shareholder suit."  In this regard, a September 29, 2017 article published in *The State* by Sammy Fretwell and John Monk, entitled "Confidential memo shows SCANA, Santee Cooper long worried over nuclear woes," reported as follows:

> Some 20 months before a report critical of the failing V.C. Summer nuclear project [the Updated Bechtel Report] became public, SCE&G was worried how much – if

---

[2]    Collectively, the Original Bechtel Report and Updated Bechtel Report are referred to as the "Bechtel Reports".

anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper.

The one-page memo – written by an unnamed official of Santee Cooper, SCE&G's junior partner in the project – *depicts SCE&G as wanting to know if releasing the [Updated] Bechtel [R]eport's contents to stockholders would expose top utility executives and directors to legal liability*.

"Now that SCE&G is specifically aware of problems raised in (the) report, failure to act may result in O&D (officers and directors) liability," the memo says, noting there was concern about how "to defend (a) potential shareholder suit."

(Emphasis added).

12.     The Santee Cooper Memo shows that the Board knew that any failure to act after the Updated Bechtel Report – which was not even as damning as the Original Bechtel Report – would subject them to a substantial likelihood of liability in a shareholder suit such as this one.

13.     After the Bechtel Reports, the Santee Cooper Memo, and additional internal Santee Cooper documents were publicly released, the public was (justifiably) livid.  For example, a November 22, 2017 article by Andrew Brown and Thad Moore entitled "Insight that would've alerted problems with nuclear project scrubbed from audit two years ago" in *The Post and Courier* quoted Representative Russell Ott, who helped lead a special House committee that investigated the Nuclear Project.  Ott stated, "*This is a cover up. This is deception at its core. The bottom line is they lied to everyone and they did it intentionally*." (Emphasis added).

14.     Notwithstanding the Bechtel Reports and the Santee Cooper Memo, Defendants plowed full steam ahead on the hopeless, ill-fated Nuclear Project.  Defendants also concealed from regulators the critical adverse information contained in the Bechtel Reports.  The Board also misled and allowed SCANA to mislead the public by stating in SCANA-produced promotional videos, press releases, and several SEC filings signed by Defendants, that, *inter alia*, the schedule for the Nuclear Project was on target and the project was entirely viable.

15.     When they could put off the truth no longer, on July 31, 2017, SCE&G and Santee Cooper announced that they would abandon construction of the Nuclear Project, citing rising construction costs.  It quickly became clear that this was no innocent business failure; rather, it was radical and indefensible mismanagement.

16.     A sustained media and legal firestorm ensued following this announcement.  On August 1, 2017, SCE&G senior management briefed the PSC regarding the project and their decision.  Subsequently, SCE&G's management met with various stakeholders and members of the South Carolina General Assembly, including legislative leaders, to discuss the abandonment of the Nuclear Project.  In response to concerns of the assembly, and to allow for adequate time for governmental officials to conduct their reviews, SCE&G voluntarily withdrew its petition to abandon the project from the PSC on August 15, 2017.

17.     In August 2017, special committees of the South Carolina General Assembly, both in the House and in the Senate, began conducting public hearings regarding the decision to abandon the Nuclear Project. Members of SCE&G's senior management, along with representatives from Santee Cooper, testified before these committees. The reviews being conducted by each of these committees are continuing.

18.     On August 11, 2017, *The Post and Courier* reported that a class action had been filed against SCE&G on behalf of South Carolina ratepayers, alleging that SCE&G had overcharged its customers for electricity for nearly 10 years by raising their rates to pay in advance for the construction of the Company's subsequently abandoned nuclear plants.

19.     In September 2017, SCANA was served with a subpoena issued by the United States Attorney's Office for the District of South Carolina seeking documents relating to the

Nuclear Project. The subpoena requires the Company to produce a broad range of documents related to the Nuclear Project.

20.    Also in September 2017, the state's Office of Attorney General, the Speaker of the House of Representatives, and the Chair and Vice-Chair of the South Carolina House Utility Ratepayer Protection Committee requested that the State Law Enforcement Division ("SLED") conduct a criminal investigation into the handling of the Nuclear Project by SCANA and SCE&G.

21.    On September 26, 2017, the Office of Regulatory Staff ("ORS") filed a request (the "ORS Request") with the PSC asking for an order directing SCE&G to immediately suspend all revised rates collections from customers which were previously approved by the PSC.

22.    On October 17, 2017, SCANA announced that the SEC had subpoenaed SCANA for documents as part of an investigation into the failed Nuclear Project.

23.    On October 31, 2017, SCANA announced Marsh's resignation as SCANA CEO and Byrne's resignation as Senior Vice President of SCANA and COO and President, Generation and Transmission of SCE&G. SCANA suggested that it still had confidence in Marsh by noting he was not resigning as a SCANA director. But Marsh did exactly that on December 21, 2017.

24.    Defendants breached their fiduciary duties to the Company and its shareholders and acted in bad faith by, among other things, overseeing, sanctioning, and participating in the grossly mismanaged Nuclear Project; purposefully concealing material information about the Nuclear Project, including the findings of the Bechtel Reports, from regulators and the public, in violation of state and federal law; consciously disregarding the many red flags related to the Nuclear Project's inevitable failure; failing to maintain proper internal controls; and accepting incentive compensation tied to their management of the Nuclear Project.

25.     As alleged in detail below, Plaintiffs have not demanded that the Board initiate this litigation because such a demand would be futile.  The Board has not commenced, and will not commence, litigation against themselves because they face a substantial likelihood of liability to SCANA for breaching their fiduciary duties by knowingly overseeing, endorsing, and participating in the gross mismanagement of the Nuclear Project.  The Bechtel Reports, the Santee Cooper Memo, and the directors' membership on various Board committees specifically responsible for issues relating to the Nuclear Project amply demonstrate that demand on the Board is futile.

26.     The Board's dereliction of its duties has now forced SCANA to accept a takeover offer by Dominion Energy, Inc. ("Dominion").  On January 3, 2018, Dominion and SCANA announced an agreement for the companies to combine in a stock-for-stock merger in which SCANA shareholders would receive 0.6690 shares of Dominion common stock for each share of SCANA common stock.  Dominion is essentially buying SCANA at a fire-sale price in the wake of the Company's collapse resulting from Defendants' wrongdoing.

27.     However, the success of the Dominion takeover is profoundly uncertain.  In numerous statements, Tom Farrell, Dominion's CEO, has made it clear that Dominion's acquisition offer is contingent on receiving regulatory approval without further major concession. Critically, part of the economic equation is a retention of major portions of Nuclear Project costs already included in the South Carolina rate base.  Farrell stated that the offer would be withdrawn if the regulatory and legal review imposes additional conditions, *i.e.*, halting South Carolina consumers' continued payments for Nuclear Project costs, which would make the transaction "uneconomical" in the opinion of Dominion.

28.     On January 23, 2018, South Carolina Governor McMaster stated that ratepayers should no longer have to pay SCANA's Nuclear Project costs.  McMaster even stated that if a law

is passed stating that such payments should continue, he would veto it – further casting doubt on the potential for the Dominion transaction to come to fruition.

29.    As of January 30, 2018, SCANA's price is trading at around $43 per share, well under the Dominion offer price, which is currently valued at over $50 per SCANA share, showing that the market does not believe the deal will be consummated.

30.    The financial and reputational harm to SCANA from Defendants' breaches is astronomical. All told, SCANA's market capitalization shrunk by billions as a result of the Board's breaches.

31.    This Court should order Defendants to indemnify SCANA for all harm flowing from their breaches of fiduciary duty.

## II.    JURISDICTION AND VENUE

32.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between Plaintiffs and each Defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

33.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. The Company is headquartered in this District, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## III.    PARTIES

34.    Plaintiff Colleen Witmer is a current shareholder of SCANA and has continuously held SCANA stock since July 2015. Witmer is a citizen of Pennsylvania.

35.    Plaintiff Richard Wickstrom is a current shareholder of SCANA and has continuously held SCANA stock since January 2017. Wickstrom is a citizen of Florida.

36.    Nominal Defendant SCANA is an energy-based holding company principally engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses. SCANA's principal subsidiary, SCE&G, is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina. SCANA is incorporated in South Carolina and maintains its principal executive offices at 220 Operation Way, Cayce, South Carolina 29033-3701. SCANA's stock is traded on New York Stock Exchange ("NYSE") under the ticker symbol "SCG".

**Officer Defendants**

37.    Defendant Marsh served as Chairman of the Board and Chief Executive Officer ("CEO") of SCANA from December 2011 until October 2017 and as SCANA director from 2011 to December 21, 2017. Marsh was also the Chairman of the Board's Executive Committee at relevant times.    As stated in the Company's public filings with the SEC, for 2015 and 2016, Marsh received total compensation of $5,733,258 and $6,108,804, respectively. Upon information and belief, Marsh is a citizen of South Carolina.

38.    Defendant Stephen A. Byrne ("Byrne") has served as an Executive Vice President of SCANA, as well as President of Generation and Transmission and Chief Operating Officer of SCE&G. As stated in the Company's 2017 Proxy Statement filed on Form DEF 14A with the SEC on March 24, 2017 (the "2017 Proxy"), Byrne's "nuclear responsibilities include overseeing the construction of [the Nuclear Project]." 2017 Proxy at 28.    According to the Company's public filings, for 2015 and 2016, Byrne received total compensation of $2,314,038 and $2,582,141, respectively. Upon information and belief, Byrne is a citizen of South Carolina.

39.    Defendant Jimmy Addison ("Addison") was appointed Executive Vice President of SCANA in January 2012, and he has served as the Company's CFO since April 2006. According to the Company's public filings, for 2015 and 2016, Addison received total compensation of $2,405,419 and $2,580,874, respectively. Upon information and belief, Addison is a citizen of South Carolina.

40.    Defendants Marsh, Byrne, and Addison are collectively referred to herein as the "Officer Defendants."

**Director Defendants**

41.    Defendant Gregory E. Aliff ("Aliff") has served as a director of the Company since October 2015. During the Relevant Period, Aliff has served as the Chairman of SCANA's Audit Committee and as a member of the Company's Executive and Nominating and Governance Committees. According to the Company's public filings, for 2015 and 2016, Aliff received total compensation of $48,250 and $213,500, respectively. Upon information and belief, Aliff is a citizen of Virginia.

42.    Defendant James A. Bennett ("Bennett") has served as a director of the Company since 1997. Bennett serves as the Chairman of the Company's Compensation Committee and is a member of the Company's Executive and Audit Committees. During the Relevant Period, Bennett was a member of the Nuclear Committee. According to the Company's public filings, for 2015 and 2016, Bennett received total compensation of $194,157 and $215,867 respectively. Upon information and belief, Bennett is a citizen of South Carolina.

43.    Defendant John F.A.V. Cecil ("Cecil") has served as a director of the Company since 2013. During the Relevant Period, Cecil has served on the Company's Audit and Compensation Committees. According to the Company's public filings, for 2015 and 2016,

Cecil received total compensation of $193,000 and $206,000, respectively. Upon information and belief, Cecil is a citizen of North Carolina.

44.     Defendant Sharon A. Decker ("Decker") has served as a director of the Company since October 2015. Decker previously served as a director of the Company from 2005 until April 2013. During the Relevant Period, Decker has served on the Company's Compensation and Nuclear Committees. According to the Company's public filings, for 2015 and 2016, Decker received total compensation of $48,250 and $206,000, respectively. Upon information and belief, Decker is a citizen of North Carolina.

45.     Defendant D. Maybank Hagood ("Hagood") has served as a director of the Company since 1999 and is the Company's Lead Director. During the Relevant Period, Hagood has served on the Company's Executive, Nuclear Oversight, and Nominating and Governance Committees. In 2015, Hagood served as Chairman of the Audit Committee. According to the Company's public filings, for 2015 and 2016, Hagood received total compensation of $207,000 and $225,500, respectively. Upon information and belief, Hagood is a citizen of South Carolina.

46.     Defendant Lynne M. Miller ("Miller") has served as a director of the Company since 1997. During the Relevant Period, Miller has served on the Company's Audit and Nominating and Governance Committees. According to the Company's public filings, for 2015 and 2016, Miller received total compensation of $197,000 and $206,000, respectively. Upon information and belief, Miller is a citizen of Virginia.

47.     Defendant James W. Roquemore ("Roquemore") has served as a director of the Company since 2007. During the Relevant Period, Roquemore served as the Chairman of the Company's Nuclear Committee and on SCANA's Executive and Compensation Committees. According to the Company's public filings, for 2015 and 2016, Roquemore received total

compensation of $197,000 and $216,000, respectively. Upon information and belief, Roquemore is a citizen of South Carolina.

48.    Defendant Maceo K. Sloan ("Sloan") has served as a director of the Company since 1997. During the Relevant Period, Sloan has served on the Company's Nuclear Oversight and Compensation Committees, including as Chairman of the Compensation Committee, and as a member of SCANA's Executive Committee. According to the Company's public filings, for 2015 and 2016, Sloan received total compensation of $201,000 and $210,000, respectively. Upon information and belief, Sloan is a citizen of North Carolina.

49.    Defendant Alfredo Trujillo ("Trujillo") has served as a director of the Company since 2013. During the Relevant Period, Trujillo has served on the Company's Nuclear Oversight and Nominating and Governance Committees. According to the Company's public filings, for 2015 and 2016, Trujillo received total compensation of $193,000 and 206,000, respectively. Upon information and belief, Trujillo is a citizen of Georgia.

50.    Defendant James M. Micali ("Micali") served as a director of the Company from 2007 until the 2017 Annual Meeting, when he retired as a result of his reaching mandatory retirement age. During part of the Relevant Period, Micali served as a member of the Audit, Compensation and Executive Committees and served as Chairman of the Nominating and Governance Committee. According to the Company's public filings, for 2015 and 2016, Micali received total compensation of $201,000 and 215,000, respectively. Upon information and belief, Micali is a citizen of Massachusetts.

51.    Defendant Harold C. Stowe ("Stowe") served as a director of the Company from 1999 until the 2016 Annual Meeting, as a result of his reaching mandatory retirement age. During part of the Relevant Period, Stowe served as Lead Director and as a member of the Audit,

14

Compensation, Executive, and Nominating and Governance Committees.   According to the Company's public filings, for 2015 and 2016, Stowe received total compensation of $211,245 and $106,105, respectively.   Upon information and belief, Stowe is a citizen of South Carolina.

52.     Collectively, Aliff, Bennett, Cecil, Marsh, Micali, Decker, Hagood, Miller, Roquemore, Sloan, Trujillo, and Stowe are referenced collectively in this Complaint as the "Director Defendants."

53.     Collectively, Aliff, Bennett, Cecil, Marsh, Decker, Hagood, Miller, Roquemore, Sloan, and Trujillo are collectively referred to hereinafter as the "Demand Directors."

54.     The Officer Defendants and the Director Defendants are collectively referred to hereinafter as the "Defendants."

## FACTUAL ALLEGATIONS

**SCANA/SCE&G Background**

55.     SCANA is a South Carolina corporation created in 1984 as a holding company. SCANA and its subsidiaries had full-time, permanent employees of 5,910 as of February 20, 2017. SCANA does not directly own or operate any significant physical properties, but it holds directly all of the capital stock of its subsidiaries, including SCE&G.

56.     SCANA subsidiary SCE&G is engaged in the generation, transmission, distribution and sale of electricity to approximately 709,000 customers and the purchase, sale and transportation of natural gas to approximately 358,000 customers (each as of December 31, 2016).   SCE&G's electric service territory extends into 24 counties covering nearly 16,000 square miles in the central, southern and southwestern portions of South Carolina.   The service area for natural gas encompasses all or part of 35 counties in South Carolina and covers approximately 23,000 square miles.   More than 3.4 million people live in the counties where SCE&G conducts its business.

**Background on the Nuclear Project**

57.     On May 27, 2008, SCE&G and Santee Cooper announced plans for the ill-fated $9.8 billion Nuclear Project.  The project consisted of constructing two new nuclear units at V.C. Summer.  SCE&G was to pay $5.4 billion for construction, Santee Cooper $4.4 billion.

58.     On May 30, 2008, SCE&G asked the PSC to approve the first of multiple rate increases to help fund the Nuclear Project (because Santee Cooper is a state agency, the PSC did not have to approve its plans).

59.     On October 27, 2008, ORS recommended approval of the Nuclear Project. The PSC then gave permission for SCE&G to begin site work.

60.     In February 2009, the PSC approved the Nuclear Project, which called for construction to begin in 2012, fuel to be loaded into the first reactor in 2015, the first reactor to begin operation in 2016 and the second reactor to begin operation in 2019.

61.     On December 31, 2011, SCE&G reported that progress was delayed because of the need to redesign nuclear modules, as well as "production issues" and "manpower issues."

62.     On March 30, 2012, the U.S. Nuclear Regulatory Commission issued construction and operating licenses for the two new reactors.

63.     On a June 3, 2013 investor call, Defendant Marsh revealed that there had been delays and problems with the ability to ship certain submodules to the V.C. Summer site, and with the site's ability to receive them.  As a result, Marsh stated that a new schedule had been developed that pushed the likely in-service date for Unit 2 back from its original estimate of 2016 to as late as 2018.  Further, as a result of these problems, costs on the project would increase $200 million.

64.     After continued delays and spiraling costs, in May 2014 Santee Cooper requested that SCE&G hire an outside company to oversee project management.

65.     In September 2014, SCANA petitioned the PSC for a $66.2 million electric rate

increase to help cover its rising costs.  On October 2, 2014, contractors stated it would cost $1.2 billion more than expected to complete the reactors.

66.     On March 12, 2015, *The State* published an in an article entitled "SCE&G: Cost of 2 new reactors up to $11 billion because of construction delays" by Roddie Burris.  *The State* reported that SCANA had petitioned the PSC to approve higher costs and later completion dates for the Nuclear Project – specifically, an increase in its total price-tag to $11 billion from an original $9.8 billion, a delay of the completion of Unit 2 to 2019, and a delay of the completion of Unit 3 to 2020.  This was the second time SCANA had petitioned the PSC for higher costs and delays since construction had begun only two years earlier.  Two months later, in May 2015, SCANA petitioned the PSC for an overall electric rate increase of $69.6 million, or 2.8%, to help cover rising costs.

67.     In June 2015, as a result of the rising costs and delays, ORS and the South Carolina Energy Users Committee reached a settlement with SCE&G, whereby the regulators agreed not to challenge SCE&G's new construction and capital cost schedules, but SCE&G would have to accept a reduced return-on-capital rate from 11% to 10.5%.

68.     In October 2015, SCE&G replaced the original consortium of contractors with Westinghouse, which agreed to cap at $7.7 billion the remaining cost customers would have to pay for construction.  In addition, any remaining costs were Westinghouse's responsibility.

69.     Also, in October 2015, SCE&G and Santee Cooper revised completion dates to 2019 and 2020.

**The Bechtel Reports Inform Defendants That the Nuclear
Project Was At Best Radically Behind Schedule and At Worst Unrealizable**

70.     According to internal Santee Cooper documents, in mid- to late-2014, Santee Cooper management had begun pressuring SCANA to hire an outside firm to help assess and potentially manage the Nuclear Project, in order to get runaway costs and delays under control.

71.     In April 2015, SCANA and Santee Cooper management met with Bechtel to evaluate the firm's proposal for a project assessment, and Marsh agreed to seek the Board's approval to move forward with having Bechtel prepare an assessment. Sometime between April and August 2015, the Board approved the proposal to have Bechtel prepare an assessment, and the Company and Bechtel signed an agreement on August 6, 2015.

72.     The Original Bechtel Report states that Bechtel representatives "met with SCE&G CEO [Defendant Marsh]" during the week of October 12-16, 2015. Thus, Defendant Marsh was well aware of the critical problems with the Nuclear Project by that time.

73.     On October 22, 2015, Bechtel delivered its initial findings to SCANA. On November 9, 2015, Bechtel delivered the Original Bechtel Report. The summary paragraph on page one of the report unequivocally states that "[b]ased on Bechtel's assessment, the current schedule is at risk." Indeed, Bechtel determined that Unit 2 and Unit 3 [the Nuclear Project] could not be completed by 2020, which was a critical date because SCANA's $1.4 billion in federal tax credits hinged on keeping that schedule. In fact, the Original Bechtel Report stated that full completion of the reactors would not occur until possibly June 2023.

74.     The Original Bechtel Report provided a laundry list of reasons why the project would face significant further delays and was at risk of non-completion, including, among other problems, that:

- The issued design is often not constructible resulting in a significant number of changes and causing delays.

- The to-go scope quantities, installation rates, productivity, and staffing levels all point to project completion later than the current forecast.

- While the Consortium's engineering, procurement, and construction (EPC) plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.

- The Consortium lacks the project management integration needed for a successful project.

- There is a lack of shared vision, goals, and accountability between the Owners and the Consortium.

- The detailed engineering design is not yet completed which will subsequently affect the performance of procurement and construction.

- The oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation.

- The relationship between the Consortium partners is strained, caused to a large extent by commercial issues.

75.    According to an internal Santee Cooper document, SCANA management immediately sought to sanitize the Bechtel Reports, instructing their outside counsel to reject the initial report, and to fight with Bechtel to redact or alter damning portions of it.

76.    Defendants were aware of and likely reviewed (or else recklessly disregarded) the Original Bechtel Report.  The Board authorized the Original Bechtel Report and knew it was being completed according to a schedule whereby Bechtel's review would be completed in October 2015, and that Bechtel was expected to present a report in November 2015.  Further, the Updated Bechtel Report, which the Board also reviewed, contained a schedule showing that Bechtel had delivered a version of the report to SCANA in November 2015.

77.    As an appendix to both of the Bechtel Reports, Bechtel attached its "weekly reports," which describe the work it did each week from starting its assessment to the drafting of the Original Bechtel Report.  Tellingly, the "weekly reports" attached to the Updated Bechtel Report stop at the same point as those attached to the Original Bechtel Report.  The Updated Bechtel Report showed that Bechtel had already completed work for its project assessment in

October 2015, even though the Updated Bechtel Report was released several months later. In other words, Bechtel performed no additional work after the Original Bechtel Report other than figure out how to water down its earlier conclusions.

78. Defendants, including in particular the members of the Board's Nuclear Committee, were certainly aware by February 2016 (if not before) that an earlier version of the Bechtel Report had been given to SCANA, and had a clear duty to inquire about and to review that report as well as the February 2016 version.

**The Updated Bechtel Report**

79. On February 5, 2016, Bechtel delivered the Updated Bechtel Report to SCANA and SCE&G. In that report, which was not made public until September 4, 2017, Bechtel again warned SCANA and SCE&G of the extensive and "fundamental" problems plaguing the Nuclear Project:

[T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC [engineering procurement and construction] and major project management issues that must be resolved for project success:

- While the Consortium's engineering, procurement, and construction plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.

- There is a significant disconnect between construction need dates and procurement delivery dates.

- The schedule for the startup test program is in the early stages of development.

- The Consortium's project management approach does not provide appropriate visibility and accuracy to the Owners on project progress and performance.

- The Consortium's forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis.

- There is a lack of a shared vision, goals, and accountability between the Owners and the Consortium.

- The Consortium lacks the project management integration needed for a successful protect outcome.

- The overall morale on the project is low.

- The Contract does not appear to be serving the Owners or the Consortium particularly well.

- The issued design is often not constructible resulting in a significant number of changes. The construction planning and constructability review efforts are not far enough out in front of the construction effort to minimize impacts.

- There is significant engineering and licensing workload remaining (currently over 800 engineers) ITAAC closure will be a significant effort.

- Emergent issues potentially requiring NRC approval of LARs remain a significant project concern.

- The amount of stored material onsite is significant, creating the need for an extended storage and maintenance program.

- Construction productivity is poor for various reasons including changes needed to the design sustained overtime, complicated work packages, aging workforce etc.

- The indirect to direct craft ratio is high.

- Field non-manual turnover is high.

- The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance.

80.    Thus, even after sanitizing the Original Bechtel Report, the Updated Bechtel Report still plainly showed – and the Board was therefore clearly aware – that the Nuclear Project was in serious jeopardy.

**Defendants Knew – at the Latest by February 2016 – That They Could Be Subject To A Shareholder Suit Unless They Revealed the Updated Bechtel Report and Addressed the Grave Issues With the Nuclear Project**

81.    The Santee Cooper Memo states that SCE&G was very concerned over whether it had to reveal the contents of the Bechtel Reports.  Indeed, as detailed in an article in *The State* titled "Confidential Memo shows SCANA, Santee Cooper long worried over nuclear woes" on September 29, 2017, the Santee Cooper Memo specifically stated that SCE&G could not now disclaim awareness of, and responsibility for, the myriad problems with the Nuclear Project discussed in the Updated Bechtel Report:

Some 20 months before a report critical of the failing V.C. Summer nuclear project [the Bechtel Reports] became public, SCE&G was worried how much – if anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper.

The one-page memo – written by an unnamed official of Santee Cooper, SCE&G's junior partner in the project – depicts SCE&G as wanting to know if releasing the Bechtel Reports's contents to stockholders would expose top utility executives and directors to legal liability.

***"Now that SCE&G is specifically aware of problems raised in (the) report, failure to act may result in O&D (officers and directors) liability," the memo says, noting there was concern about how "to defend (a) potential shareholder suit."***

[…]

The undated Santee Cooper memo apparently was written around mid-February 2016, within weeks of Santee Cooper and SCE&G officials receiving a report from the Bechtel consulting firm.

82.    Thus, the Santee Cooper Memo shows that the Board was worried about "expos[ing] top executives and directors to legal liability" in a "potential shareholder suit" – precisely what is at issue in this case.

83.    *The State* article also quoted State Representative James Smith as to SCANA's lack of "plausible deniability" in the wake of the Santee Cooper Memo:

[The memo] provides further evidence that SCANA and Santee Cooper knew the nuclear project was failing long before they told anyone else. He particularly was critical of SCANA, which the memo shows did not want to release the Bechtel Reports. '***This shows they could no longer have plausible deniability, to say they didn't know what was going on***,' Smith said. 'They knew or should have known what was going on.'"

(Emphasis added).

84.    The same article stated that Representative Kirkman Finlay was "appalled" with SCANA's behavior:

The one-page memo made its way to The State after state Rep. Kirkman Finlay, R-Richland, came across it. Finlay shared it with state officials. The State obtained the memo Friday and authenticated it with Santee Cooper…. Finlay said Friday he was appalled by the memo's portrayal of utility officials, seemingly concerned only

> with themselves…. State Rep. James Smith, D-Richland, said he doesn't think the Santee Cooper memo was intended to be released. Instead, he thinks, it was inadvertently included in the Bechtel report that Santee Cooper provided to House leaders earlier this month.

(Emphasis added).

85.    The Santee Cooper Memo also stated that although "SCE&G…was aware the [ORS] was trying to find out about the Bechtel Reports[,]" an SCE&G official "did not answer questions from Santee Cooper about how 'to handle ... disclosure' of the report."

**Defendants Also Knew in Mid-2016 That Westinghouse Would Be Unable to Further Fund the Nuclear Project**

86.    Several private communications show that Defendants knew that SCANA's relationship with Westinghouse had deteriorated and that grave financing issues with the Nuclear Project were afoot. For example, on May 1, 2016, SCE&G partner Santee Cooper CEO Lonnie Carter sent a private letter to Jose Gutierrez, the interim President and CEO of Westinghouse: "Unfortunately, our experience with Westinghouse . . . has been set in a trend of continuous deceit and non-transparency."

87.    In June 2016, Marsh sent a private email to Mamoru Hatazawa, Executive Officer of Toshiba Corporation (the parent company of Westinghouse) as follows: "We have no doubt that we have been the victim of financial malfeasance by [Westinghouse] and Toshiba." In another email on June 8, 2016, Marsh informed Mr. Hatazawa that "[w]e continue to be taken aback by what we see as Toshiba's lack of respect" and stated that Toshiba "is not acting honorably."

88.    This correspondence shows that SCANA had fundamental concerns over Westinghouse's ability to fund the Nuclear Project.

**Instead of Taking Action After the Bechtel Reports, Defendants Pretend Everything is Fine**

89.    On November 6, 2015, SCANA issued its quarterly report on Form 10-Q. That report provided in pertinent part:

The construction of the New Units and SCE&G's related recovery of financing costs through rates is subject to review and approval by the SCPSC as provided for in the BLRA [Base Load Review Act]. Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates, so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.

90.    On February 26, 2016, SCANA filed its Annual Report on Form 10-K which Marsh signed and Aliff, Bennett, Miller, Cecil, Roquemore, Decker, Sloan, Hagood, Addison, Stowe, Micali, and Trujillo also signed through their attorney in fact, Ronald T. Lindsay.  The report stated that "[w]hen the New Units [Nuclear Units 2 and 3 under construction at the V.C. Summer Station] are completed, our generating capacity and the percentage of total generating capacity represented by nuclear sources are expected to increase."

91.    In March 2016, a month after receiving the Updated Bechtel Report, Marsh stated in a letter to shareholders that "[SCANA] continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."

92.    On April 28, 2016, SCANA held a conference call [Q1 2016 Earnings Call] with analysts and investors to discuss the Company's first quarter 2016 earnings and operations.  During the conference call, SCANA's Chief Nuclear Officer Byrne answered an analyst's question regarding SCE&G's progress in constructing the V.C. Summer reactors.  Byrne reassured the analyst that SCE&G's contractors were "doing a tremendous job" and that progress was "better than we expected":

> [**Analyst**]: Okay. And then, I think you mentioned on the nuclear that the current critical path item is the shield building. And I know that you note in your report that you filed in February, that was mentioned there as well.  *I was just wondering if you could update us on the status of that in terms of the components that are being fabricated and so forth.*

[Byrne]: *Yes. Dan, the shield building is going probably better than we had anticipated.* Our concern for the shield building really came from the contractor, their concerns, and at the time that was Chicago Bridge and Iron. Now, Fluor has taken over, but we still retained the CB&I services crew that is doing that welding. So, even though CB&I power exited the consortium, the CB&I Services folks who are doing the containment vessel welding and the shield building welding stay, *and they're doing a tremendous job.*

\*\*\*

*Overall, I'd say the shield building is going a little better than expected.*

(Emphasis added).

93.    On or around June 30, 2016, SCANA issued a "V.C. Summer Nuclear Station Units 2 & 3 Quarterly Report" to the ORS. This report stated that "[w]hile certain aspects of the work present challenges to the completion schedule, overall progress continues."

94.    On July 28, 2016, SCANA held a conference call [Q2 Earnings Call] with analysts and investors to discuss the Company's second quarter 2016 earnings and operations. During the conference call, Byrne discussed the Nuclear Project's schedule with an analyst:

[Analyst]: So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones. If you could provide a little bit more of an update there. And ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project.

[Byrne]: Yes, Julien, this is Steve. *The guaranteed suspension completion dates remain at August of 2019 for Unit 2 and August of 2020 for Unit 3. We don't see anything to change those.* Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and then they will be giving that to Westinghouse. And remember that on the project now, we're just dealing with Westinghouse, Fluor is a subcontractor to Westinghouse. I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates. *So I don't expect anything dramatic to come from that.* **(Emphasis added).**

95.    On October 7, 2016, SCE&G "[p]ublished" a video on YouTube of Marsh speaking to reporters on September 21, 2016, at the "V.C. Summer Media Day 2016." In the video, Marsh

stated: **"Well they say well if you could do it again, would you make the same decision? And**
**absolutely I would make the same decision. I feel as strongly today, probably even stronger today,**
**than I did back in 2008 that this is the solution for us for a clean energy future."** Marsh further
stated that "with projects of this nature, you're gonna have some challenges . . . but we've been
**able to meet those challenges, make adjustments. to the contract, and continue progress on the**
**project."** Marsh reiterated:

> We're excited about where we are, we've had challenges, we've been able to work
> **through those challenges**, because you're not gonna go through a project that's
> gonna be ten or twelve years without issues come up. I would offer if you've ever
> built a house, whether it took twelve months or eighteen months, you had a couple
> issues, you had a couple of change orders along the way, and the likelihood is that
> didn't reduce the cost of your house as you went through that process.

(Emphasis added).

96.    On October 27, 2016, top SCANA insiders held a conference call [Q3 2016
Earnings Call] with analysts and investors to discuss the Company's third quarter 2016 earnings
and operations. During the conference call, Byrne discussed Westinghouse with an analyst:

> **[Analyst]**: Okay. And then I think in your last update report, there was also some
> discussion about Fluor maybe having some troubles in terms of staffing up for the
> evening shift or whatever. I wondered if you could update us on that.

> **[Byrne]**: Yes, Fluor, when they first came in, identified the need to increase
> staffing, and wanted to staff a full back shift or night shift because we'd been
> operating with a skeleton crew night shift or back shift up to that point. Initially,
> they had some difficulty in hiring, but I'd say that they recently have rectified that.
> . . . **So they are doing a good job,** they're trying some innovative things,
> implementing multilingual workforces, those kinds of things. **So we are very happy**
> **with what Fluor is doing for us. They've been very successful recently.**

(Emphasis added).

97.    Also on October 27, 2016, SCANA issue a video on YouTube titled "SCE&G
Welcomes News Media to Nuclear Construction Site" featuring "members of the V.C. Summer
leadership team." In the video, Byrne spoke to reporters on September 21, 2016, at the "V.C.

Summer Media Day 2016." Byrne "gave the journalists an overview of the massive construction site before they boarded a bus to see it for themselves." Byrne stated that "[t]he pace of this project is quickening. Though we have run into some issues and roadblocks in the past, most of those issues and roadblocks are behind us."

98.     On February 14, 2017, Toshiba announced that it would delay the release of its quarterly earnings report due to concerns around the company's accounting controls, specifically as they related to its U.S. nuclear subsidiary Westinghouse, which Toshiba estimated would require it to take a $6.3 billion write-down related to the Nuclear Project.

99.     Toshiba's chairman, Shigenori Shiga, announced his resignation to take responsibility for the massive write-down.

100.     Also on February 14, 2017, SCANA issued a quarterly report to the ORS that included "a revised completion schedule" for the Nuclear Project "of April 2020 and December 2020" – later than the previous completion dates of August 2019 and August 2020.

101.     Upon these and other revelations, SCANA's stock price fell approximately 6.25%, or $4.38 per share, from a closing price of $70.03 on February 13, 2017, to a closing price of $65.65 on February 17, 2017.

102.     Despite these announcements which revealed some – but not the full extent – of the troubles affecting SCANA, Westinghouse, Toshiba, and the Nuclear Project, SCANA and the Board continued to make false and misleading statements to the market.

103.     On February 16, 2017, SCANA held a conference call [Q4 2016 Earnings Call] with analysts and investors to discuss the Company's first quarter 2017 earnings and operations. During the conference call, Marsh stated that "we still anticipate completing our two new nuclear units" and that "we are making substantial progress on these new plants":

We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, ***we still anticipate completing our two new nuclear units,*** which will enable us to provide our customers with safe, reliable energy for decades to come . . . . ***As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again, we will continue to monitor this situation closely and will alert you if we are made aware of any changes.***

(Emphasis added).

104.    During the same call, Byrne reassured analysts that SCANA would still reach its "2020 deadline" because "efficiency factors have increased significantly," things were "going much, much more smoothly," and that "we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us." Specifically, Byrne stated as follows:

**[Byrne]**: . . . When you say the second unit, you talking about the second new unit or are you talking about Unit 2, which is the first new unit?

**[Analyst]**:  Sorry, yes, the second new unit and the 2020 deadline.

**Byrne]**:  ***What we've seen so far is that the efficiency factors have increased significantly ... and it's going much, much more smoothly. So I have a reasonable confidence in the efficiency gains for the second new unit.***

***

**[Analyst]**:  And also, I think in an earlier question you were talking about the various critical path, activities that you have coming up here over the first half of this year and going forward.  At what point, how close are you guys to getting to the point where the construction project now becomes a more traditional construction project? And nuclear, in and of itself, is no longer what's the defining factor in terms of getting from here to there?

**[Byrne]**: ***I think we're actually pretty close to that. . . . I think we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us.***

105.    Between February 28 and March 2, 2017, SCANA attended the 2017 UBS & Morgan Stanley Utilities Conferences, at which the Company published a "2017 UBS & Morgan Stanley Utilities Conferences Presentation" for investors and industry analysts.  This presentation

included the following slide, which graphically showed that SCANA's "Current Position" on the "Manufacturing Schedule" for the V.C. Summer reactors was nearly complete:



106.     On February 24, 2017, SCANA filed its annual report on Form 10-K which was signed by Marsh and signed by Aliff, Bennett, Miller, Cecil, Roquemore, Decker, Sloan, Hagood, Addison, Micali, and Trujillo also signed this report through their attorney in fact, Ronald T. Lindsay.  That report stated:

> SCE&G and Santee Cooper have agreed to jointly own, contract the design and construction of, and operate the New Units, which will be two 1,250 MW (1,117 MW, net) nuclear units at SCE&G's Summer Station, in pursuit of which they have committed and are continuing to commit significant resources. ***In addition, construction of significant new transmission infrastructure is necessary to support the New Units and is under way as an integral part of the project. Achieving the intended benefits of any large construction project is subject to many uncertainties***.

(Emphasis added).

107.    On March 29, 2017, Westinghouse filed to reorganize its business under the protection of Chapter 11 of the U.S. Bankruptcy Code.

108.    On April 12, 2017, Marsh, as well as Byrne, gave an "Ex Parte Briefing" to the PSC concerning Westinghouse's March 29, 2017 bankruptcy filing.  During the briefing, Byrne stated that "[s]ince the bankruptcy, Westinghouse has been generally cooperative and responsive to our requests for information"; that "we expect this cooperation to continue"; and that "work continues on-site without substantial disruption."

109.    During the briefing to the PSC, Marsh and Byrne presented another slide showing that the "Manufacturing Completion Schedule" for the V.C. Summer reactors was nearing completion:



110.    The above statements were false and misleading when made because the Defendants were in position of the Original Bechtel Report in November 2015 and were therefore aware that it would be virtually impossible for SCANA to complete work on the Nuclear Project by the end of 2020.  Defendants further knew of other problems with the Nuclear Project from the Original Bechtel Report, including that relevant construction and installation rates "all point to project completion later than the current forecast"; that "plans and schedules are not reflective of actual project circumstances"; that the Company lacked "project management integration needed for a successful project"; and that there was a "lack of shared vision, goals, and accountability" between SCANA and its partners, including "strained" relationships between certain of the entities.

**SCANA is Forced to Face the Music as the Bechtel Reports'**
**Strenuous Warnings About the Viability of the Nuclear Project Are Borne Out**

111.    On July 31, 2017, SCANA publicly announced that it would abandon construction of the nuclear project because of delays and cost overruns.

112.    Since this announcement, there has been sustained and vociferous criticism of SCANA.  On August 2, 2017, *The Post and Courier* published an article by Andrew Brown entitled "S.C. lawmakers want SCANA stockholders to eat costs of two failed nuclear reactors." The article stated:

> A bipartisan group of legislators met in the Statehouse on Wednesday to condemn utility regulators, the executives of SCANA and the board of the state-operated utility Santee Cooper, which partnered on the V.C. Summer expansion projects more than a decade ago.
>
> Many of the lawmakers went a step further, claiming they will investigate how to stop the executives and investors of SCANA — the parent company of [SCE&G] — from charging customers between $2 billion to nearly $5 billion in costs over the next 60 years for the wasted concrete, steel and labor pumped into the unfinished reactors.

113.    On August 4, 2017, South Carolina Attorney General Alan Wilson announced that he was opening an investigation and state Senate leaders called for a special legislative session to investigate SCANA's abandonment of the Nuclear Project.

114.    In response to these announcements, SCANA's stock price fell approximately 5%, or $3.36 per share, to close at $63.79 per share on August 4, 2017, after several days of unusually heavy trading volume.

115.    On August 10, 2017, *The Post and Courier* published an article by Thad Moore entitled "CEO:  SCANA may not return to scuttled nuclear project — even if a new partner emerges." The article reported on Marsh's comments to state lawmakers that "he wasn't sure he would want to take the project back up after it fell years behind schedule and its costs soared billions of dollars over budget."

116.    On this news, SCANA's stock price fell approximately 2.1%, or $1.32 per share, to close at $60.69 per share on August 11, 2017.

117.    The previous day, *Seeking Alpha* published an article entitled "Scana: Priced for Perfection Despite Massive Uncertainty" commenting on Marsh's announcement.  The article stated that "[a]bandonment of nuclear plant under construction is a dramatic and unexpected move that is meeting political uproar."  The article further stated that "[SCANA] had made no indication that they were considering abandonment.  Even the Regulators were taken by surprise. In fact, the Chairman of the [PSC] was quoted as asking senior management at an ex parte briefing:  "[A]re the three of you aware that this Commission was blindsided yesterday by this news?""

**Lawmakers and the Public Are Aghast As They Learn That Bechtel Told
SCANA Long Ago That the Nuclear Project Was In Fundamental Jeopardy**

118.    On August 31, 2017, *The Post and Courier* published a lengthy article about the Bechtel Reports by Andrew Brown entitled "Secretive report on South Carolina nuclear reactor construction never given to state utility regulators."  The article stated:

> SCANA Corp. may have misled state utility regulators about the existence of a secretive report that detailed construction failures at two troubled nuclear reactors at the V.C. Summer station in Fairfield County, months before the $9 billion energy project was abandoned.
>
> The director of the state Office of Regulatory Staff told *The Post and Courier* on Thursday that SCANA officials repeatedly told state agency employees they didn't have a copy of a report that was produced by Bechtel Corp., an engineering and project management company that observed the nuclear construction near Jenkinsville in past years.
>
> "They have continued to ask for it," said Dukes Scott, the regulatory staff director. "As we asked for it, they never said, 'Yes, here it is."'
>
> Those state regulators were surprised last week when SCANA and Santee Cooper officials admitted under oath in a Senate hearing the document did exist, and they were again denied access to it by SCANA, who is now claiming it as legally privileged information….
>
> Santee Cooper, which isn't overseen by state utility regulators, didn't respond to questions sent from the newspaper this week about the report.
>
> Lawmakers on two special legislative committees in the S.C. House and Senate have requested the document. It reportedly points out problems with the reactors' construction and offered recommendations of how to correct the nuclear build-out that was abandoned at the end of July.
>
> The exact findings of the report are not known but lawmakers hope the previously undisclosed document will shed some light into why electric customers are paying for two unfinished nuclear reactors that are only 30 percent complete and lacked a legitimate construction schedule.
>
> Roughly 5,000 workers were fired at V.C. Summer when investor-owned SCANA and state-run Santee Cooper pulled the plug on the decade-long construction effort that was supposed to usher in a new age of nuclear power in the United States.
>
> But to this point, nobody outside the two partnering utilities has seen the report. Gov. Henry McMaster, who oversees the 11-member board of Santee Cooper, knew nothing of it before last week. Later Thursday, McMaster sent a letter to Santee Cooper Chairman Leighton Lord asking for a copy of the report immediately.

33

Members of the state's regulatory staff heard about the report, compiled by Bechtel, the country's largest construction and civil engineering company, through conversations with workers at the V.C. Summer site in past years. But when the utility watchdog agency inquired about the document, Scott said his staff was told by SCANA officials that the utility didn't have a physical copy of any report.

SCANA employees informed state regulators that Bechtel had only orally communicated with them about the San Francisco-based company's work at V.C. Summer, Scott said.

Much is still unknown about Bechtel's work, including who paid for the report, what date Bechtel started its analysis, when it was completed, who it was delivered to and what problems it pointed out.

The report was initiated after Santee Cooper, the minority owner of the now-canceled reactors, pushed to have a third-party company analyze the construction effort, according to Lord.

By that point, the project had already seen one temporary construction schedule after another fail and the total cost for the two reactors increase dramatically.

Lord didn't go into detail about what findings or recommendations were contained in the report, but he told The Post and Courier it led Santee Cooper's board to issue a call for an independent construction monitor at the V.C. Summer site.

SCANA, which was primarily in charge of building and starting the reactors, rejected the call to hire a third-party construction monitor, according to Santee Cooper's chairman.

SCANA's failure to provide the state's utility regulators with the report has raised questions from state lawmakers leading the special committees.

"Some things just aren't quite adding up," said Rep. Russell Ott, a St. Matthews Democrat who co-chairs the House committee. "If a report surfaces, then we are going to have a situation where we will have to find out who is telling the truth."

SCANA and Santee Cooper have yet to hand over the report to senators and representatives investigating the nuclear plant debacle. But the committees have threatened to subpoena the document if the utilities don't comply. The Senate asked for the utilities to hand over the document by Sept. 7.

"We understand the Senate committee has indicated they plan to issue a subpoena for production of this document," the House committee wrote in their letter to the utilities. "We would hope to avoid that process but are willing and able to issue our own subpoena if forced to."

*The Post and Courier* has requested the report through the state's Freedom of Information Act.

McMaster, who has been pushing for a sale of Santee Cooper since the reactors were cancelled last month, said he's asked the state-run utility to produce whatever documents lawmakers need to investigate the reactors' failure.

"We've asked Santee Cooper to be forthcoming with information," McMaster said. "There are some things by law or agreement they can do, some things they can't, but our intention is to get every piece of information that would be of any interest at all to these people, these companies who are interested in purchasing some or all of Santee Cooper or entering into any other kind of agreement."

119.    Over strenuous objections from SCANA, Santee Cooper provided the Updated Bechtel Report to South Carolina Governor McMaster on September 4, 2017.

120.    On September 4, 2017 – again over SCANA's objections – South Carolina Governor McMaster released the Updated Bechtel Report.

121.    On September 6, 2017 *SeekingAlpha* published an entitled "Ugly Disclosure for Scana." *SeekingAlpha* reported that "SCANA seems to have wanted desperately to keep this report under wraps. Governor's office had to get a copy from plant partner Santee Cooper and then release it despite SCANA's protest."

122.    On September 21, 2017, SCANA announced that it had received subpoenas from the U.S. Attorney's Office for documents related to the Nuclear Project. Santee Cooper stated that it has also received subpoenas.

123.    On September 22, 2017, South Carolina Attorney General Alan Wilson requested that the SLED launch a criminal investigation related to the Nuclear Project.

124.    On this news, SCANA's stock price fell approximately 3.43%, or $1.96 per share, to close at $55.22 per share on September 22, 2017.

125.    On September 26, 2017, SLED confirmed it had opened an investigation.

126.    Also on September 26, 2017, the ORS filed a petition asking that SCANA be forced to immediately stop charging customers for the Nuclear Project.

127.    On October 17, 2017, SCANA announced that the SEC had subpoenaed SCANA for documents as part of an investigation into the Nuclear Project.

128.    On October 31, 2017, SCANA announced that Marsh was resigning as SCANA CEO and Byrne as Chief Nuclear Officer and Senior Vice President, effective January 1, 2018.

129.    On November 1, 2017, Moody's Investors Service placed SCE&G and SCANA on review for downgrade. The review was prompted by the escalating political and regulatory contentiousness that developed following SCANA's decision to cease construction of the Nuclear Project.

130.    On November 3, 2017, SCANA filed a Form 8-K filed with the SEC stating that Marsh and Byrne were eligible to receive customary payments under the terms of applicable Company plans. Thus, Marsh and Byrne can receive future payments from SCANA despite the fact they were responsible for the disastrous Nuclear Project.

**Defendants' Breaches of Fiduciary Duty Set the Stage For the Proposed Dominion Takeover**

131.    After Defendants ran SCANA into the ground, the distressed Company was ripe for a takeover. Sure enough, on January 3, 2018, Dominion and SCANA announced an agreement for the companies to combine in a stock-for-stock merger in which SCANA shareholders would receive 0.6690 shares of Dominion Energy common stock for each share of SCANA common stock.

132.    It is unclear at this point if the Dominion deal will be consummated. Dominion CEO Tom Farrell has stated that the deal is contingent on receiving regulatory approval without further major concessions. Farrell has stated that the offer would be withdrawn if the regulatory

and legal review imposes additional conditions which would make the transaction "uneconomical" in the opinion of Dominion management.  Part of the economic equation is a retention of major portions of Summer construction costs already included in the South Carolina consumers' electric bills.

133.    On January 22, 2018, South Carolina Governor Henry McMaster stated that he would not support forcing South Carolina consumers to continue to pay expenses relating to the Nuclear Project – precisely what Dominion is demanding.

## DUTIES OF SCANA'S BOARD

### A.    The Board's Fiduciary Duties

134.    By reason of their positions as directors, officers, and/or fiduciaries of SCANA and because of their ability to control the business and corporate affairs of SCANA, the Board owed and owes the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SCANA in a fair, just, honest, and equitable manner.

135.    Each director and officer of the Company owes to SCANA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

136.    The Board, because of their positions of control and authority as directors and/or officers of SCANA, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

137.    Because of their directorial and/or executive positions with SCANA, each Board member had knowledge of material non-public information regarding the Company, including the Bechtel Reports.  In addition, as directors and/or officers of a publicly held company, the Board

had a duty to promptly disseminate accurate and truthful information with regard to the Company's business so that the market price of the Company's stock would be based on truthful and accurate information.

138.    To discharge their duties, the directors and officers of SCANA were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of SCANA were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements; and

c. When put on notice of problems with, or misstatements about, the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct or misstatements and prevent their recurrence.

**B.      To Fulfill Their Fiduciary Duties, the Board and its Committees Had to Oversee and Monitor the Nuclear Project**

**1.      SCANA's Governance Principles**

139.    According to the Company's website, SCANA's Board "is charged with the responsibility of overseeing SCANA's business which is conducted by the officers, managers and employees, under the direction of the Chief Executive Officer ("CEO")."  Notably, the Board is tasked with "monitoring the performance of the management team to enhance the long-term value of SCANA Corporation for its shareholders."

140.    Among the Board's important duties is "review[ing], oversee[ing] and approv[ing] fundamental financial and business strategies and major corporate actions" and "review[ing] and assess[ing] identified significant risks facing SCANA and the alternatives for their mitigation."

There was no "business strategy" or "corporate action" more fundamental to SCANA than the strategy relating to the Nuclear Project.

141.    As stated in the Company's 2017 Proxy Statement, SCANA's "business and affairs are managed under the direction of [its] Board of Directors.  This includes the Board overseeing the types and amounts of risks undertaken."  SCANA's 2017 Proxy further represents that all Board members have frequent interactions with the Company's risk officers:

> Also, at each quarterly meeting of the Board of Directors, the Board reviews and discusses a report prepared by the Company's Risk Management Officer and approved by the Risk Management Committee, which sets forth certain high-level risks identified by the Company's senior executive officers and others. The report also provides the current status of such high-level risks, and further identifies where the primary responsibility for risk oversight resides, including both at the Board and Committee level, and identifies the senior executive officer who has primary responsibility for oversight of the particular risk.  2017 Proxy at 18.

142.    In addition to those responsibilities, the Board also performs the following functions:

> a. approves and maintains a succession plan for the CEO, senior executives, and other senior leaders;
>
> b.  reviews the CEO's performance toward accomplishing the objectives of the strategic and business plans; and
>
> c.  reviews with the CEO his annual assessment of senior management and other senior leaders.

143.    The Board's committees monitor other specific aspects of SCANA's business. These committees include the Nuclear Oversight Committee, Audit Committee, Compensation Committee, Executive Committee and the Nominating and Governance Committee.   These committees either have their own supplemental charters setting forth duties for their respective members in addition to the duties of board members generally, or their committee functions are described in the Company's proxy statements.

144.    The chart below, compiled from SCANA's public filings, illustrates the membership of these committees during all or part of the Relevant Period:

| Director/ Defendant | Audit | Compensation | Executive | Nominating and Governance | Nuclear Oversight |
|---|---|---|---|---|---|
| Aliff | X | | X | X | |
| Bennett | X | X | X | | X |
| Cecil | X | X | | | |
| Decker | | X | | | X |
| Hagood | X | | X | X | X |
| Marsh | | | X | | |
| Miller | X | | | X | |
| Roquemore | | X | X | | X |
| Sloan | | X | X | | X |
| Trujillo | | | | X | X |
| Micali | X | X | X | X | |
| Stowe | X | X | X | X | |

145.    These Board members served during the following times during the Relevant Period:

(a)    Aliff served on three committees—Audit, Executive and Nominating and Governance—from 2016-2017;

(b)    Bennett served on four committees—Audit, Compensation, Executive and Nuclear Oversight—from 2015- 2017;

(c)    Cecil served on two committees—Audit and Executive—from 2015-2017;

(d)    Decker served on two committees—Compensation and Nuclear Oversight—from 2016-2017;

(e)    Hagood served on four committees—Audit, Executive, Nominating and Governance and Nuclear Oversight—from 2015-2017;

(f)    Marsh served on one committee—Executive—from 2016-2017;

(g)    Miller served on two committees—Audit and Nominating and Governance—from 2015-2017;

(h)    Roquemore served on three committees—Compensation, Executive and Nuclear Oversight—from 2015-2017;

(i)    Sloan served on three committees—Compensation, Executive and Nuclear Oversight—from 2015-2017;

(j)    Trujillo served on two committees—Nominating and Governance and Nuclear Oversight—from 2015-2017;

(k)    Micali served on four committees—Audit, Compensation, Executive and Nominating and Governance—from 2015-2017; and

(l)    Stowe served on four committees—Audit, Compensation, Executive and Nominating and Governance—-in 2015.

146.    In addition, a majority of the Board served on each committee during the Relevant Period.

## 2.    Nuclear Oversight Committee

147.    During the Relevant Period, the following six directors – a majority of the Board – served on the Board's Nuclear Oversight Committee (the "Nuclear Committee"):  Roquemore (Chair), Decker, Hagood, Sloan, Trujillo, and Bennett.  According to the 2017 Proxy, the Nuclear Committee is tasked with "periodically tour[ing] the [Nuclear Project]."  The Nuclear Committee shall "meet at least quarterly to monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics."  2017 Proxy at 17.

148.    Additionally, the Nuclear Committee "reviews with the Institute of Nuclear Power Operations, on a periodic basis, its appraisal of our nuclear operations." *Id.* at 17. The Nuclear

Committee also "routinely presents an independent report to the Board on the status of our nuclear operations." The committee met four times during 2016. *Id.*

149.    The composition of the Board and in particular, its Nuclear Committee, has been heavily scrutinized, including in an October 15, 2017 article by John McDermott of the *Post and Courier* entitled "Members of SCANA board lack nuclear expertise yet oversaw failed S.C. project while earning a combined $11M" which describes the Company's directors as "[a] sod grower from Orangeburg[,] [a] flooring business executive from Charleston, [and a] financial adviser from Charlotte." The article also stated that "[t]hey're all well-respected members of a select and powerful club that pushed a multibillion-dollar energy deal that was to fulfill the future electricity needs for millions of South Carolinians for decades to come." Regarding the Nuclear Committee, the article noted that unlike SCANA, the Company's two closest investor-owned utility peers include directors with nuclear experience:

> Rep. Peter McCoy, chairman of the S.C. House committee investigating the V.C. Summer meltdown, reviewed the professional backgrounds of SCANA's board members Thursday.

> "I'm sure there are some nice folks on there," the Charleston Republican said. "They look like they're well-educated, and I think it's always good to bring a variety of backgrounds to a board. That's a plus. ... ***But I don't see a single person who has any past working experience with nuclear plants or nuclear projects. To me, it's problematic if they're asking the state and its citizens to be on the hook for billions of dollars for a project they told us they're not going to finish***."

> Leading the board's five-member Nuclear Committee, which deals only with the existing reactor at V.C. Summer, is James Roquemore, a respected agricultural entrepreneur who runs a Georgia seed company and Orangeburg-based Super-Sod/Carolina.

> ***SCANA's two closest investor-owned utility peers have taken a different approach. Charlotte-based Duke Energy has stocked its 13-member board with four directors who have real-world experience, including a former chief nuclear officer for New Orleans-based Entergy Corp. Southern Co., the owner of Georgia Power, has recruited two outside nuclear experts to its inner circle. Among them is Dale Klein, a retired chairman of the Nuclear Regulatory Commission***.

> The dearth of technical experience at SCANA is just one of the perceived weaknesses within the company's boardroom, according to experts.

(Emphasis added).

150.    The article noted that Rep. Micah Caskey summarized the lack of technical expertise at SCANA by stating: "I just think it's a damn shame none of them know anything about building a nuclear plant."

### 3.    Audit Committee

151.    During the Relevant Period, the following seven Board members – a majority of the Board – served on the Board's Audit Committee: Aliff (Chair), Bennett, Cecil, Miller, Hagood, Micali and Sloan.  The 2017 Proxy states that the Audit Committee "reviews the scope and effectiveness of our risk management program which includes the review of quarterly reports pertaining to significant risks" and "reviews major issues regarding accounting principles and financial statement preparation as well as reviews the Company's quarterly and annual financial statements before submission to the Board of Directors for approval and prior to dissemination to our shareholders, the public and regulatory agencies."  2017 Proxy at 14-15.

152.    As further described in the Audit Committee Charter[3], the committee shall provide assistance to the Board with respect to "the integrity of SCANA's financial statements, SCANA's compliance with legal and regulatory requirements[.]" The Audit Committee is also charged with overseeing "SCANA's systems of disclosure controls and procedures and systems of internal controls over financial reporting."

153.    The Audit Committee is also tasked with reviewing "the appointment, replacement or reassignment of the Internal Auditor or Corporate Compliance Officer and certain other Officer

---

[3] www.scana.com/about/governance/audit-committee

positions as appropriate." SCANA's applicable charter in effect during the Relevant Period specifically provides that the job of the Audit Committee includes, among other things, the following:

- Review the status of significant risk(s) for which oversight is assigned to the Committee by the Board of Directors;

- Discuss SCANA's major financial risk exposures and the steps management has taken to monitor and control such exposures;

- Review with the external auditors and Audit Services the adequacy and effectiveness of SCANA's internal controls over financial reporting; and

- Review with any disclosure committee of SCANA the effectiveness of SCANA's disclosure controls and procedures.

154.    The 2017 Proxy details the Audit Committee's risk function and oversight of the Company's Risk Management Committee: "The Board has established an executive senior officer-level Risk Management Committee which reports directly to the Audit Committee of the Board…At each quarterly meeting of the Board, the Audit Committee receives a report from the Risk Management Officer. Several members of the Risk Management Committee are also present at the Audit Committee meetings to provide details of the Committee's work and respond to questions raised by Audit Committee members." 2017 Proxy at 18.

### 4.    Compensation Committee

155.    During the Relevant Period, seven directors served on the Board's Compensation Committee: Bennett (Chair), Cecil, Decker, Roquemore, Micali, Stowe and Sloan. According to the Compensation Charter, the committee shall "assist the Board in the oversight of matters relating to compensation plans, compensation of SCANA's executives, SCANA's long-term strategic plans and performance in regard to management of human resources."

156.    As further described in the Company's 2017 Proxy, the Compensation Committee:

reviews and makes recommendations to the Board with respect to compensation plans, recommends to the Board persons to serve as our senior officers and as senior officers of our subsidiaries, and recommends to the Board salary and compensation levels, including all benefits, for our officers and officers of our subsidiaries. The Committee also approves goals and objectives with respect to the compensation of the Chief Executive Officer, evaluates the Chief Executive Officer's performance and along with the other independent directors sets his compensation based on this evaluation. 2017 Proxy at 15.

157.    According to the Compensation Committee Charter[4], the Compensation

Committee is charged with the following duties:

- Recommend to the Board salary and compensation levels, including fringe benefits, for all officers of SCANA and its subsidiaries;

- Review and make recommendations to the Board with respect to all SCANA executive compensation plans, including incentive compensation plans and equity based plans;

- Review SCANA's operating performance relative to the bonus and incentive programs;

- Review and approve corporate goals and objectives with respect to the compensation of the Chief Executive Officer, evaluate the Chief Executive Officer's performance in light of those goals and objectives and, either as a Committee or together with the other independent directors (as directed by the Board), determine and approve the Chief Executive Officer's compensation based on this evaluation;

- Produce an annual report on executive compensation for inclusion in SCANA's proxy statement, in accordance with applicable rules and regulations of the Securities and Exchange Commission;

- Recommend to the Board persons to serve as senior officers of SCANA and its subsidiaries;

- Review SCANA's overall succession and continuity planning with the Chief Executive Officer; and

- Review the level of SCANA stock ownership by SCANA's executive officers to determine whether each executive officer is in compliance with the Company's minimum ownership requirement, and, as may be requested and appropriate, grant temporary waivers from such requirements.

---

[4] https://www.scana.com/about/governance/compensation-committee

### 5.    Nominating and Governance Committee

158.    During the Relevant Period, the following six Board members served on the Board's Nominating and Governance Committee:  Aliff, Hagood, Miller, Trujillo, Micali and Sloan.  The Nominating and Governance Committee Charter states that the committee's purpose is to "identify individuals qualified to become members of the Board and to recommend such individuals to the Board to be Board nominees for directors, as well as to develop and recommend to the Board corporate governance principles, to recommend Board committee membership and responsibilities, and to oversee the evaluation of the Board, its committees and management."

159.    SCANA's 2017 Proxy states that the committee "annually reviews the membership and responsibilities of Board committees and recommends to the Board any changes that may be appropriate, and reviews and revises as necessary, SCANA's Governance Principles, taking into account provisions of the Securities Exchange Act of 1934, the listing standards of the New York Stock Exchange and any other source or sources the Committee deems appropriate."  2017 Proxy at 16.

160.    The Nominating and Governance Committee is charged with the following duties and responsibilities, among others:

- Evaluate the qualifications and performance of incumbent directors and determine whether to recommend them for re-election to the Board;

- Monitor the orientation and education needs of directors and recommend action to the Board, individual directors and management where appropriate;

- Review the level and form of director compensation and recommend changes to the Board for consideration and approval. In determining compensation for non-employee directors, the Committee shall be guided by the following goals: compensation should fairly pay directors for work required in a company of SCANA's size and scope; compensation should align directors' interests with the long-term interests of shareholders; and the structure of the compensation should be simple, transparent and easy for shareholders to understand;

- Review the status of significant risk(s), if any, for which oversight has been assigned to the Committee by the Board of Directors;

- Evaluate periodically the desirability of, and recommend to the Board, any changes in the size, composition, organization and operational structure of the Board;

- Review annually membership and responsibilities of Board committees and recommend to the Board any changes that may be appropriate;

- Review annually and revise as necessary, SCANA's Governance Principles, taking into account provisions of the Securities Exchange Act of 1934 (the "Exchange Act"), the listing standards of the New York Stock Exchange…and any other source or sources the Committee deems appropriate; and

- Initiate and oversee annually an evaluation of (i) the quality, sufficiency and timeliness of information furnished by management to the directors in connection with Board and committee meetings and other activities of the directors, (ii) the Board's effectiveness, (iii) the composition, organization (including committee structure, membership and leadership) and practices of the Board, (iv) tenure and other policies related to the directors' service on the Board, and (v) corporate governance matters generally; and recommend action to the Board where appropriate.

### 6.      Executive Committee

161.     During the Relevant Period, the following eight Board members – a majority of the Board – served on the Executive Committee: Marsh (Chair), Aliff, Bennett, Hagood, Roquemore, Sloane, Micali, and Stowe. The 2017 Proxy adds that the Executive Committee "exercises the powers of the full Board of Directors when the Board is not in session or cannot be called into session in a timely manner to deal with a time sensitive circumstance, with the exception of certain powers specifically reserved to the full Board of Directors by statute." 2017 Proxy at 16.

162.     Further, "the Committee also advises the Chief Executive Officer on other matters important to the Company (due to the size of our Board of Directors, and availability of our Directors to us, the Executive Committee is rarely required to meet)." SCANA's CEO "from time to time sought the advice of the Executive Committee." *Id.* at 16.

### 7.    The Company's Code of Conduct and Ethics

163.    SCANA's Code of Conduct and Ethics (the "Code") outlines how SCANA is to "conduct business using the highest ethical standards" as "[i]t is an obligation we have to our customers, our shareholders, our communities and ourselves."[5] In describing the Code, Defendant Marsh states that the Code "mandates that we conduct our business ethically and fairly, following all the rules and regulations that govern us."

164.    The Code states that "[e]xpectations of professional conduct apply to all employees, contractors, Board members or agents of SCANA."  The Code also states that Board members must, among other things:

- Behave honestly and avoid illegal, unethical or improper conduct;

- Have a practical working knowledge of the policies, laws and regulations affecting your job responsibilities;

- Report any actual or suspected violation of a law, rule or regulation through your management chain or other available reporting resources.  If the concern is related to accounting, internal controls, auditing matters or financial reporting irregularities, contact the Corporate Compliance & Privacy Officer;

- Cooperate with any investigation of alleged wrongdoing; and

- Be aware of the appearance of wrongdoing.

165.    Additionally, members of "SCANA management" must, among other things:

Be an ethical leader;

Promptly and properly address situations before they escalate; and

Ensure systems and procedures are in place to protect Company assets and legally achieve Company goals.

---

[5] *Available at* https://www.scana.com/docs/librariesprovider15/pdfs/code-of-conduct-and-ethics.pdf?sfvrsn=6.

166.    Defendants violated the Company's Code of Conduct and Ethics by affirmatively adopting, implementing, and condoning a business strategy based on deliberate and widespread violations of applicable laws.

## IV.    DEFENDANTS EGREGIOUSLY BREACHED THEIR FIDUCIARY DUTIES

167.    In breach of their fiduciary duties to SCANA and its shareholders, and in violation of South Carolina and federal law, Defendants consciously or recklessly disregarded extensive red flags that made it clear that the Nuclear Project could not be completed on schedule.  Yet Defendants caused or allowed SCANA to continue construction and to continue to seek funding increases from South Carolina ratepayers, when they knew or should have known that they were putting SCANA's existence as a going concern on the line.

168.    Before the Relevant Period, SCANA reported repeated cost-overruns, delays, and design and construction problems.   The  problems were so significant enough that in or around August 2015, the Board – only after Santee Cooper's insistence – authorized the Company to seek a project assessment by Bechtel to determine whether the Nuclear Project was viable.  In November 2015 and February 2016, respectively, Defendants were confronted with the findings in the Bechtel Reports, which made clear that the project could not be completed by 2020 and was in fact unachievable in the promised time frames.  In March 2016, the Board of SCANA met with the Board of Santee Cooper to discuss the fact that Westinghouse was at high risk of bankruptcy, threatening the viability of the project.

169.    Defendants breached their fiduciary duties by willfully ignoring these unmistakable signs that the Nuclear Project was in fundamental jeopardy.  Instead, Defendants doubled down and caused SCANA to seek further budget and rate increases, knowing that their profound failures to oversee and manage the Nuclear Project could destroy the Company and jeopardize SCANA's ability to recover such imprudently incurred costs.

170.    Defendants Bennett, Decker, Hagood, Roquemore, Sloan, and Trujillo had special responsibilities as members of the Nuclear Committee during the Relevant Period, including to "monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics." Indeed, the Nuclear Committee also "periodically tour[ed] the V.C. Summer Nuclear Station and its training facilities." Thus, these six Defendants' breaches are particularly egregious because they had both special duties and greater access to the truth about the Nuclear Project's problems.

171.    Defendants also breached their fiduciary duties by purposefully concealing material information from both regulators and the public about the status of the Nuclear Project for the sole purpose of attempting to avoid liability for themselves, as detailed in the Santee Cooper Memo. Defendants are already under state and federal criminal investigation for, *inter alia*, this concealment.

172.    Defendants who served on the Nominating and Governance Committee also breached their fiduciary duties to the Company by failing to nominate qualified directors. Specifically, these Defendants failed to nominate any directors who had any experience relevant to overseeing a massive nuclear construction project. This was especially indefensible because the Nuclear Project was critical to the Company.

173.    Particularly in light of the practices of SCANA's utility peers, the Nominating and Governance Committee defendants breached their fiduciary duties by failing to nominate even a single director with relevant experience to overseeing a nuclear project.

174.    Likewise, Defendants who served on the Compensation Committee also breached their fiduciary duties by approving compensation packages for the Officer Defendants including short-term incentive payments based specifically on purported achievements of goals regarding

the Nuclear Project, even though they knew or recklessly disregarded that the project was being seriously mismanaged and was extremely unlikely to be completed.

175.    Defendants who served on the Audit Committee also breached their fiduciary duties by failing to exercise their risk management duties with respect to the Nuclear Project and failing to properly exercise their duties as members of that committee as they caused, or allowed, SCANA to issue false and misleading statements relating to the Nuclear Project.

176.    As a result of Defendants' fiduciary breaches, SCANA has been extensively and irreparably harmed.  By directing and/or allowing construction on the Nuclear Project to continue long past the point when it was prudent to do so based on available information, SCANA has incurred billions of dollars in imprudent expenses while Defendants pursued an unachievable project, and has already seen its ability to pass those expenses on to ratepayers eroded.  SCANA may face further liability for these expenses if South Carolina legislative and regulatory authorities block SCANA from getting further reimbursement and/or force them to disgorge money they have previously received.  SCANA has also already reduced its rates by 3.5% and its revenue by $450 million over five years, due to public and legislative outcry, and may be forced to accept further rate cuts.  In addition, SCANA has agreed to take an $810 million charge, and to absorb $2.9 billion in nuclear amortization costs over the next 50 years.

177.    Defendants have also exposed SCANA to both state and federal criminal investigations.  The panel of South Carolina legislators who called for the state investigation stated that "it has become our belief that the proximate cause of the V.C. Summer collapse is a direct result of misrepresentation by SCANA and SCE&G.  We also believe that criminal fraud through the concealment of material information is also a plausible cause for the project's disastrous collapse."

178.    SCANA also faces an SEC investigation, securities class action lawsuits, and ratepayer class actions as a result of its malfeasance with respect to the project.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

179.    Plaintiffs bring this action derivatively in the right and for the benefit of SCANA to redress injuries suffered, and to be suffered, by SCANA as a direct result of Defendants' breaches of fiduciary duties and other violations of law.  SCANA is named as a nominal defendant solely in a derivative capacity.

180.    Plaintiffs will adequately and fairly represent the interests of SCANA in enforcing and prosecuting their rights.

181.    Plaintiffs are SCANA shareholders and held SCANA stock while Defendants were breaching their fiduciary duties as described herein.

182.    Plaintiffs did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

183.    SCANA has been directly and substantially injured by reason of the Board's breaches of their fiduciary duties to SCANA.  Plaintiffs, as shareholders of SCANA, seek damages and other relief on behalf of the Company, in an amount to be proven at trial.

184.    At the time this action was commenced, the Board of SCANA consisted of the following ten (10) directors:  Kevin B. Marsh, Gregory E. Aliff, Sharon A. Decker, Lynne M. Miller, Alfredo Trujillo, James A. Bennett, D. Maybank Hagood, James W. Roquemore, John F.A.V. Cecil, and Maceo K. Sloan.

**Demand on the Demand Directors is Futile Because They
Face a Substantial Likelihood of Liability For Their Conduct**

185.    The entire Board served as SCANA directors at all relevant times.  Thus, each faces a substantial likelihood of liability for their participation in the wrongful acts alleged herein.

186.    All of the Demand Directors have served on the Board since at least October 2015, the month Bechtel delivered its initial findings in the Original Bechtel Report to SCANA.   Each Demand Director purportedly received reports on progress, issues and variances related to the construction process.    All of the Demand Directors knew or should have known that this project was one of the most ambitious construction efforts in South Carolina history and was critically significant to the Company's reputation and financial well-being.   The Demand Directors were aware of and/or reviewed the Bechtel Reports.   All members of the Board knew or should have known that construction on the Nuclear Project was progressing far too slowly to be completed by the Company's critical and publicly stated 2020 deadline.   And all were aware by March 2016 that Westinghouse was at high risk of bankruptcy, threatening the viability of the Nuclear Project. All members of the Board also caused SCANA to make materially misleading statements about the Nuclear Project.

187.    The Santee Cooper Memo states that SCE&G was worried over whether SCANA directors would be liable in a shareholder suit if it concealed the contents of the Updated Bechtel Report, demonstrating that Board members knew the contents of the Bechtel Reports showed they knew since at least February 2016 that the Nuclear Project was in grave trouble, and undermined their, and SCANA's, public statements about the Nuclear Project.

188.    Further, as described below, six members (a majority) of the Board (Defendants Bennett, Decker, Hagood, Roquemore, Sloan, and Trujillo) served on the Nuclear Committee and thus face a substantial likelihood of liability for their special failures as members of that committee.  Four Demand Directors served on the Nominating and Governance Committee (Aliff, Hagood, Miller, and Trujillo) and thus face a substantial likelihood of liability for their failure to nominate *any* directors with nuclear expertise or experience.  Five Demand Directors (Bennett,

Cecil, Decker, Roquemore, and Sloan) served on the Compensation Committee that improperly approved millions of dollars in "incentive award" compensation for the Officer Defendants based on purported achievement of "goals" and "strategic objectives" regarding the Nuclear Project when the project was fundamentally failing. Five Demand were Audit Committee members (Aliff, Bennett, Cecil, Hagood, and Miller) and failed to fulfill their risk management duties and their duties related to ensuring that the Company's SEC filings and public statements were not materially false or misleading. Eight directors were Executive Committee members with specific duties to inform the CEO of important issues.

189.    Consequently, the members of the Board would not be able to impartially consider a demand.

190.    These acts, and the other improper acts set forth in this Complaint, which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment, nor could they have been.

191.    The Director Defendants' misconduct at the heart of this case constitutes the direct facilitation of violations of federal law, including knowingly and consciously presiding over the Company's systematic deficiencies and unsound practices with respect to the Nuclear Project, as well as its failures and its corresponding effects on SCANA's financial results. The Director Defendants also made, or caused SCANA to make, materially false or misleading statements.

192.    The Director Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicates they knowingly adopted, endorsed, or condoned a business strategy that caused a clearly failing project to continue, which cannot be considered a legitimate exercise of business judgment.

A.    **Defendant Marsh**

193.    Throughout most of the Relevant Period (until his resignation), Defendant Marsh served as the CEO and a director of SCANA.  As CEO, Marsh oversaw and bore ultimate responsibility for the failing Nuclear Project.  Throughout the Relevant Period, Marsh personally made false and misleading statements to regulators and to the public about the project's status and likelihood of completion.  Further, Marsh actively *concealed* crucial information from both regulators and the public, including, *inter alia*, both Bechtel Reports.

194.    The Original Bechtel Report states that Marsh met with Bechtel representatives on October 16, 2015 – ***several weeks before the damning report***.

195.    After receiving the Original Bechtel Report, Marsh instructed SCANA's outside counsel to have Bechtel weaken its findings and remove key portions of the report.  A September 27, 2017 article in *The State* by Cindi Ross Scoppe entitled "How Much Worse Was the Original Bechtel Report" discusses the dynamic surrounding the two Bechtel reports.  The article stated that "[a] timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry: "Bechtel Assessment Report…[w]eeks go by with…wrangling over [SCANA's attorney's] rejection of initial report, redactions, timeline removal, critique of project management."

196.    According to internal Santee Cooper documents, even after receiving the Updated Bechtel Report, Marsh determined not to disclose the report out of fear of shareholder lawsuits and potential personal liability.  Marsh was also directly on notice by March 2016 that Westinghouse was at high risk of bankruptcy, threatening the viability of the Nuclear Project.

197.    Marsh's concealment of information was sufficiently egregious that a legislative panel asked South Carolina's SLED to investigate the Company for possible criminal fraud, and

the U.S. Attorney's office for the District of South Carolina and the SEC have also opened investigations.

198.    The Company has already faced substantial harm as a result of Marsh's conduct, including, inter alia, billions of dollars in write-downs and lost revenue, massive erosion of the Company's market capitalization, and exposure to civil and criminal liability and penalties.

199.    There is also reason to doubt that Marsh can independently evaluate a pre-suit demand because Marsh's principal professional occupation is his employment with SCANA. According to the 2017 Proxy, Marsh received over $6 million in total compensation in 2016.

200.    There is also reason to doubt that Marsh can independently evaluate a pre-suit demand because the Board has publicly stated Marsh is not independent. In the 2017 Proxy the Board has admitted that Marsh is not independent under the New York Stock Exchange Rules.

201.    As such, demand on Defendant Marsh would have been futile.

**B.    The Demand Directors**

202.    As set forth above, demand would have been futile on the Demand Directors because all ten members of the Board at the time this action was initiated face a substantial likelihood of liability for breaches of fiduciary duty.

203.    As set forth further above, the Demand Directors were tasked by SCANA's governance principles with monitoring the performance of Company management, as well as "review[ing], oversee[ing] and approv[ing] fundamental financial and business strategies and major corporate actions" and "review[ing] and assess[ing] identified significant risks facing SCANA and the alternatives for their mitigation."   The Nuclear Project was clearly a major corporate action and also presented SCANA with significant risks.

204.    The Company has repeatedly touted the Nuclear Project as critical to SCE&G's ability to meet growing customer demands for electricity.  For example, in the Company's February

12, 2009 investor call for the fourth quarter of 2008, Defendant Addison said: "Our forecast continue[s] to show that we will need the additional generation our new nuclear units will provide in order to support load growth in our system," and Defendant Marsh said that the Company's "request to build the new nuclear plants is a key milestone in our efforts to meet South Carolina's growing need for clean, reliable energy."

205.    Credit ratings agencies and analysts also cited the Nuclear Project's critical importance to SCANA.  For example, on May 21, 2015, Fitch Ratings cut SCANA's credit rating from BBB+ to BBB solely based on delays and increased costs on the Nuclear Project. Similarly, Morgan Stanley cited Nuclear Project delays and cost overruns as the primary driver of its downgrade of SCANA to "underweight" on June 15, 2016.

206.    The Nuclear Project was also a constant focus of the Company's presentations and investor conference calls, and the Company sometimes held separate conference calls solely for the purpose of discussing the Nuclear Project, *e.g.* on August 11, 2014.  The Nuclear Project also attracted extensive analyst scrutiny, with multiple analysts asking in-depth questions about the project during each of the Company's quarterly investor conference calls throughout the Relevant Period.

207.    The Nuclear Project was so significant to SCANA that, throughout the Relevant Period, SCANA's website had a featured, dedicated page just for the project, including news links, construction videos and construction photos as well as regulatory filings and investor information. Further, the SCANA website's "Investor News" page is divided into three categories: "Nuclear Development," "Investor Releases" and "Other Investor Info."  During the Relevant Period, the Company issued over 50 press releases specifically concerning the Nuclear Project.

208.     Further, the Nuclear Project had, and continues to have, an enormous financial impact on the Company.  In each year during the Relevant Period, SCE&G's estimated capital expenditures related to the Nuclear Project were far higher than the rest of the SCE&G's estimated capital expenditures combined.  In the Company's 10-K annual report filed February 27, 2015, for example, SCANA estimated it would spend $957 million on the Nuclear Project versus $666 million on all normal SCE&G capital expenditures.   Thus, in 2015 the Company expected to spend an amount on the Nuclear Project equal to approximately 20% of its total operating revenues for 2014.    Similarly, the Company's Form 10-K annual report filed on February 26, 2016, the Company estimated that SCE&G would spend $1.116 billion constructing the Nuclear Project, versus $581 million on all normal capital expenditures combined.  This amount equated to more than 25% of the Company's total operating revenues for 2015.  And the Company's Form 10-K annual report filed February 24, 2017, SCANA estimated that SCE&G would spend $1.222 billion constructing the Nuclear Project in 2017, versus $769 million in total normal capital expenditures. This amount equated to 29% of the Company's total operating revenues for 2016.

209.     As such, the Demand Directors had a clear duty to closely monitor the Nuclear Project and to stay abreast of news concerning its progress and viability.  The Demand Directors' fiduciary breaches in light of the Nuclear Project's centrality to the Company's strategy are all the more egregious.

210.     Indeed, the Nuclear Project was of such critical importance to the Company that it is inconceivable that the Demand Directors were unaware of news concerning its progress and viability unless they consciously or recklessly ignored such information.

211.    Prior to and throughout the Relevant Period, the Demand Directors received unmistakable information showing that the Nuclear Project was failing – over 18 months before the project was finally abandoned in July 2017.  This included, *inter alia*:

- Rampant cost overruns and delays, many of which were publicly reported in news outlets and which required SCANA to repeatedly seek rate increases and schedule changes from the PSC;

- Concerns expressed by Santee Cooper that an outside construction manager was needed, leading the Board to authorize Bechtel – sometime between April and August 2015 – to do a project assessment;

- The Original Bechtel Report in November 2015;

- The Updated Bechtel Report in February 2016;

- A March 2016 meeting between the Board and the board of Santee Cooper at which the strong possibility of a Westinghouse bankruptcy was discussed;

- Emails from Santee Cooper executives throughout 2016 continuing to urge SCANA to hire an outside construction manager and warning that "SCANA's project management team …. does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a large new build project with complexities";

- Morgan Stanley's downgrade of SCANA in June 2016 on concerns about Toshiba and Westinghouse's continued financial viability;

- News reports in major U.S. press outlets at the end of December 2016 that Toshiba had announced that it faced billions of dollars in likely write-downs due to losses stemming from work on the Nuclear Project and one other nuclear project;

- Toshiba's widely reported announcement on February 14, 2017, that it would take a $6 billion write-down related to its nuclear program, and that it might sell Westinghouse, calling into question the continued viability of the Nuclear Project; and

- Westinghouse's filing for bankruptcy in March 2017.

212.    The Demand Directors were made aware of these red flags, as all of them had joined the Board by, at latest, October 2015.  In spite of these and other red flags, the Demand Directors took no action to mitigate the Company's losses and potential liability from the Nuclear Project.

213.    Further, as set forth above, Demand Directors face a substantial likelihood of liability for causing SCANA to issue false and misleading statements.

214.    As such, demand each of the ten members of the Demand Directors Board would be futile, as each faces a substantial likelihood of liability for breaches of their fiduciary duties of good faith, fair dealing, loyalty, and due care.

### C.    The Nuclear Committee

215.    Six Demand Directors – Defendants Bennett, Decker, Hagood, Roquemore, Sloan, and Trujillo – served on the Nuclear Committee during the Relevant Period, and thus face a substantial likelihood of liability for their special failures as members of that committee. As set forth above, the Nuclear Committee was tasked with "periodically tour[ing] the V.C. Summer Nuclear Station and its training facilities," and with meeting "at least quarterly to monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics." Further, the committee "reviews with the Institute of Nuclear Power Operations, on a periodic basis, its appraisal of our nuclear operations," and "routinely presents an independent report to the Board on the status of our nuclear operations."

216.    In spite of their special duties with respect to the Company's nuclear operations, none of these six Defendants took any action to mitigate or prevent the substantial harm to the Company that has occurred and will continue to occur as a result of the failure of the Nuclear Project. As such, these six directors face a substantial liability for breaches of their fiduciary duties. Consequently, demand on each of these six directors would be additionally futile.

### D.    The Nominating and Corporate Governance Committee

217.    Four Demand Directors – Aliff, Hagood, Miller, and Trujillo served on the Nominating and Governance Committee during the Relevant Period, and thus face a substantial likelihood of liability for their failure to nominate any directors with nuclear expertise or

experience.  According to the Nominating and Governance Committee Charter, its purpose includes "identify[ing] individuals qualified to become members of the Board and to recommend[ing] such individuals to the Board to be Board nominees for directors."

218.    During the Relevant Period, the Nominating and Governance Committee took no steps to nominate even *one* director with experience relevant to overseeing a major nuclear project.

219.    Aliff, Hagood, Miller, and Trujillo therefore face a substantial likelihood of liability for their reckless failure to nominate qualified directors, in violation of their fiduciary duties under the Nominating and Governance Committee Charter, SCANA governance principles, and South Carolina law.  Demand on Aliff, Hagood, Miller, and Trujillo would thus be futile.

### E.     The Compensation Committee

220.    Five Demand Directors – Defendants Bennett, Cecil, Decker, Roquemore, and Sloan – served on the Compensation Committee during the Relevant Period.  This committee improperly approved millions of dollars in "incentive award" compensation for the Officer Defendants based on purported achievement of "goals" and "strategic objectives," regarding the Nuclear Project when they knew, or had reason to know, that the Nuclear Project was actually failing.  As such, these five Demand Directors face a substantial likelihood of liability for breaches of their fiduciary duties.  Demand on Bennett, Cecil, Decker, Roquemore, and Sloan would thus be futile.

### F.     The Audit Committee

221.    Five Demand Directors – Defendants Aliff, Bennett, Cecil, Hagood, and Miller– were members of the Audit Committee during the Relevant Period.  Aliff, Bennett, Cecil, Hagood, and Miller failed to fulfill their risk management duties and their duties to ensure that the Company's SEC filings and public statements were not materially false or misleading.

Accordingly, these Aliff, Bennett, Cecil, Hagood, and Miller face a substantial likelihood of liability for breaches of fiduciary duty and demand on them would be futile.

## COUNT I

### Breach of Fiduciary Duties Against the Director Defendants

222.    Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

223.    Each of the Director Defendants was a member of SCANA's Board at relevant times.  As such, each owed SCANA the highest obligations of care and loyalty.

224.    Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to SCANA and its stockholders in at least the following ways:

> (a)    Overseeing, endorsing, and participating in the gross mismanagement of the Nuclear Project;
>
> (b)    Ignoring or consciously disregarding the many red flags related to the Nuclear Project's impending failure;
>
> (c)    Deliberately concealing material information about the Nuclear Project, including the findings of the Bechtel Reports, from regulators and the public, in violation of state and federal law;
>
> (d)    Failing to maintain proper internal controls;
>
> (e)    Accepting incentive compensation tied to their management of the Nuclear Project, which they were in fact mismanaging and which was failing;
>
> (f)    wasting corporate assets by continuing to construct the Nuclear Project when they knew or should have known that the Company, rather than South Carolina ratepayers, would wind up responsible for imprudent expenditures;

(g)     Making, and allowing SCANA to make, public statements regarding the Nuclear Project that were false and misleading due to the lack of feasibility of its completion, which also resulted in the artificial inflation of the Company's share price;

(h)     Allowing for inadequate risk controls over the Company's policies and practices, which allowed the Company to continue with the failing Nuclear Project, regardless of viability and the pervasive problems that existed;

(i)     Engaging in abuse of control and gross mismanagement of SCANA's assets and business through a failure to prevent the Nuclear Project;

(j)     With respect to the Defendants who served on the Nuclear Committee, grossly failing to adequately exercise their special oversight duties with respect to the unfeasible Nuclear Project;

(k)     With respect to the Defendants who served on the Compensation Committee, approving "incentive compensation" paid to the Officer Defendants under false pretenses of successful management of the Nuclear Project;

(l)     With respect to the Defendants who served on the Nominating and Corporate Governance Committee, failing to nominate any directors with qualifications relevant to overseeing a nuclear construction project; and

(m)     With respect to the Defendants who served on the Audit Committee, failing to fulfill their duties to ensure that SCANA issued accurate statements about the Nuclear Project and to properly fulfill their risk-management duties.

225.    Defendants, individually and in concert, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to SCANA to protect its rights and interests.

226.    In breach of their fiduciary duties owed to SCANA, Defendants willfully participated in misrepresentations related to the progress of the Company's Nuclear Project, risk controls, and internal and disclosure controls, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors and officers, rendering them personally liable to the Company for breaching their fiduciary duties.

227.    Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the status of the Nuclear Project and they failed to correct the Company's public statements.   Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of SCANA's securities.

228.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

229.    Additionally, Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Code of Conduct and Ethics, Governance Principles and the charters of various Board committees that, had they been discharged in accordance with Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

230.    Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

231.    Defendants' actions as detailed in this Complaint were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

232.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, SCANA has sustained and continues to sustain significant damages.  As a result of the misconduct alleged in this Complaint, Defendants are liable to the Company.

## COUNT II

### BREACH OF FIDUCIARY DUTIES
### AGAINST OFFICER DEFENDANTS

233.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

234.    Marsh served as SCANA's CEO from SCANA from December 2011 to October 2017.

235.    Byrne served an Executive Vice President of SCANA, as well as President of Generation and Transmission and Chief Operating Officer of SCE&G throughout the Relevant Period.

236.    Addison served as Executive Vice President of SCANA since January 2012 and as CFO since April 2006.

237.    As officers of SCANA, the Officer Defendants owed SCANA the highest obligations of care and loyalty.

238.    The Officer Defendants breached their fiduciary duties by endorsing, overseeing, and participating in the disastrous Nuclear Project.

239.    The Officer Defendants' fiduciary breaches caused harm to the Company.

240.    Plaintiffs, on behalf of SCANA, have no adequate remedy at law.

## COUNT III
## UNJUST ENRICHMENT

241.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

242.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense and to the detriment of SCANA. Defendants received excessive compensation and bonuses due to the ongoing and pervasive violations of law at the Company.

243.    Plaintiffs, as shareholders and representatives of SCANA, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongdoing as alleged herein;

B.    Directing SCANA to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect SCANA and its shareholders from a repeat of the damaging events described herein;

C.    Awarding to SCANA restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs, on behalf of SCANA, hereby demand a trial by jury.

Dated: January 30, 2018

**HOPKINS LAW FIRM, LLC**

*s/ William E. Hopkins*

William E. Hopkins (Federal Bar No. 6075)
12019 Ocean Highway
P.O. Box 1885
Pawleys Island, SC 29585
Tel.: (843) 314-4202
bill@hopkinsfirm.com

***Co-Liaison Counsel for Plaintiffs***

**BLAND RICHTER, LLP**

Eric S. Bland (Federal Bar No. 5472)
1500 Calhoun Street
Post Office Box 72
Columbia, South Carolina 29202
Tel.: (843) 573-9900

***Co-Liaison Counsel for Plaintiffs***

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jmf@weiserlawfirm.com
22 Cassatt Avenue
Berwyn, PA 19312
Tel.: 610-225-2677

***Co-Lead Counsel for Plaintiffs***

**BERNSTEIN LIEBHARD LLP**
U. Seth Ottensoser
Joseph R. Seidman, Jr.
10 East 40th Street
New York, New York 10016
Tel.: (212) 779-1414

***Co-Lead Counsel for Plaintiffs***