# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE SCANA CORPORATION DERIVATIVE LITIGATION | Lead Case No. 3:17-cv-03166-MBS |

**PLAINTIFFS' OMNIBUS OPPOSITION TO THE SCANA DEFENDANTS', JIMMY ADDISON'S, KEVIN MARSH'S, AND STEPHEN BYRNE'S MOTIONS TO DISMISS**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ..........................................................................................1

II.  STATEMENT OF FACTS ............................................................................6

III. ARGUMENT ................................................................................................11

    A.   Pre-Suit Demand on the Board Is Excused............................................11

        1.   Legal Standards Governing Demand Futility ............................................11

        2.   Plaintiffs Do Not Plead Mere "Oversight" Claims ....................................14

        3.   The Demand Directors Face a Substantial Likelihood of Liability for Their Failure to Act in the Face of the Bechtel Reports......................15

        4.   Demand is Futile Because the Santee Cooper Memo Shows that the Board Was Aware of the Bechtel Reports ..................................................17

        5.   Demand Is Futile Because a Majority of the Demand Directors Served as Members of the Nuclear Committee, Which Was Specifically Responsible for the Disastrous Nuclear Project ....................19

        6.   Demand on the Nominating and Governance Committee Members Would Have Been Futile ...........................................................................23

        7.   Demand on the Compensation Committee Members Would Have Been Futile ................................................................................................25

        8.   Demand on the Audit Committee Members Would Have Been Futile ...........................................................................................................26

        9.   Demand on the Executive Committee Members Would Have Been Futile ...........................................................................................................26

        10.  SCANA's Exculpatory Provision Does Not Insulate Defendants From Liability ............................................................................................27

    B.   The Complaint States a Claim Against Addison ..................................28

IV.  CONCLUSION.............................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abbott Labs. Derivative S'holders Litig.*,
    325 F.3d 795 (7th Cir. 2003) ...........................................................................12, 14

*Alidina v. Internet.com Corp.*,
    No. CIV. A. 17235-NC, 2002 WL 31584292 (Del. Ch. Nov. 6, 2002)...................................27

*In re Am. Int'l Grp., Inc.*,
    965 A.2d 763 (Del. Ch. 2009)...................................................................................28

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) ........................................................................................15

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ...................................................................................11, 13

*Beneville v. York*,
    769 A.2d 80 (Del. Ch. 2000)....................................................................................14

*Calma on Behalf of Citrix Sys., Inc. v. Templeton*,
    114 A.3d 563 (Del. Ch. 2015)...................................................................................30

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996)................................................................................4, 14

*Conrad v. Blank*,
    940 A.2d 28 (Del. Ch. Sept. 7, 2007) ........................................................................31

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................. *passim*

*David B. Shaev Profit Sharing Account v. Armstrong*,
    No. CIV.A. 1449-N, 2006 WL 391931(Del.Ch. Feb. 13, 2006) ...........................................21

*Dockside Ass'n, Inc. v. Detyens*,
    294 S.C. 86 (1987)................................................................................................24

*Emerald Partners v. Berlin*,
    787 A.2d 85 (Del. 2001) .........................................................................................27

*In re Ezcorp Inc. Consulting Agreement Derivative Litig.*,
    No. CV 9962-VCL, 2016 WL 301245 (Del. Ch. Jan. 25, 2016) ...........................................14

*In re Galena Biopharma, Inc. Derivative Litig.*,
    83 F. Supp. 3d 1047 (D. Or. 2015) .......................................................................31

*Grimes v. Donald*,
    673 A.2d 1207 (Del. 1996) .................................................................................12

*Grobow v. Perot*,
    539 A.2d 180 (Del. 1988) ..............................................................................12, 25

*Guth v. Loft, Inc.*,
    5 A.2d 503 (1939) ...............................................................................................13

*Hazelton v. Kuttner*,
    No. C/A/NO. 08:06CV02063, 2007 WL 1120405 (D.S.C. Apr. 13, 2007) ............22

*In re INFOUSA, Inc. Shareholders Litig.*,
    953 A.2d 963 (Del. Ch. 2007)..............................................................................29

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*,
    Civ. A. 14995, 1997 WL 208955 (Del. Ch. Apr. 22, 1997) ..................................12

*In re Intuitive Surgical Shareholder Derivative Litigation*,
    146 F. Supp. 3d 1106 (N.D. Ca. Nov. 16, 2015) ..................................................21

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991)...............................................................................................11

*McPheely v. Adams*,
    No. 6:13-CV-02660-GRA, 2013 WL 6581850 (D.S.C. Dec. 16, 2013) ................17

*In re Morgan Stanley*,
    542 F. Supp. 2d 317 (S.D.N.Y. 2008)..................................................................25

*In re Pfizer Inc. S'holder Derivative Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010)................................................11, 12, 13,14

*Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*,
    863 A.2d 772 (Del. Ch. 2004)..............................................................................27

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ......................................................................11, 13, 16

*In re Resorts Int'l Shareholders Litig.*,
    No. CIV.A. 8605, 1988 WL 92749 (Del. Ch. Sept. 7, 1988) ...............................24

*Rosenbloom v. Pyott*,
    No. 12-55516, 2014 WL 4290625 (9th Cir. Sept. 2, 2014) ..................................15

*Ryan v. Gifford,*
 918 A.2d 341 (Del. Ch. 2007)..................................................................................12, 29

*Sanders v. Wang,*
 No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) .........................................28

*Sandys v. Pincus,*
 No. 157, 2016, 2016 WL 7094027 (Del. Dec. 5, 2016).........................................16

*In re SFBC Int'l, Inc. Sec. & Derivative Litig.,*
 495 F. Supp. 2d 477 (D.N.J. 2007) ........................................................................13

*South v. Baker,*
 62 A.3d 1 (Del. Ch. 2012)........................................................................................25

*Stanziale v. Nachtomi (In re Tower Air, Inc.),*
 416 F.3d 229 (3d Cir. 2005).....................................................................................27

*In re TASER Int'l S'holder Derivative Litig.,*
 No. CV-05-123-PHX-SRB, 2006 WL 687033 (D. Az. Mar. 17, 2006) ...........................13, 14

*In re Tyson Foods, Inc.,*
 919 A.2d 563 (Del. Ch. 2007)..................................................................................24

*In re Veeco Instruments, Inc. Sec. Litig.,*
 434 F. Supp. 2d 267 (S.D.N.Y. 2006)................................................................11, 12

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha,*
 No. 8:07-CV-1952-T-26MAP, 2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ....................21

*Wenham v. Owings,*
 No. CV 6:06-3312-HFF, 2009 WL 10677931 (D.S.C. January 26, 2009)...........................19

*Wood v. Baum,*
 953 A.2d 136 (Del. 2008) ........................................................................................22

*In re World Acceptance Corp. Derivative Litig.,*
 No. 6:15-CV-02796-MGL, 2017 WL 770539 (D.S.C. Feb. 28, 2017) ....................18, 19, 27

**Statutes, Rules and Regulations**

Fed. R. Civ. P.
 12(b)(6) .............................................................................................................5, 27, 28
 23.1..........................................................................................................................5, 6

iv

Co-Lead Plaintiffs Colleen Witmer ("Witmer") and Richard Wickstrom ("Wickstrom" and collectively with Witmer, "Plaintiffs") respectfully submit this omnibus opposition to Defendant Jimmy Addison's Motion to Dismiss, Defendant Kevin Marsh's Motion to Dismiss, Defendant Stephen Byrne's Motion to Dismiss, and the SCANA Defendants'[1] Motion to Dismiss (collectively, the "Motions") the above-captioned consolidated shareholder derivative action (the "Action").[2]

## I.    INTRODUCTION

On July 31, 2017, SCANA "blindsided" regulators and revealed that it was abandoning the construction of two nuclear reactors at the V.C. Summer Nuclear Station (the "Nuclear Project"), a project SCANA's Board of Directors (the "Board") had relentlessly pushed forward for nearly two years – even after all the Board members were directly informed, through two detailed and damning reports by Bechtel Corporation ("Bechtel") in an independent review that the Board itself commissioned, that the Nuclear Project was in fundamental jeopardy.[3]  Indeed, a memo written at the time of the Bechtel's final findings by Santee Cooper (the "Santee Cooper Memo"), SCANA's partner on the project, stated that SCANA was concerned over the liability of its directors and officers based on Bechtel's reports.  Collectively, two reports received by SCANA from Bechtel (the "Bechtel Reports") and the Santee Cooper Memo support a strong inference that the Board

---

[1]    The "SCANA Defendants" include SCANA Corporation ("SCANA" or the "Company"), as well as SCANA directors Gregory Aliff ("Aliff"), James Bennett ("Bennett"), John Cecil ("Cecil"), Sharon Decker ("Decker"), Maybank Hagood ("Hagood"), Lynne Miller ("Miller"), James Roquemore ("Roquemore"), Maceo Sloan ("Sloan"), and Alfredo Trujillo ("Trujillo").

[2]    The Motions are cited herein in the following formats: "SCANA Mem. at __" and "Addison Mem. at __."  Defendant Stephen Byrne's Motion to Dismiss and Defendant Kevin Marsh's Motion to Dismiss simply adopt the arguments made by the SCANA Defendants and fail for the same reasons.

[3]    Any undefined terms have the definitions set forth in the Complaint.

knew that any failure to act would subject them to a substantial likelihood of liability in a shareholder suit such as this one.  By the time it was abandoned, the Nuclear Project was four years old, had cost $9.8 billion, and has been referred to as one of the most ambitious – and now disastrous – construction projects in South Carolina history.

The announcement came as a complete shock to the public, as well as shareholders, ratepayers, and regulators.  But it could hardly be described as a shock for the Board.  Two years prior, in August 2015, the full Board approved a proposal to retain Bechtel to assess the then two-year old Nuclear Project.  Bechtel reported its findings in November 2015, and those findings were startling.  Bechtel's November 2015 report (the "Original Bechtel Report"): (a) made clear that it would be virtually impossible for SCANA to complete work on the Nuclear Project by the end of 2020 – a crucial deadline for SCANA to be eligible for $1.4 billion in federal tax credits; (b) stated that construction was a minimum of two to three years behind the Company's publicly-projected schedule and would not be completed before mid-2022; and (c) identified several significant deficiencies that were plaguing the Nuclear Project and threatened its viability.  In response to the Original Bechtel Report, the Board took no action and said ***nothing*** publicly for almost two years.  The Board was also well aware of the final report – which was toned down at SCANA's request but still stated the Nuclear Project was in peril – from Bechtel in February 2016 (the "Updated Bechtel Report").  Bechtel's damning findings, and the fact that those findings were known at the highest levels of SCANA for over two years, has dominated the headlines in South Carolina (and elsewhere) for months.

At the time of the Updated Bechtel Report, Santee Cooper authored the Santee Cooper Memo, an astoundingly frank memorandum revealing that there were worries at SCANA over whether releasing the Updated Bechtel Report would expose SCANA directors and officers to

2

liability in a "shareholder suit." The Santee Cooper Memo depicted concerns at SCANA over its executives and directors' legal liability after the Bechtel Reports. The inference that such concerns were not communicated to SCANA's directors and officers is weak at best.

The Board's conscious disregard of non-public, negative reports about the ill-fated Nuclear Project ultimately resulted in fallout for the Company and its shareholders which could only be described as "nuclear." SCANA has lost billions of dollars in write-downs, unrecoverable costs, and market capitalization. The South Carolina General Assembly, both in the House and in the Senate, has conducted public hearings. The Chairman of the South Carolina Public Service Commission stated that regulators were "blindsided" by the announcement. SCANA has been served with a subpoena issued by the U.S. Attorney's Office for the District of South Carolina. South Carolina's Office of Attorney General, the Speaker of the House of Representatives, and the Chair and Vice-Chair of the South Carolina House Utility Ratepayer Protection Committee have requested that the State Law Enforcement Division ("SLED") conduct a criminal investigation. The Office of Regulatory Staff has filed a request with the South Carolina Public Service Commission to immediately suspend all revised rates collections from customers. And, SCANA has received a subpoena from the U.S. Securities and Exchange Commission ("SEC").

Yet, in the face of Plaintiffs' well-pled allegations that the entire Board knew that the Nuclear Project was in jeopardy, failed to act, and failed to disclose that critical information to shareholders, the response from the SCANA Defendants is an incredulous "not us." Their position is simply untenable.

The SCANA Defendants' Motion asserts that Plaintiffs' complaint (the "Complaint") fails to allege with particularity that that pre-suit demand on the Demand Directors – the members of

the Board at the time the Action was filed – is excused.[4]  This is untrue.  The Complaint is replete with well-pled allegations that the Demand Directors, either by virtue of their membership on the Board at the time they commissioned and received the Bechtel Reports, and/or by their membership on Board subcommittees with direct responsibility over the Nuclear Project, in particular the Nuclear Oversight Committee (the "Nuclear Committee"), face a substantial likelihood of liability for their breaches of fiduciary duty.  Indeed, Santee Cooper stated there were concerns at SCANA over the liability of its officers and directors after the Bechtel Reports.  As a general matter, pre-suit demand excusal is a high hurdle for derivative plaintiffs to satisfy, but here the allegations supporting a finding that there is reason to doubt that demand was required are overwhelming.

Instead of facing Plaintiffs' Complaint and the highly inconvenient facts (for the Board) head on, the SCANA Defendants change the narrative, asking this Court to read into the Complaint a pleading theory that is not there.  Specifically, the SCANA Defendants claim that Plaintiffs merely espouse a "failure of oversight" claim, as seminally discussed in *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959 (Del. Ch. 1996).  But Plaintiffs do not assert a so-called "*Caremark* claim."  Rather, Plaintiffs allege claims for breach of the non-exculpable fiduciary duties of loyalty and good faith based on the Board's ***knowledge*** – obtained through their receipt of the Bechtel Reports, or otherwise through their respective positions on Board committees, in particular the Nuclear Committee, on which sat half of the Board – that the Nuclear Project was nowhere near on track for completion as originally scheduled, and was unmistakably destined to fail.  This case

---

[4]     Citations to Plaintiffs' Verified Consolidated and Amended Shareholder Complaint shall appear in the following format "¶__."

is about the Board turning a deliberate blind eye to a coming train wreck and keeping shareholders in the dark.  This is no "*Caremark*" case.

For the Action to proceed, Plaintiffs must satisfy the threshold pleading inquiry under Fed. R. Civ. P. 23.1 ("Rule 23.1"), and adequately allege that pre-suit demand on Board was not required.  At the time this Action was commenced, the Board of SCANA consisted of the following ten (10) Demand Directors: Kevin Marsh ("Marsh"), Aliff, Decker, Miller, Trujillo, Bennett, Hagood, Roquemore, Cecil, and Sloan.  By pleading particular facts showing that at least five of the ten directors face a substantial likelihood of liability for their breaches of fiduciary duty, Plaintiffs readily satisfy demand futility standards.

In an attempt to take the Court's eye off the ball, the SCANA Defendants dedicate pages of their brief to the completely irrelevant biographies of SCANA's directors, who they characterize as South Carolina's "most accomplished business people and respected citizens."  SCANA Mem. at 5.  But a finding that there is reason to doubt that a director of a South Carolina corporation can disinterestedly evaluate a hypothetical pre-suit litigation demand does not mean that director is a villain.  Rather, it means that individuals who face a substantial likelihood of liability should not have the authority to determine whether or not legal action should be brought against them.  That is the pleading inquiry here, and Plaintiffs meet it.

The SCANA Defendants' Motion is most notable for the arguments it omits, rather than its contents.  Significantly, the SCANA Defendants do not argue that Plaintiffs failed to state claims for relief pursuant to Fed. R. Civ. P. 12(b)(6) – thus, they concede the facial validity of the Complaint.  This concession should not be minimized.  It leaves the Court with a sole inquiry under Rule 23.1; namely, is the liability associated with the validly stated claims "substantial"

enough to make the Demand Directors interested for purposes of Rule 23.1?  As argued below, the answer is clearly yes.

Finally, Defendant Jimmy Addison's ("Addison") Motion makes a few additional arguments.  Addison seeks to dismiss causes of action against Addison for failure to state a claim for breach of fiduciary duty and unjust enrichment.  As detailed herein, this attempt fails.  As the Company's Chief Financial Officer ("CFO") during the Relevant Period, Addison received substantial compensation all the while knowing, or consciously disregarding, that the Nuclear Project was fundamentally failing.  The claims against Addison are adequately stated.

In sum, the SCANA Defendants have not credibly countered the detailed factual allegations against them, and all reasonable inferences drawn therefrom, demonstrating that they are subject to a substantial likelihood of liability and, thus, that pre-suit demand on the Board would have been futile.  The Motions should be denied and the Action should move to discovery.

## II.    STATEMENT OF FACTS

The Complaint alleges state law claims for breaches of fiduciary duty relating to the Nuclear Project.  ¶¶222-243.  As a result of the Individual Defendants' breaches, SCANA suffered a multi-billion dollar loss in market capitalization, and has been materially damaged. ¶1.

SCANA is an energy-based holding company whose principal subsidiary, South Carolina Electric & Gas Company ("SCE&G"), is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina. ¶2.  SCE&G and Santee Cooper, a state-owned utility formally known as the South Carolina Public Service Authority, jointly own the V.C. Summer in Fairfield County, South Carolina.  SCE&G is the plant operator of V.C. Summer – the site of the Nuclear Project.  *Id.*

In 2007, SCANA successfully lobbied the South Carolina legislature to pass new legislation that would allow it to construct two new nuclear reactors at V.C. Summer. ¶3.  SCANA

initially projected that the first reactor would be on-line and generating power as early as 2016, and the second by 2019. ¶4.  The total projected cost at the time was $9.8 billion and was referred to as one of the most ambitious construction efforts in South Carolina history.  After going through multi-year federal and state approval processes, SCANA, along with Santee Cooper, began construction on the Nuclear Project in March 2013.  *Id*.  SCANA's lead contractor for the project was Westinghouse Electric Co. ("Westinghouse").  *Id*.

The Nuclear Project immediately began to experience significant delays and runaway costs. ¶5.  SCANA received extensive warnings about these problems early in the project's construction but did little to remedy the situation.  *Id*.  Under the Individual Defendants' direction and on their watch, SCANA continued to petition the South Carolina Public Service Commission ("PSC") for further rate increases and schedule extensions.  *Id*.  As issues worsened, SCANA's partner on the Nuclear Project, Santee Cooper, pressured SCANA to hire construction firm Bechtel to perform an in-depth analysis of the viability of the Nuclear Project. *Id*.  In August 2015, the full SCANA Board approved a proposal to retain Bechtel to assess the Nuclear Project, with findings to be presented later that year.  *Id; see also* ¶71.

Bechtel presented its initial findings to SCANA in October 2015 and issued the Original Bechtel Report in November 2015.  ¶6.  The Original Bechtel Report made clear that it would be virtually impossible for SCANA to complete work on the Nuclear Project by the end of 2020 – a crucial deadline for SCANA to be eligible for $1.4 billion in federal tax credits. *Id*.  The Original Bechtel Report stated that the construction was a minimum of two to three years behind its publicly-projected schedule and would not be completed before mid-2022. *Id*.  The Original Bechtel Report also identified a laundry list of problems with the Nuclear Project, including that relevant construction and installation rates "all point to project completion later than the

current forecast"; that "plans and schedules are not reflective of actual project circumstances"; that the Company lacked "project management integration needed for a successful project"; and that there was a "lack of shared vision, goals, and accountability" between SCANA and its partners, including "strained" relationships between certain of the entities. *Id*. The Original Bechtel Report states that Bechtel representatives "met with SCE&G CEO [Defendant Marsh]" during the week of October 12-16, 2015. ¶7; *see also* ¶¶70-78.

The Individual Defendants caused SCANA to work furiously with Bechtel to sanitize the Original Bechtel Report and downplay its statements about the grave problems plaguing the Nuclear Project. ¶8. To that end, on February 5, 2016, Bechtel issued the "Updated Bechtel Report", which still contained many of the Original Bechtel Report's adverse findings about the Nuclear Project's feasibility, but no longer expressly stated that completion by 2020 was impossible. *Id*. *See also* ¶¶79-80.

The Bechtel Reports put every Board member on notice of insurmountable problems with the Nuclear Project, including an unrealistic and unachievable schedule; unlikely completion of engineering and licensing workload; and poor productivity. ¶10. All Board members knew or should have known that these issues and other problems fundamentally threatened the Nuclear Project. *Id*.

The Santee Cooper Memo, written around February 2016, reveals that SCE&G personnel were worried as to whether releasing the Updated Bechtel Report would expose SCE&G directors and officers to liability in a "shareholder suit." ¶11. As detailed in an article in The State titled "Confidential Memo shows SCANA, Santee Cooper long worried over nuclear woes" on September 29, 2017 (the "State Article"), the Santee Cooper Memo specifically stated that SCE&G

could not now disclaim awareness of, and responsibility for, the myriad problems with the Nuclear

Project discussed in the Updated Bechtel Report:

> Some 20 months before a report critical of the failing V.C. Summer nuclear project [the Bechtel Reports] became public, SCE&G was worried how much – if anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper.
>
> The one-page memo – written by an unnamed official of Santee Cooper, SCE&G's junior partner in the project – depicts SCE&G as wanting to know if releasing the Bechtel Reports's contents to stockholders would expose top utility executives and directors to legal liability.
>
> "Now that SCE&G is specifically aware of problems raised in (the) report, failure to act may result in O&D (officers and directors) liability," the memo says, noting there was concern about how "to defend (a) potential shareholder suit."
>
> […]
>
> The undated Santee Cooper memo apparently was written around mid-February 2016, within weeks of Santee Cooper and SCE&G officials receiving a report from the Bechtel consulting firm.

¶81.   This Santee Cooper Memo shows that the Board was worried about "expos[ing] top

executives and directors to legal liability" in a "potential shareholder suit" – precisely what is at

issue in this case.  ¶82.

Notwithstanding the Bechtel Reports and the Santee Cooper Memo, the Individual

Defendants plowed full steam ahead on the hopeless Nuclear Project. ¶14.  The Individual

Defendants also concealed from regulators the critical adverse information contained in the

Bechtel Reports.  *Id.*  The Board also misled and allowed SCANA to mislead the public by stating

in SCANA-produced promotional videos, press releases, and several SEC filings signed by the

Individual Defendants, that, *inter alia*, the schedule for the Nuclear Project was on target and the

Nuclear Project was entirely viable. *Id.*

9

When they could put off the truth no longer, on July 31, 2017, SCE&G and Santee Cooper announced that they would abandon construction of the Nuclear Project, citing rising construction costs. ¶15.  It quickly became clear that this was no innocent business failure; rather, it was radical and indefensible mismanagement.

The fallout has been immense: SCE&G's management met with various stakeholders and members of the South Carolina General Assembly, including legislative leaders, to discuss the abandonment of the Nuclear Project (¶16); the South Carolina General Assembly, both in the House and in the Senate, began conducting public hearings regarding the decision to abandon the Nuclear Project (¶17); SCANA was served with a subpoena issued by the U.S. Attorney's Office for the District of South Carolina seeking documents relating to the Nuclear Project (¶19); the state's Office of Attorney General, the Speaker of the House of Representatives, and the Chair and Vice-Chair of the South Carolina House Utility Ratepayer Protection Committee requested that SLED conduct a criminal investigation into the handling of the Nuclear Project by SCANA and SCE&G (¶20); the Office of Regulatory Staff ("ORS") filed a request with the PSC asking for an order directing SCE&G to immediately suspend all revised rates collections from customers which were previously approved by the PSC (¶21); the SEC has subpoenaed SCANA for documents as part of an investigation into the failed Nuclear Project (¶22); and myriad other litigation has followed.

The Board's dereliction of its duties has now forced SCANA to accept a takeover offer by Dominion Energy, Inc. ("Dominion").   ¶26.   On January 3, 2018, Dominion and SCANA announced an agreement for the companies to combine in a stock-for-stock merger in which SCANA shareholders would receive 0.6690 shares of Dominion common stock for each share of

SCANA common stock. *Id.* Dominion is essentially buying SCANA at a fire-sale price in the wake of the Company's collapse resulting from the Invidual Defendants' wrongdoing. *Id.*

## III.  ARGUMENT

### A.  Pre-Suit Demand on the Board Is Excused

#### 1.  Legal Standards Governing Demand Futility

SCANA is a South Carolina corporation, and South Carolina law controls the instant demand futility analysis. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 90 (1991) ("a court that is entertaining a derivative action. . . must apply the demand futility exception as it is defined by the law of the State of incorporation"). Defendants correctly point out that the well-developed corporate law of Delaware is persuasive authority in derivative actions brought under South Carolina law. *See* SCANA Mem. at 13 n.7, *citing Carolina First Corp. v. Whittle*, 343 S.C. 176 (Ct. App. 2000). Under Delaware law, a pre-suit demand on a board of directors is not required if the facts pled show that such a demand would have been futile. *Aronson v. Lewis*, 473 A.2d 805, 807 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

A plaintiff is excused from making a pre-suit demand if there is reason to doubt that: (i) a majority of a board's directors are independent or disinterested; or (ii) the challenged acts are a valid exercise of business judgment. *Id.* at 812; *see also In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 458 (S.D.N.Y. 2010) (applying Delaware law). To implicate the *Aronson* test, a plaintiff must challenge a board decision where its members exercised business judgment. *Aronson*, 473 A.2d at 812; *see also In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (applying Delaware law).

In the absence of a challenged board action, demand is excused where the complaint raises a reasonable doubt that a majority of the directors are disinterested or independent. *Rales v.*

*Blasband*, 634 A.2d 927, 930 (Del. 1993). This reasonable doubt standard "is sufficiently flexible and workable to provide the shareholder with 'the keys to the courthouse' in an appropriate case where [as here], the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996). Thus, a plaintiff only need allege with particularity facts that would give rise to a reasonable inference that a majority of directors could not consider a demand disinterestedly. *Id.*; *see also Grobow v. Perot*, 539 A.2d 180, 186-87 (Del. 1988). A plaintiff adequately alleges such reasonable doubt regarding the disinterestedness of directors in considering a demand by demonstrating that they are subject to a "substantial likelihood of liability" by virtue of the challenged conduct. *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) (citing *In re Baxter Int'l S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995)); *see In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 808 (7th Cir. 2003) ("*Abbott Labs*").[5]

It is well-established that a substantial likelihood of liability exists where there is a conscious disregard of a duty to act. Such actions or conscious inaction cannot constitute a legally protected business decision, and as such are not a valid exercise of business judgment. *See Veeco*, 434 F. Supp. 2d at 278 (excusing demand under Delaware law where directors allegedly "conscientiously permitted a known violation of law by the corporation to occur"); *Pfizer*, 722 F. Supp. 2d at 460 (same).

It is also well-established that condoning or consciously disregarding serious problems or misconduct threatening a company's core business cannot constitute a legally protected business

---

[5]    Further, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, the totality of the plaintiff's allegations in combination may be sufficient to do so. *See Int'l Equity Capital Growth Fund, L.P. v. Clegg*, Civ. A. 14995, 1997 WL 208955, at *5 (Del. Ch. Apr. 22, 1997).

decision, and as such is not, and cannot be, a valid exercise of business judgment. *See Aronson*, 473 A.2d at 814; *Veeco*, 434 F. Supp. 2d at 278; *Pfizer*, 722 F. Supp. 2d at 460 (excusing demand under both the *Rales* and *Aronson* tests). Black-letter Delaware corporate law requires directors to take action once they have information indicating that they should. Directors are duty-bound to act if they are on notice, thereby preventing problems from mushrooming into far-more-significant troubles. *See, e.g., Guth v. Loft, Inc.,* 5 A.2d 503, 510 (1939). Thus, once a director has knowledge of a Company's serious problems, particularly those affecting its core business, he or she is required to act.

Demand is regularly excused under Delaware law where, based on the facts alleged, it is reasonable to infer that directors consciously failed to take such action. *See, e.g., In re TASER Int'l S'holder Derivative Litig.,* No. CV-05-123-PHX-SRB, 2006 WL 687033, at **9-17 (D. Az. Mar. 17, 2006) (excusing demand and finding that "the alleged facts, taken together, lead to 'reasonable inferences' that the Board was aware of Taser's safety issue problems"); *In re Countrywide Fin. Corp. Derivative Litig*., 554 F. Supp. 2d 1044, 1081 (C.D. Cal. 2008) (applying Delaware law, excusing demand, and reasonably inferring that directors were on notice of, and failed to take action to address, wrongdoing that "implicate[d] a fundamental part of the Company's business."); *In re SFBC Int'l, Inc. Sec. & Derivative Litig*., 495 F. Supp. 2d 477, 485-86 (D.N.J. 2007) (same).

Based on the particularized allegations in the Complaint and all reasonable inferences to be drawn therefrom, there is good reason to doubt that ***any*** of the ten Demand Directors could have disinterestedly considered a demand in good faith given their conscious disregard of, and their knowing failure to address, the damning findings of the Bechtel Reports. Indeed, the Santee Cooper Memo lays bare the concerns over the liability of SCANA's director and officers.

13

At the time this Action was commenced, there were 10 directors on the Board.  While Plaintiffs need only demonstrate that demand was not required as to five of the ten Demand Directors in order to adequately allege demand excusal,[6] there is reason to doubt that *all* ten individuals could have independently and disinterestedly responded to a shareholder's demand, necessitating the denial of the Motions.

### 2.    Plaintiffs Do Not Plead Mere "Oversight" Claims

Much of the SCANA Defendants' motion is aimed at a pleading theory Plaintiffs do not espouse.  The SCANA Defendants argue that Plaintiffs fail to state an "oversight" claim against the directors, and that they do not face a substantial likelihood of liability for such a violation. This argument is misdirected because Plaintiffs do not plead such a claim.  Plaintiffs allege that the Board *knew* of the Bechtel Reports; thus, Plaintiffs principally allege a "good faith" duty of loyalty claim rather than a *Caremark* "due care" or "failure to oversee" claim.  *See, e.g., Pfizer*, 722 F. Supp. 2d at 459-60 (distinguishing *Caremark* based on the inference of "knowledge" of directors on whom demand would be made); *Abbott Labs*, 325 F.3d 795 (same); *TASER*, 2006 WL 687033, at *17 (same).

Put simply, the Complaint alleges that in August 2015, the full SCANA Board approved a proposal to retain Bechtel to assess the Nuclear Project and received two damning reports from Bechtel in November 2015 and February 2016. ¶¶5, 6, 8, 71, 76.[7]  The Demand Directors face a

---

[6]    *See In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, No. CV 9962-VCL, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016) (demand is futile when half the members of an even-numbered board could not respond impartially to a demand); *see also Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000).

[7]    Even if the Court accepts the SCANA Defendants' interpretation of the Complaint (that is, the Board authorized Bechtel to assess the Nuclear Project and prepare a report, but then inexplicably *never asked what came of that report*) then the basis for a *Caremark* claim would be just as easily satisfied and demand would still be futile.

substantial likelihood of liability for their failure to affirmatively act, not (solely) their failure to oversee. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."); *see also Rosenbloom v. Pyott*, No. 12-55516, 2014 WL 4290625, at *9 (9th Cir. Sept. 2, 2014) ("*Allergan*") (Ninth Circuit found that "[t]he duty of loyalty…is violated '[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibility [and] failing to discharge [the non-exculpable fiduciary duty of loyalty] in good faith'").

### 3.    The Demand Directors Face a Substantial Likelihood of Liability for Their Failure to Act in the Face of the Bechtel Reports

The allegations in the Complaint support the reasonable inference that each of the Demand Directors "fail[ed] to act" despite knowledge of extensive problems with the Nuclear Project, subjecting them to a substantial likelihood of liability. *Stone,* 911 A.2d at 370. The Complaint alleges that all ten of the Demand Directors served on the Board since at least October 2015, the month Bechtel delivered its initial findings in the Original Bechtel Report to SCANA. ¶186. Each Demand Director received reports on progress, issues and variances related to the construction process. *Id*. Because they were aware of and/or reviewed the Bechtel Reports, they knew the Nuclear Project was hanging on by the skin of its teeth and would never meet the Company's critical and publicly-stated 2020 deadline. The Demand Directors also knew or should have known that the Nuclear Project was one of the most ambitious construction efforts in South Carolina history and was critically significant to the Company's reputation and financial well-being. *Id*.

The importance of the Nuclear Project to SCANA, as detailed in the Complaint, further supports the reasonable inference that the Demand Directors consciously turned a blind eye to

serious problems and failed to act.  In *Allergan*, the Ninth Circuit found the issue threatening Allergan's core business "was unquestionably of significant magnitude and duration" to be persuasive.  *Id*. at *13.  The same is true here.  Plaintiffs allege that the Nuclear Project was a critical component of SCANA's future, and this was true from a public relations perspective as much as it was from a business perspective.[8]

Plaintiffs are not seeking an inference from this Court at the pleading stage that the Demand Directors were aware of the Original Bechtel Report and reviewed the Updated Bechtel Report – they are specifically alleging it as fact.  *See*, *e.g.*, ¶76 ("Defendants were aware of and likely reviewed (or else recklessly disregarded) the Original Bechtel Report [and] the Board also reviewed [the Updated Bechtel Report, which] contained a schedule showing that Bechtel had delivered a version of the report to SCANA in November 2015").

Yet, even if the Court determines that the Demand Directors' awareness and review of the Bechtel Reports, respectively, cannot be accepted for pleading purposes as fact, based on all the other facts alleged by Plaintiffs, it is at the very least a reasonable inference that must be granted to Plaintiffs at the pleading stage.  The alternative, radically implausible inference – one that

---

[8]    While the Complaint alleges that there is reason to doubt that all ten Demand Directors could disinterestedly evaluate a pre-suit demand, there are also additional reasons to doubt that Marsh could evaluate a demand.  As SCANA's former CEO (having retired a mere two weeks before the filing of the Action), Marsh's principal, and lucrative, occupation during the Relevant Period was as the Company's CEO which the Company itself admitted made Marsh not-independent under New York Stock Exchange Rules. ¶¶199-200; *see also Sandys v. Pincus*, No. 157, 2016, 2016 WL 7094027, at *7 (Del. Dec. 5, 2016) (finding director not independent when "the company's own board has determined that the director[] whose ability to consider a demand impartially is in question cannot be considered independent, a reasonable doubt exists under *Rales*.").

16

Defendants are not entitled to here[9] – would be that the Demand Directors authorized the retention of Bechtel to investigate the Nuclear Project, a $9.8 billion expenditure referred to as one of the most ambitious construction efforts in South Carolina history, and then simply "forgot" to follow-up *for over two years*.

The allegations that the Demand Directors knew of the contents of the Bechtel Reports are well-pled and as a result, each of the Demand Directors faces a substantial likelihood of liability for their respective non-exculpable breaches of fiduciary duties of loyalty and good faith.

### 4.    Demand is Futile Because the Santee Cooper Memo Shows that the Board Was Aware of the Bechtel Reports

The Santee Cooper Memo states that there were worries at SCANA over whether releasing the Updated Bechtel Report would expose SCE&G directors and officers to liability in a "shareholder suit."  The State Article noted:

> Some 20 months before a report critical of the failing V.C. Summer nuclear project [the Updated Bechtel Report] became public, SCE&G was worried how much – if anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper.

> The one-page memo – written by an unnamed official of Santee Cooper, SCE&G's junior partner in the project – depicts SCE&G as wanting to know if releasing the [Updated] Bechtel [R]eport's contents to stockholders would expose top utility executives and directors to legal liability.

> "Now that SCE&G is specifically aware of problems raised in (the) report, failure to act may result in O&D (officers and directors) liability," the memo says, noting there was concern about how "to defend (a) potential shareholder suit."

¶81.  South Carolina State Representative James Smith stated that SCANA lacked "plausible deniability" in the wake of the Santee Cooper Memo:

---

[9]    *See, e.g., McPheely v. Adams*, No. 6:13-CV-02660-GRA, 2013 WL 6581850, at *4 (D.S.C. Dec. 16, 2013) ("Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged").

[The memo] provides further evidence that SCANA and Santee Cooper knew the nuclear project was failing long before they told anyone else. He particularly was critical of SCANA, which the memo shows did not want to release the Bechtel Reports. 'This shows they could no longer have plausible deniability, to say they didn't know what was going on,' Smith said. 'They knew or should have known what was going on.'"

¶82.  The Santee Cooper Memo supports no other reasonable inference but that the Board knew of the Bechtel Reports and knew they showed the Nuclear Project was on life support.  Thus, the Santee Cooper Memo strongly supports a finding of demand futility.

The SCANA Defendants claim that the allegations that the Demand Directors knew of the Bechtel Reports are "unsupported." SCANA's Mem. at 22.  This claim simply ignores the contents of the Complaint – the allegation is more than amply supported.  The Complaint alleges that in August 2015, the Demand Directors approved a proposal to retain Bechtel to assess the viability of the Nuclear Project. ¶5.  Notably, the Demand Directors originally resisted, but relented under pressure from Santee Cooper. *Id*.  The SCANA Defendants do not dispute this fact, nor could they at the pleading stage.  The Complaint also alleges that Bechtel presented its initial findings to SCANA in October 2015 and issued the Original Bechtel Report on November 9, 2015.  ¶¶6, 71.  The Santee Cooper Memo shows SCANA was very worried about the liability of its directors and officers after the Bechtel Reports.  The notion that such concerns would not be communicated to directors and officers is ridiculous.  South Carolina State Representative Russell Ott said it all: "This is a cover up. This is deception at its core. The bottom line is they lied to everyone and they did it intentionally." ¶13.[10]

Likewise, Defendants' reliance on *In re World Acceptance Corp. Derivative Litig.,* No. 6:15-CV-02796-MGL, 2017 WL 770539, at *7 (D.S.C. Feb. 28, 2017), is misplaced because that

---

[10]    Ott helped lead a special House committee that investigated the Nuclear Project and therefore had access to documents that Plaintiffs do not yet have access to.  *Id*.

case lacked the detailed allegations present here showing the Demand Directors' knowledge.  In *World Acceptance*, the plaintiffs alleged defendants allowed faulty internal controls relating to the company's accounting; in particular, the accoutning provision allowing loans to be recapitalized into new loans only if the borrower has repaid at least 10% of the principal.  The court dismissed the plaintiffs' complaint because it failed to plead facts "suggesting a majority of the Board was ever alerted to, but ignored…sub-10% renewals." *Id*. at *9.  Here, the Complaint alleges particular details why Board members knew the Nuclear Project was in grave peril by August 2015.  *See supra* at §IIIA(3).  Moreover, as discussed *infra*, the Santee Cooper Memo further demonstrates that the Board knew of the Bechtel Reports and Board members sat on various committees implicated in the wrongdoing here, in particular in the Nuclear Oversight Committee.

> **5.      Demand Is Futile Because a Majority of the Demand Directors Served as Members of the Nuclear Committee, Which Was Specifically <u>Responsible for the Disastrous Nuclear Project</u>**

Courts in this District have found that membership on Board subcommittees can support a finding of demand futility when, like here, the committee in question was intimately linked with the alleged wrongdoing based on its unique and specific duties.  For example, in *Wenham v. Owings*, No. CV 6:06-3312-HFF, 2009 WL 10677931, at *1 (D.S.C. January 26, 2009), the plaintiffs alleged that various officers and directors of nominal defendant ScanSource backdated stock options.  Of five ScanSource directors, two directors were members of the compensation committee.  *Id*. at *2.  As such, they allegedly "knowingly…backdated stock option grants." *Id.* These two directors were also members of the audit committee and, thus "knowingly…participated in and approved the filing of false financial statements and other false SEC filings." *Id.*  Among

other reasons, because these committees were directly linked to the alleged wrongdoing, the court

found that "demand on the board of directors would have been futile[.]"[11]

*Countrywide* is also instructive.  There, the plaintiffs alleged that the directors, several of

whom sat on the audit and finance committees, breached their fiduciary duties by allowing the

company to approve low quality mortgages, many with low or no documentation from the

borrowers, which exposed Countrywide to undisclosed risk because loan quality was essential to

virtually every facet of Countrywide's business.  *Id*. at 1057, 1081.  Per their respective charters,

the audit committee was "tasked with overseeing the exposure to risk and management of systems

to assess, monitor, and control such exposures" and the finance committee "was responsible for

assessing and monitoring other aspects of market risk with respect to liquidity, financing, and

mortgage loan sales."  *Id*. at 1081.  The Court found that the plaintiffs adequately pled demand

futility:

> [These committee members] could not ignore the impact of departures from
> underwriting standards, especially given the public report issued by a coalition of
> banking regulators condemning low-documentation loans….
>
> *It defies reason, given the entirety of the allegations, that these Committee members
> could be blind to widespread deviations from the underwriting policies….*

*Id*. at 1082 (emphasis added).

*Wenham* and *Countrywide* support a finding of demand futility here.  Six of the ten Demand

Directors – Defendants Bennett, Decker, Hagood, Roquemore, Sloan, and Trujillo – served on the

Nuclear Committee during the Relevant Period, and thus face a substantial likelihood of liability

for their breaches of their duties in their capacity as members of Nuclear Committee.  The Nuclear

Committee's links to the alleged wrongdoing are undeniable: members were specifically tasked

---

[11]    One of the five ScanSource directors received backdated options.  Thus, finding demand
on two of the remaining four sufficed for demand futility purposes.  *Id*. at *2.

with "periodically tour[ing] the V.C. Summer Nuclear Station and its training facilities"; and with meeting "at least quarterly to monitor, discuss, and evaluate [SCANA's] nuclear operations, which include regulatory matters, operating results, training and other related topics." ¶215.  The Nuclear Committee also "reviews with the Institute of Nuclear Power Operations, on a periodic basis, its appraisal of [SCANA's] nuclear operations," and "routinely presents an independent report to the Board on the status of [SCANA'] nuclear operations."  *Id.*

The Original Bechtel Report made clear that the Nuclear Project was in grave peril by November 2015.  ¶¶6, 74.  After touring the Nuclear Project facility, reviewing the project with the Institute of Nuclear Operations, and meeting to discuss the project at least quarterly (¶215), the Nuclear Committee members "could not ignore" the profound problems plaguing the Nuclear Project. *Countrywide*, 554 F. Supp. 2d at 1081.[12]  Thus, "[i]t defies reason, given the entirety of the allegations, that these [Nuclear] Committee members could be blind to [the] widespread" and fundamental problems threatening the viability of the Nuclear Project.  *Id.* at 1082. In sum, "the Nuclear Committee [directors] grossly fail[ed] to adequately exercise" their special oversight duties with respect to the unfeasible Nuclear Project.  ¶244(j).[13]

---

[12]    Indeed, that the Nuclear Committee "routinely" presented reports relating to the Nuclear Project to the full Board also supports a finding of demand futility as to each Demand Director. ¶148.

[13]    Other courts have found membership on Board subcommittees relating directly to the alleged wrongdoing supported a finding of demand futility.  *See, e.g., In re Intuitive Surgical Shareholder Derivative Litigation*, 146 F. Supp. 3d 1106 (N.D. Ca. Nov. 16, 2015) (demand was futile as to Audit Committee members where the committee charter "suggests that these directors would have received even more information regarding the regulatory issues than the full board"); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 8:07-CV-1952-T-26MAP, 2009 WL 3853592, at *3 (M.D. Fla. Mar. 30, 2009) (demand futile on directors who were Audit Committee members because they were "specifically charged with oversight of…the integrity of the financial statements…[and] compliance…with legal and regulatory requirements"); *David B. Shaev Profit Sharing Account v. Armstrong*, No. CIV.A. 1449-N, 2006 WL 391931, *5 (Del.Ch. Feb. 13, 2006) ("[a] claim that an audit committee or board had notice of serious misconduct and simply failed to

Defendants claim that Plaintiffs make "no specific allegation regarding what information or reports the Nuclear Committee did or did not receive[.]" SCANA Mem. at 28. That is inaccurate. The Complaint alleges that "[t]he Board authorized the Original Bechtel Report and…the Updated Bechtel Report, which the Board also reviewed, contained a schedule showing that Bechtel had delivered a version of the report to SCANA in November 2015." ¶76. Of course, the full "Board" includes every Nuclear Committee member.[14]

Defendants cite several cases, arguing that committee membership is insufficient to plead a substantial likelihood of liability on behalf of Nuclear Committee members. SCANA Mem. at 28. Their citations fall flat. For example, in *Hazelton v. Kuttner*, No. C/A/NO. 08:06CV02063, 2007 WL 1120405, at *4 (D.S.C. Apr. 13, 2007), the plaintiffs' complaint "contain[ed] [no] particularized allegations regarding information or warning signs that had been brought to the attention of the Director Defendants." Here, the Bechtel Reports went way beyond warning signs that something might be amiss – they showed the Nuclear Project was in grave peril.

Likewise, in *Wood v. Baum*, 953 A.2d 136, 142-143 (Del. 2008) the Delaware Supreme Court rejected the plaintiffs' allegations that Audit Committee members "should have been aware of the facts on which the plaintiff premised her interpretation of SEC rules and regulations, and FSAB and GAAP standards." Here, Plaintiffs plead far more than 'should have known' claims against the Nuclear Committee directors. Plaintiffs allege detailed facts showing the Nuclear Committee's knowledge, including the Bechtel Reports, the Santee Cooper Memo, Santee Cooper

---

investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and otherwise functioning.").

[14] Thus, Defendants' argument that the Complaint's particularized allegations relating to director memberships are nothing more than conclusory "should have known" allegations is untenable. *See* SCANA Mem. at 30-31, n.12.

emails, meetings between Santee Cooper and SCANA boards, and membership on *the* committee responsible for the Nuclear Project debacle.[15]

### 6.     Demand on the Nominating and Governance Committee Members Would Have Been Futile

Four Demand Directors, Aliff, Hagood, Miller, and Trujillo, served on the Nominating and Governance Committee during the Relevant Period, and thus face a substantial likelihood of liability for their failure to nominate any directors with nuclear expertise or experience.  According to the Nominating and Governance Committee Charter, its purpose includes "identify[ing] individuals qualified to become members of the Board and to recommend[ing] such individuals to the Board to be Board nominees for directors."  ¶217.  During the Relevant Period, the Nominating and Governance Committee took no steps to nominate even a single director with experience relevant to overseeing a major nuclear project.  ¶218.  Indeed, the woefully inadequate composition of the Nuclear Committee has been heavily scrutinized by the media and has been a source of embarrassment for the Board and for SCANA.  *See, e.g.,* ¶149 (article stating that "[m]embers of [the] SCANA board lack nuclear expertise yet oversaw failed S.C. project while earning a combined $11M.").  These Nominating and Corporate Governance directors profoundly failed in their responsibility to nominate "qualified" directors.  ¶217.

Defendants argue that South Carolina law does not require directors of South Carolina corporations to have specialized nuclear training.  SCANA Mem. at 31.  But that is not the point.  Most South Carolina corporations have no need for and do not maintain a "Nuclear Oversight Committee."  The point is that in light of the unique nature of SCANA's business, the Board

---

[15]     Moreover, *Wood* is also distinguishable because it involved a Delaware limited liability corporation which, under the Delaware Limited Liability Company Act permits exculpation of the fiduciary duties of good faith and loyalty which is not permitted under its corporate analogue, the Delaware General Corporation Law's § 102(b)(7). *Id*. at 141.

maintained a purported "Nuclear Oversight Committee," but the Nominating and Corporate Governance Committee's fiduciary failures meant that the Nuclear Committee would be populated exclusively with members lacking any real understanding of the issues pertaining to constructing or operating a nuclear power plant. Defendants' argument about what is generally required of directors of South Carolina corporations ignores the unique nature of SCANA's business, as well as the specific intent and function of its Nuclear Committee. It is an argument entirely devoid of context, and belies any protection afforded by the business judgment rule.

Defendants also argue that the Nominating and Corporate Governance Committee's decisions are insulated by the business judgment rule. However, their supporting case citations either do not apply here or merely stand for the general proposition that the business judgment rule protects disinterested directors. *See In re Tyson Foods, Inc.*, 919 A.2d 563, 591-92 (Del. Ch. 2007) (defendants not entitled to business judgment protection because they approved options while, like here, in possession of material, nonpublic information); *In re Resorts Int'l Shareholders Litig.*, No. CIV.A. 8605, 1988 WL 92749, at *5 (Del. Ch. Sept. 7, 1988), *aff'd sub nom. In re Resorts Int'l Shareholders Litig. Appeals*, 570 A.2d 259 (Del. 1990) (rejecting objections to settlement and noting that in general "decision-making" of directors who were, unlike here, disinterested is protected); *Dockside Ass'n, Inc. v. Detyens*, 294 S.C. 86, 87 (1987) ("business judgment rule precludes judicial review of actions taken by a corporate governing board absent a showing of a lack of good faith, fraud, self-dealing or unconscionable conduct").

Finally, Defendants are wrong (and frankly, out of line) to suggest that, if anything, the blame lies at the feet of SCANA stockholders for electing unqualified directors. SCANA Mem. at 32. It was the responsibility of the members of the Nominating and Corporate Governance Committee to ensure that the directors they nominated were sufficiently qualified so as to protect

24

the Company's and stockholders' interests.  It is not the responsibility of stockholders to become experts in what is required to intelligently monitor and oversee the expansion of a nuclear power plant, and any suggestion to the contrary is inappropriate and outrageous.

### 7.    Demand on the Compensation Committee Members Would Have Been Futile

Half of SCANA's Board, Demand Directors Bennett, Cecil, Decker, Roquemore, and Sloan, served on the Compensation Committee during the Relevant Period.[16]  In addition, three of these directors, Bennett, Roquemore, and Sloan, also served on the Nuclear Committee.  The Compensation Committee improperly approved millions of dollars in "incentive award" compensation for several of the Individual Defendants based on purported achievement of "goals" and "strategic objectives" regarding the Nuclear Project when they knew, or had reason to know, that the Nuclear Project was in fundamental peril. ¶188.  To award lavish financial rewards in such circumstances was beyond unwarranted – it was obscene.  As such, these five Demand Directors face a substantial likelihood of liability for breaches of their fiduciary duties and demand on Bennett, Cecil, Decker, Roquemore, and Sloan would thus be additionally futile.  ¶220.

Defendants' citations to cases relating to Compensation Committees are of no avail.  *See In re Morgan Stanley*, 542 F. Supp. 2d 317, 328 (S.D.N.Y. 2008) (unlike here, "there are no allegations whatsoever as to what specific benefit was obtained by any defendant"; *compare* ¶¶188, 199 (describing millions of dollars in compensation awards to the Officer Defendants); *Perot*, 539 A.2d at 188 (insufficient to allege that directors were wrongfully "paid for their services"; here, certain defendants received *particular* awards for meeting benchmarks relating to the Nuclear Project – which was a dismal failure (*see* ¶188)).

---

[16]    *See South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) (demand is futile if "at least half of the directors face 'a substantial likelihood of personal liability'").

### 8.    Demand on the Audit Committee Members Would Have Been Futile

Half of SCANA's Board, Defendants Aliff, Bennett, Cecil, Hagood, and Miller, were also members of the Audit Committee during the Relevant Period.  These directors failed to fulfill their risk management duties relating to the Nuclear Project, as well as their duties to ensure that the Company's SEC filings and public statements were not materially false or misleading. Accordingly, these defendants face a substantial likelihood of liability for breaches of fiduciary duty and demand on them would be additionally futile.  ¶221.

As to the Audit Committee's duties to ensure accurate public statements, the SCANA Defendants argue that Plaintiffs must allege each Board member's knowledge of the problems at issue.  SCANA Mem. at 29.  That is exactly what Plaintiffs have done.  *See supra* at §IIIA(3).

### 9.    Demand on the Executive Committee Members Would Have Been Futile

During the Relevant Period, the following eight Board members – a majority of the Board – served on the Executive Committee: Marsh (Chair), Aliff, Bennett, Hagood, Roquemore, Sloane, Micali, and Stowe.  The Executive Committee "exercises the powers of the full Board of Directors when the Board is not in session or cannot be called into session in a timely manner to deal with a time sensitive circumstance, with the exception of certain powers specifically reserved to the full Board of Directors by statute."  ¶161.  The Executive Committee "also advises the CEO on other matters important to the Company (due to the size of our Board of Directors, and availability of our Directors to us, the Executive Committee is rarely required to meet)." ¶162.  The Complaint further alleges that SCANA's CEO, Marsh, who was at the very heart of the alleged wrongdoing, "from time to time sought the advice of the Executive Committee."  ¶162; s*ee*, *e.g.*, ¶7 (Original Bechtel Report states that Bechtel representatives "met with [Marsh]" during the week of October 12-16, 2015").

26

### 10.    SCANA's Exculpatory Provision Does Not Insulate Defendants From Liability

That SCANA has adopted an exculpatory clause modeled on Section 102(b)(7) of the Delaware General Corporation Law is hardly remarkable.  Defendants would be hard pressed to find a public company in this country, incorporated in Delaware or any other jurisdiction, which has not adopted a similar provision.  And the provision does not shield the Board from liability for "[c]onduct that falls outside of the exemption includ[ing] bad faith, intentional misconduct, knowing violation of law, or any other conduct for which the directors may be liable." *World Acceptance*, 2017 WL 770539, at *7 (internal quotations omitted).  In addition, the provision does not apply to officers Marsh, Addison, and Byrne.

Here, Plaintiffs allege that the Board failed to act even though it knew of grave problems related to the Nuclear Project which were withheld from the public until they could no longer be kept under wraps. Plaintiffs therefore plead "good faith" and "loyalty" breach of fiduciary duty claims, which are non-exculpable as a matter of law.  *See Alidina v. Internet.com Corp.*, No. CIV. A. 17235-NC, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002) ("[W]hen a duty of care breach is not the exclusive claim, a court may not dismiss based upon an exculpatory provision"); *Emerald Partners v. Berlin,* 787 A.2d 85, 96 (Del. 2001) (Delaware's exculpatory provision 8 *Del. C.* § 102(b)(7) ("does not permit shareholders to exculpate directors for violations of loyalty or good faith"); *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 788 n.52 (Del. Ch. 2004) ("conduct that involves knowing violations of law cannot be exculpated"); *Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 242 (3d Cir. 2005) (exculpatory clause is an affirmative defense that "generally will not form the basis for dismissal under Rule 12(b)(6)").  Moreover, exculpation is an affirmative defense that is improper to resolve at the pleading stage because of the fact-intensive nature of the inquiry. *Id.* (exculpatory statute is an affirmative defense not

suitable for consideration in a motion to dismiss); *Sanders v. Wang,* No. 16640, 1999 WL 1044880, at *11 (Del. Ch. Nov. 8, 1999) (same).

### B.     The Complaint States a Claim Against Addison

The Complaint alleges claims of breach of fiduciary duty and unjust enrichment against Addison. In his separate motion to dismiss the Complaint, Addison, SCANA's CFO since 2006, moves to dismiss the claims against him pursuant to Fed. R. Civ. P. 12(b)(6). Addison claims the Complaint "merely" consists of allegations regarding his compensation and signing of two SEC filings. Addison Mem. at 3. This argument is regularly advanced by corporate officers in derivative actions who improperly seek to force plaintiffs to ***prove*** their claims at the pleading stage – without the benefit of discovery – rather than properly ***allege*** those claims. Such arguments regularly fail.

In *In re Am. Int'l Grp., Inc.* ("*AIG*"), a similar argument by corporate officers was rejected. 965 A.2d 763, 777 (Del. Ch. 2009). There, as here, certain officers argued the complaint was "less detailed" or had only "sparse references" to their "role[s] in the alleged misconduct." *Id.* at 776. The Delaware Chancery Court rejected this argument, noting that the "problem for [the officers was] fundamental. At this stage, I must draw all reasonable inferences in favor of the plaintiffs. Each [officer] … was directly responsible for business units whose conduct was critical to the pervasive misconduct alleged in the Complaint. That misconduct was not isolated; it permeated [the corporation's] way of doing business." *Id.* at 777. Similarly, in *In re Countrywide Fin. Corp. Derivative Litig.*, the court sustained a claim for breach of fiduciary duty against officers even "[t]hough the Complaint le[ft] many details unpled," where the complaint alleged a failure to take corrective action despite "widespread deviations from the underwriting policies and standards being committed by employees at all levels." 554 F. Supp. 2d at 1082.

28

Moreover, signing an allegedly materially false and misleading SEC document is by itself a breach of fiduciary duty. *See In re INFOUSA, Inc. Shareholders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007) (""shareholders are entitled to honest communication from directors, given with complete candor and in good faith" and "[c]ommunications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders.  Such violations are sufficient to subject directors to a derivative claim.")

Addison signed the Company's February 26, 2016 Annual Report on Form 10-K which stated that "[w]hen the New Units [Nuclear Units 2 and 3 under construction at the V.C. Summer Station] are completed, our generating capacity and the percentage of total generating capacity represented by nuclear sources are expected to increase." ¶90.  The next year, Addison would also sign the Company's February 24, 2017 Annual Report on Form 10-K which stated, in relevant part, "[i]n addition, construction of significant new transmission infrastructure is necessary to support the New Units and is under way as an integral part of the project." ¶106.

These statements were false and misleading because the Bechtel Reports had outlined that Nuclear Units 2 and 3 were years behind their projected completions dates and that the V.C. Summer Station lacked the "project management integration needed for a successful project" – meaning the Nuclear Project would never be completed.  ¶6.

The Complaint also states a claim for unjust enrichment against Addison due to receipt of compensation and performance bonuses in connection with his role as CFO.  Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Ryan*, 918 A.2d at 361. "A defendant may be liable even when the defendant retaining the benefit is not a

wrongdoer and even though he may have received [it] honestly in the first instance." *Id.* at 361 (quotations omitted). If it is reasonably conceivable that an officer or director retained "something of value…at the expense of the corporation and shareholders," the claim should stand. *Id.*

An unjust enrichment claim under Delaware law requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015). Here, all the elements are met. Plaintiff alleges that Addison received approximately $2.5 million in total compensation in both 2014 and 2015. These sums, paid by the Company, lack justification because the Company's largest financial expenditure was doomed.[17]

## IV.   CONCLUSION

In the face of the colossal, Company-defining failure relating to the Nuclear Project, and the extensive allegations showing Defendants knew the very existence of the Nuclear Project was fundamentally threatened since November 2015, neither the SCANA Defendants, Marsh, Addison, nor Byrne should be allowed to plead ignorance. The well-pled allegations in the Complaint readily support a reasonable inference that the Individual Defendants knew that the Nuclear Project was in jeopardy and why, and yet continued to both conceal that information from the public and ratepayers, and dump vast amounts of Company funds into a hopeless project in an apparent attempt to save face. Any pre-suit demand on the Board would have been futile, the Motions should be denied in their entirety, and the Action should be allowed to proceed to discovery.[18]

---

[17]   For the same reasons, Plaintiffs sufficiently plead unjust enrichment claims against all Defendants.

[18]   Defendants' standing arguments relating to Wickstrom are of no moment. Courts have held that derivative plaintiffs have standing for claims relating to the time period they held the

Dated: March 9, 2018

**HOPKINS LAW FIRM, LLC**

*/s/ William E. Hopkins*

William E. Hopkins (Federal Bar No. 6075)

12019 Ocean Highway
P.O. Box 1885
Pawleys Island, SC 29585
Tel.: (843) 314-4202
bill@hopkinsfirm.com

***Co-Liaison Counsel for Plaintiffs***


**BLAND RICHTER, LLP**

Eric S. Bland (Federal Bar No. 5472)
1500 Calhoun Street
Post Office Box 72
Columbia, South Carolina 29202
Tel.: (843) 573-9900

***Co-Liaison Counsel for Plaintiffs***


**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Tel.: 610-225-2677

---

subject stock even when, as for Wickstrom, it is not the entire relevant period. *See, e.g.*, *Conrad v. Blank*, 940 A.2d 28, 42 (Del. Ch. Sept. 7, 2007) (upholding standing for shareholder plaintiff who bought in the middle of relevant period but requiring that plaintiff locate earlier purchasers to provide standing for claims relating to earlier periods).  In addition, this case concerns not one discrete transaction but an evolving and lengthy series of misconduct and misstatements. Wickstrom bought his stock *before* portions of the misconduct and before numerous alleged misstatements.  Thus, Wickstrom has standing to allege claims based on all misconduct and misstatements post-dating his SCANA stock purchases in January 2017.  Regardless, Witmer has continuously held SCANA stock since July 2015.  ¶34.  Accordingly, any alleged deficiency with respect to Wickstrom's standing has no "practical effect" because "there has been no challenge" to Witmer's standing.  *In re Galena Biopharma, Inc. Derivative Litig.*, 83 F. Supp. 3d 1047, 1077 (D. Or. 2015).

*Co-Lead Counsel for Plaintiffs*

**BERNSTEIN LIEBHARD LLP**
U. Seth Ottensoser
Joseph R. Seidman, Jr.
10 East 40th Street
New York, New York 10016
Tel.: (212) 779-1414

*Co-Lead Counsel for Plaintiffs*